## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JOE D'AMBROSIO, | : | Case No.  1:00 CV 2521 |
| | : | |
| Petitioner, | : | |
| | : | JUDGE KATHLEEN M. O'MALLEY |
| vs. | : | |
| | : | |
| MARGARET BAGLEY, Warden, | : | <u>MEMORANDUM & ORDER</u> |
| | : | |
| Respondent. | : | |

Joe D'Ambrosio petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  D'Ambrosio challenges the constitutional sufficiency of his conviction by a three-judge panel for aggravated murder, and also challenges the constitutionality of the imposition of a sentence of death.

For the reasons set forth below, D'Ambrosio's petition for a writ of habeas corpus is **GRANTED.**   Accordingly, the Court issues a writ of habeas corpus as follows.  The Respondent shall either: (1) set aside D'Ambrosio's conviction and sentence of death; or (2) conduct another trial.  This shall be done within 180 days from the effective date of this Order.  On this Court's own motion, execution of this Order and, hence, its effective date, is stayed pending appeal by the parties.

## I. PROCEDURAL HISTORY

On September 24, 1988, a jogger found the body of Estel Anthony Klann in Doan's Creek in Cleveland, Ohio.  Shortly thereafter, on October 6, 1988, petitioner D'Ambrosio was indicted on four counts: (1) aggravated murder with prior calculation and design, pursuant to Ohio Revised Code § 2903.01, with a felony murder specification; (2) aggravated felony murder, pursuant to Ohio Revised Code § 2903.01(B)(3); (3) kidnapping pursuant to Ohio Revised Code § 2905.01; and, (4) aggravated burglary, pursuant to Ohio Revised Code § 2911.11.

D'Ambrosio pleaded not guilty to the charges and proceeded to trial before a three-judge panel on February 6, 1989.  The trial court sealed the verdict on February 9, 1989, until the resolution of co-defendant, Thomas Michael Keenan's trial.  On February 21, 1989, the court pronounced D'Ambrosio guilty on all four counts.  The trial court then held a sentencing hearing, pursuant to Ohio Revised Code §§ 2929.022(A) and 2929.03.  On February 23, 1989, the court sentenced D'Ambrosio to death.  The court also sentenced D'Ambrosio to a term of ten to twenty-five years on count three and ten to twenty-five years on count four.  Counts three and four were to run consecutively.

D'Ambrosio appealed his convictions and sentence of death.  The Eighth District Court of Appeals affirmed, State v. D'Ambrosio, No. 57448, 1990 WL 125453 (Ohio Ct. App. Aug. 30, 1990).  The Ohio Supreme Court affirmed the convictions but remanded the case to the Court of Appeals for an independent review of the death sentence because several mitigation exhibits had been excluded from the appellate record.  After reviewing the augmented record, the Court of Appeals affirmed the sentence of death, State v. D'Ambrosio, No. 57448, 1993 WL 489764 (Ohio Ct. App. Nov. 24, 1993), as did the Ohio Supreme Court, State v. D'Ambrosio, 652 N.E.2d 710

2

(Ohio 1995).[1]  D'Ambrosio then filed a Petition for a Writ of Certiorari to the United States Supreme Court, which was denied.  D'Ambrosio v. Ohio, 517 U.S. 1172 (1996).

D'Ambrosio also petitioned for post-conviction relief in state court, pursuant to Ohio Revised Code § 2953.21.  The trial court dismissed D'Ambrosio's petition.  State v. D'Ambrosio, No. CR 232189 B, slip op. (Ohio Ct. Common Pleas Sept. 27, 1996).  The Court of Appeals affirmed the dismissal of D'Ambrosio's petition.  State v. D'Ambrosio, No. 75076, 2000 WL 283079 (Ohio Ct. App. Mar. 16, 2000).  D'Ambrosio then filed an appeal with the Ohio Supreme Court, which declined to exercise jurisdiction.  State v. D'Ambrosio, 731 N.E.2d 1140 (Ohio 2000).

D'Ambrosio filed an application to reopen his direct appeal in the Eighth District Court of Appeals pursuant to Ohio Rule of Appellate Procedure 26(B)(hereinafter "Murnahan application" or "application to reopen").[2]  He wished to exhaust a claim of ineffective assistance of appellate counsel so that he could use it as cause to excuse his procedurally defaulted claims.  That court denied the application.  State v. D'Ambrosio, No. 57448, 2001 WL 1399850 (Ohio Ct. App. Nov. 2, 2001).

---

[1]     Justice Wright wrote a dissenting opinion in which Justice Pfeifer joined.  Justice Wright reasoned that, because of D'Ambrosio's military background, his lack of a criminal record, and his limited involvement in the crime, he was a candidate for rehabilitation.  State v. D'Ambrosio, 652 N.E.2d at 716.  Thus, Justice Wright would have reversed the death sentence.  Id. at 717.

[2]     The Ohio legislature created this proceeding to permit a convicted criminal defendant to raise ineffective assistance of appellate counsel in the Ohio Courts of Appeal and to the Ohio Supreme Court. In State v. Murnahan, 584 N.E.2d 1204 (Ohio 1992), the Ohio Supreme Court determined that post-conviction proceedings are not the proper forum to raise an ineffective assistance of appellate counsel claim, as raising such a claim to the trial court would require that court to rule on counsel's effectiveness in the higher-level Court of Appeals. Consequently, the Ohio legislature created Ohio Rule of Appellate Procedure 26(B).

3

## II. FACTUAL HISTORY

In its consideration of D'Ambrosio's direct appeal, the Ohio Supreme Court set out the

factual history of this case, as revealed by the evidence adduced at D'Ambrosio's trial.  The facts

surrounding the underlying incident are as follows:

On Friday evening, September 23, 1988, at approximately 7:30 p.m., Anthony Klann ("victim") and Paul "Stoney" Lewis visited a Cleveland area bar called The Saloon. At that time, Lewis encountered Thomas "Mike" Keenan, a former employer of his, whereupon the two engaged in a conversation, left the bar in Keenan's truck, and went to another bar nearby called Coconut Joe's. Shortly thereafter, Klann, Edward Espinoza and defendant-appellant, Joe D'Ambrosio, arrived at Coconut Joe's.

Lewis testified that Espinoza took the victim into the men's restroom two or three times, and that he could hear Espinoza yelling at the victim while he (Lewis) was seated at the bar. However, during his own testimony, Espinoza denied that he argued with the victim at that time. Lewis stayed at Coconut Joe's until approximately 10:45 p.m. or 11:45 p.m.

Espinoza testified that at approximately 1:30 a.m., Saturday, September 24, he, Keenan and defendant also left the bar. Espinoza and defendant went to defendant's apartment; however, before they entered, Keenan pulled up in his truck and asked the two to help him find Lewis so he could get back drugs that he claimed Lewis had stolen from him. Defendant and Espinoza went into the defendant's apartment, whereupon Espinoza armed himself with a baseball bat and defendant picked up a knife. Espinoza assumed this knife was in addition to one that defendant usually carried. Defendant and Espinoza joined Keenan in his truck, and the three rode around the Coventry and Murray Hill area looking for Lewis.

Carolyn Rosel testified that at approximately 3:00 a.m., she and a friend, James Russell (a.k.a. "Foot" or "Lightfoot"), were awakened by banging on their door. They went to the door and let Keenan, Espinoza and defendant inside, whereupon Keenan asked where Lewis was. At that time, Keenan and Espinoza told Rosel and Russell that they wanted to kill Lewis because he had "ripped Michael [Keenan] off." After about fifteen to twenty minutes, the three left.

According to Espinoza's testimony they then resumed their search for Lewis in Keenan's truck. Soon the three saw the victim walking next to the road they were traveling on and hailed him. When the victim approached the truck, Keenan forced him into the backseat next to defendant. The victim was asked where Lewis was, but he said he didn't know. While the three interrogated the victim, Espinoza hit him on

4

the head with a baseball bat. The victim told them where Lewis lived, and Keenan drove to Lewis's apartment building and knocked on what he thought was Lewis's door.

Mimsel Dandec and her boyfriend, Adam Flanik, lived in the same apartment building as Lewis. At approximately 3:30 a.m. on the date in question, Dandec and Flanik were awakened by what they described as screaming, shouting and banging outside. Dandec testified that she heard someone yell, "I want my dope" or "my coke." Flanik went to investigate and found Keenan pounding on another apartment door in search of Lewis. After Flanik directed Keenan to Lewis's door, Keenan and Espinoza kicked it in while they repeatedly declared that they were going to kill Lewis. Lewis was not in his apartment at that time, so Keenan and Espinoza got back in the truck and drove off.

Meanwhile, defendant had stayed in the truck with the victim during the incident at Lewis's apartment building. Flanik testified that defendant had a large knife poised within inches of the victim's face. Flanik also testified that the victim "looked like he had been crying," and "like he had been roughed up a little bit."

Russell testified that Espinoza returned to his home and asked whether Lewis had been there. Espinoza then told Russell to "tell Stoney we got a contract out on him," and that he had the victim in the truck and that he was "dead meat." Rosel testified that Espinoza said that they had the victim, and were "going to do him in, and drop him off."

Thereafter, according to Espinoza's testimony, Keenan drove the group to Doan's Creek and pulled his truck off the road near the bank of the creek. Keenan got out of the truck, pulled the victim out and made him walk behind the truck. Keenan asked the victim repeatedly where Lewis was, but the victim stated he didn't know. Keenan told the victim to put his head back, whereupon Keenan took D'Ambrosio's large knife, cut the victim's throat and pushed him into the creek.

When the victim got up and began to run, Keenan said, "finish him off." The defendant grabbed the knife from Keenan and pursued the victim. Within a minute or two, Espinoza testified, the victim screamed, "please don't kill me," but defendant caught him and killed him.

Still, according to Espinoza's testimony, the trio then went to defendant's apartment, where defendant changed clothes, and proceeded to Keenan's room at the Turfside Motel. Espinoza testified that at that time Keenan "made us [sic] some story that we were supposed to keep to. * * * [O]ne was that we'd dropped off [the victim] earlier that night after we were done partying, and he went on his way. * * * Then the other story was that we never ran into [the victim]."

5

State v. D'Ambrosio, 616 N.E.2d 909, 911-12 (Ohio 1993).

In sum, the theory of the state's case was that the murder occurred on the night, and during the early morning hours of Friday, September 23 and Saturday, September 24, 1988. Through its witnesses, the state posited that the events leading up to Klann's murder began at a bar called Coconut Joe's, where Espinoza, Keenan and D'Ambrosio went to drink and ran into Klann, with whom Espinoza had an altercation, and Lewis, who stole some cocaine from Keenan. Thereafter, the state theorized that Espinoza, Keenan and D'Ambrosio went in search of Lewis to retrieve Keenan's drugs, but could not find him. Instead, the three allegedly came upon Klann, who they decided to kill because he would not disclose Lewis's whereabouts. Thus, the state painted the picture of a series of continuous events, beginning at Coconut Joe's and ending with the murder at Doan's Creek, with D'Ambrosio being in the constant presence of Keenan and Espinoza throughout.

Critically, the only witness to all of these events, including the actual murder, was Espinoza, who received substantial benefits in return for his testimony. Specifically, Espinoza not only escaped a death penalty charge for his own involvement in the murder, but received a reduced period of incarceration in return for his testimony against Keenan and D'Ambrosio.

The state also proffered the testimony of Dr. Elizabeth K. Balraj, the Cuyahoga County Coroner, in support of its theory that D'Ambrosio was involved in the murder following this search for Lewis. She testified that she found three stab wounds on the victim's chest, and that his windpipe had been perforated in two places because his throat had been cut. Additionally, she found some defensive wounds on the victim. The Coroner stated that all the knife wounds could have been caused by weapons the state obtained from D'Ambrosio's apartment, though she admitted it was also possible that another knife could have been involved in the murder. Balraj testified, moreover, that

6

the evidence was "consistent" with the conclusion that the victim died the day before the autopsy, though that it was "possible" that the victim died forty-eight hours before the autopsy which occurred on Sunday, September 25, 1988.

Many additional facts have been adduced during the course of this proceeding, both through the evidentiary hearing and through various expansions of the record.  Although not summarized here, those facts will be described below to the extent relevant to the Court's analysis.

## III. FEDERAL HABEAS PROCEEDING

On October 3, 2000, D'Ambrosio filed a notice of intent to file a petition for a writ of habeas corpus, a motion for appointment of counsel, and a motion to proceed in forma pauperis.  The Court granted the motions and appointed attorneys Henry DeBaggis and Gary H. Levine to represent D'Ambrosio.  D'Ambrosio filed a motion to stay the execution of death sentence on March 1, 2001, which the Court granted shortly thereafter.

D'Ambrosio filed his petition on March 30, 2001.  The Respondent filed the return of writ on May 31, 2001.  After requesting and receiving one extension of time, D'Ambrosio filed a traverse on August 27, 2001, to which the Respondent filed a sur-reply on September 11, 2001.

Also on September 11, 2001, D'Ambrosio filed a motion for an evidentiary hearing and motion for leave to conduct discovery.  He filed a motion to expand the record on December 28, 2001, a motion to amend the petition on January 18, 2002, and a supplemental motion for leave to conduct discovery on March 25, 2002.  The Court granted the motion to expand the record.  Finding that D'Ambrosio provided it with insufficient detail regarding his need for an evidentiary hearing, the Court denied that motion but permitted D'Ambrosio to re-file the motion within twenty-one days.  The Court granted in part and denied in part D'Ambrosio's request for discovery.

7

The Respondent filed a motion to set forth a briefing schedule on the impact of the Eighth District Court of Appeals' decision to deny D'Ambrosio's application to reopen direct appeal. The Court granted the motion and both parties filed briefs on this issue.

On April 16, 2002, DeBaggis and Levine filed a motion to withdraw as counsel. The Court held a hearing on this motion on April 30, 2002. The Court granted the motion to withdraw as counsel, appointing J. Joseph Bodine from the Office of the Ohio Public Defender as lead counsel and Jeffrey S. Sutton, of Jones Day, as co-counsel to represent D'Ambrosio.[3] On June 25, 2002, the Court granted prior counsel's motions to extend time in which to file a supplemental motion for an evidentiary hearing and denied without prejudice all pending motions submitted by prior counsel. The Court ordered new counsel to file any motions they deemed appropriate by September 16, 2002.

On September 19, 2002, D'Ambrosio filed a motion to amend the petition, a motion to permit counsel to take possession of evidence to conduct forensic testing, and a motion to conduct additional discovery. The Respondent filed a motion to expand the record on October 25, 2002. The Court granted D'Ambrosio's motion to amend the petition and the Respondent's motion to expand the record. The Court also granted D'Ambrosio's motion to conduct forensic testing but, by agreement of the parties, ordered that the Court would cause the evidence to be delivered for forensic testing. On December 2, 2002, the Court granted in part and denied in part D'Ambrosio's motion for discovery. The Respondent filed the return of writ for the amended claim, claim fifteen, on December 18, 2002.

---

[3]  Jones Day agreed to this representation on a purely pro bono basis, waiving any right to seek fees under the Criminal Justice Act, 18 U.S.C. § 3006A.

8

After noting that a conflict had arisen between D'Ambrosio and the Office of the Ohio Public Defender, the Respondent filed a motion for order to determine the status of the Ohio Public Defender on April 4, 2003.  D'Ambrosio filed a motion for an evidentiary hearing and a motion for summary judgment on April 28, 2003.  He filed a motion to amend the first, eleventh, and fifteenth grounds for relief raised in the petition shortly thereafter.  The Court held a telephone conference on the pending motions on May 20, 2003.  The Court thereafter granted in part and denied in part D'Ambrosio's motion for discovery, granted D'Ambrosio's motion to amend the first, eleventh, and fifteenth grounds raised in the petition, and permitted the Ohio Public Defender to remain as counsel for D'Ambrosio subject to D'Ambrosio's filing a waiver of any right to assert a conflict with the Court.  On June 19, 2003, the Respondent submitted an amended return of writ to the amended petition.  Thereafter, the parties conducted discovery.

On January 8, 2004, D'Ambrosio filed a motion to substitute Michael J. Benza as his counsel in place of attorney Bodine.  The Office of the Ohio Public Defender subsequently filed a motion to remove Bodine as counsel.  The Court ordered that all counsel, with the exception of Jones Day counsel,[4] refrain from contact with D'Ambrosio.  On January 15, 2004, the Court denied both motions regarding who would continue to represent D'Ambrosio.  Instead, the Court appointed Jones Day counsel to serve as lead counsel and Jeffry Kelleher to serve as co-counsel for D'Ambrosio.

On March 4, 2004, the Court denied D'Ambrosio's motion for summary judgment without prejudice and without consideration on the merits and granted his motion for an evidentiary hearing

---

[4]     Although Jeffrey Sutton was appointed to the Sixth Circuit Court of Appeals during this habeas proceeding, thus rendering him unable to continue to serve as D'Ambrosio's habeas counsel, attorneys from Jones Day remained as counsel after Sutton's departure, continuing to do so on a pro bono basis.

9

regarding his first, eleventh, and fifteenth grounds for relief.  The Court also granted a hearing

regarding D'Ambrosio's development (or lack thereof), of his claims in state court.[5]  D'Ambrosio

filed a final motion for discovery on June 17, 2004, which the Court granted on July 12, 2004.

After granting one extension of time, the Court held an evidentiary hearing on this matter on

July 19, 20, and 21, 2004.   The hearing focused on only a few critical points, described below.

D'Ambrosio's counsel first attempted to undercut Espinoza's version of the events leading

up to the murder.  Melvin Goldstein and Ernest Hayes, former Cleveland Police Detectives, took the

stand and stated that, based on the fact that no grass or weeds surrounding the area of Doan's Creek

where Klann's body was found were disheveled or bloodied, they surmised that Klann had been

---

[5]      Under the Anti-Terrorism and Effective Death Penalty Act (hereinafter
"AEDPA"):

> (2) If the applicant has failed to develop the factual basis of a claim in
> State court proceedings, the court *shall not* hold an evidentiary hearing on
> the claim *unless* the applicant shows that —
>            (A) the claim relies on —
>                        (i) a new rule of constitutional law, made retroactive
>                        to cases on collateral review by the Supreme Court,
>                        that was previously unavailable;
>                        or
>                        (ii) a factual predicate that could not have been
>                        previously discovered through the exercise of due
>                        diligence; and
>            (B) the facts underlying the claim would be sufficient to establish
>            by clear and convincing evidence that but for the constitutional
>            error, no reasonable fact-finder would have found the applicant
>            guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(emphasis added).  For purposes of efficiency, the Court
notified the parties that it would hear evidence on whether D'Ambrosio diligently
pursued his claims in state court concurrently with hearing evidence in support of
D'Ambrosio's claims.  The Court addresses its conclusions under § 2254(e)(2) in
connection with its substantive consideration of D'Ambrosio's claims, below.

10

killed elsewhere and that his body was dumped in the Creek.  Both testified that, although they were the initial detectives to investigate the case when Klann's body was discovered, they had no subsequent participation in the investigation.  After their initial investigation, Cleveland Police Detective Leo Allen assumed all responsibilities for the case.

D'Ambrosio's counsel next attempted to develop his <u>Brady</u> claim through the testimony of Christopher Longenecker.  Longenecker testified that Paul "Stoney" Lewis raped him shortly before Klann's murder.  He also stated that, shortly after the rape occurred, Klann entered Lewis's apartment, permitting Longenecker a means of escape.  Longenecker testified that he believed the impetus for Klann's visit was because Klann heard noises and was attempting to aid him.  Although Longenecker did not tell Klann that he had just been raped, he testified that Klann knew he was distraught after leaving Lewis's apartment, that he had told Klann that "something had just happened," and that he suspected that Klann understood what had happened.  Longenecker was subpoenaed to testify against Lewis for the rape but, being legally blind, Longenecker misread the subpoena and appeared on a later date.  Consequently, the rape indictment against Lewis was dismissed.

Upon hearing of Klann's murder, Longenecker called either the Victims of Violent Crimes or the Sex Crimes Unit of the Cleveland Police Department to notify them that he believed that Klann's murder was connected to the rape case.  He thought it strange that Lewis had been released because he had misread the court date and that a person living at the same address and likely aware of the rape was murdered a short time later.  To the best of Longenecker's recollection, no agent of either department returned his call.

11

Attorney Martin James Keenan, the brother of Thomas Michael Keenan, also testified regarding the connection between Longenecker's rape and Klann's murder.  During Keenan's representation of his brother, he stated that, although he questioned Carmen Marino, the prosecutor assigned to handle both D'Ambrosio and Keenan's cases, regarding a possible connection between Klann's murder and the Longenecker rape, Marino belittled him, insisting that the two cases were unrelated.  Keenan testified that Marino stated the rape case was a weak one because the witnesses did not appear.

Keenan testified that he and his co-counsel had become aware of and investigated the Lewis rape charge while representing his brother.[6]  They learned through court documents that Lewis had an extensive drug record.  Keenan stated that, at some point during a pre-trial hearing, he learned that Lewis had twice been indicted for rape, that the first case was dismissed without prejudice, and the second was no-billed by the grand jury.

D'Ambrosio's counsel also attempted to develop his Brady and spoliation of evidence claims by calling Timothy Horval and Patricia Sanney of the Cleveland Police Department who both testified that, although they attempted to locate a cassette tape referred to in a police report which allegedly contained a statement by a man named Angelo Crimi implicating others in Klann's murder, they were unable to locate any such tape at the Cleveland Police Department.  Sanney specifically recalled that the prosecutor had signed out the physical evidence of the case in 1988 and that it had not been returned to the Cleveland Police Department since that time.

---

[6]     D'Ambrosio's counsel were not aware of the rape during D'Ambrosio's trial, which occurred earlier than that of Keenan.

12

Gary Gabriel, a member of D'Ambrosio's trial team, testified that, to the best of his recollection and information, the prosecution never made defense counsel aware that an audio tape of Angelo Crimi existed or that Klann was a potential witness in the Lewis rape case. He also stated that he was present when prosecutors led members of D'Ambrosio's defense team inside the prosecutor's office to view police reports.  He recalled that the defense was not permitted to physically view the police reports, but that a prosecutor read them to defense counsel.  Additionally, Gabriel testified regarding his attempt to procure defense witnesses.  In particular, Gabriel recalled speaking with D'Ambrosio about a female friend that had promised to help D'Ambrosio pack on Thursday evening in anticipation of his eviction from his apartment.  D'Ambrosio, however, could not remember her name or where she lived.

Gabriel stated that he did not recall any of the other alleged Brady evidence ever being presented to the defense team.  Specifically, he did not recall the prosecution providing the defense with information regarding: (1) Hayes and Goldstein's conclusion that Klann was murdered elsewhere and dumped at Doan's Creek; (2) the Lewis rape case; or (3) the fact that Russell had requested protection during the trial because he believed he was being threatened by D'Ambrosio's brothers.

Steven Gaines, who was the manager of Coconut Joe's in September of 1988, also testified regarding the events that occurred at that location.  Gaines testified that, to the best of his recollection, Coconut Joe's only held Tequila Night on Thursday evenings.  Gaines stated that, on Thursday, September 22, 1988, he observed an altercation between Klann and Espinoza.  Initially, he stated,  he merely warned the two to cease fighting.  Thereafter, however, the altercation resumed, involving a few additional individuals.  Gaines then stated that a man whom he later learned was

13

Espinoza threw a beer bottle at him.  Consequently, Gaines called the Cleveland Heights Police.  He stated that, based on his recollection, D'Ambrosio did not instigate the altercation and, in fact, attempted to quell it.

Finally, counsel called Ralph DeFranco, D'Ambrosio's trial counsel.  DeFranco testified that, although he made a discovery request to Marino, he did not receive any of the alleged exculpatory evidence prior to or during trial.  As with Gabriel, he neither saw copies of any police reports, nor was made aware of the Lewis rape case.  Furthermore, DeFranco testified that he never learned that the police determined that Lewis was the individual who had made an anonymous call regarding Klann after the murder, identifying Klann as the victim and disclosing details about the body that had not been made publically available, or that an attorney named David Rossi had called the police asserting that he was representing Lewis in connection with the murder investigation.  DeFranco testified that he was never shown a report with a cassette tape from Angelo Crimi implicating others in Klann's murder.  He stated that he would have recalled if he had possessed or heard of such a tape because he was acquainted with Angelo Crimi as they were from the same neighborhood.  DeFranco testified that he was not made aware that the disturbance at Coconut Joe's, pursuant to police dispatch logs, occurred at 1:30 a.m. on Friday morning, and not on Friday evening/Saturday morning as the state's witnesses claimed.  He also received no information that Linda DeBlasis (now Hudak) stated to police that she had seen Klann alive on Friday evening, twenty-four hours after the events at Coconut Joe's, or that one police statement indicated that a witness in Lewis's apartment building heard someone say "let's dump the body" on Friday evening.  DeFranco testified that all of this information would have helped shape a different defense strategy.  He asserted, moreover, that, had

14

he known about the impressions of the initial investigating officers at the crime scene, he would have asked the trial court to provide him with a crime scene expert.

DeFranco stated that he and Marino had a pre-trial conference in which Marino represented to him that the file before them was complete.  Additionally, pursuant to Marino's policy, DeFranco was not permitted to copy any police reports.  Instead, he was required to take notes on things of import to the case.  DeFranco concluded that, had he been in possession of the alleged Brady evidence prior to trial, he could have impeached several of the prosecution's witnesses, especially Espinoza.  Particularly, DeFranco asserted that he would have attacked Espinoza's claim, and the state's theory that Espinoza, Keenan, and D'Ambrosio left Coconut Joe's in search of Lewis and it was that search on that day that ultimately led to Klann's murder.  DeFranco pointed out, moreover, that all evidence indicating that Klann was murdered somewhere other than Doan's Creek would have had substantial impeachment value when cross-examining Espinoza, the state's only eyewitness to the murder.

Counsel also attempted to demonstrate D'Ambrosio's actual innocence through the testimony of Nemo Sicking, Michael Feller, Matthew Alves, and Karen Hauserman Hay.  First, Sicking testified regarding Klann and Keenan's relationship.  He stated that Klann was selling cocaine for Keenan.  Feller testified that, although Klann previously had landscaped for Keenan, at the time of Klann's murder, Klann and Keenan were often arguing.  Feller remembered that Keenan had owed Klann money, that Keenan had wanted to pay Klann with cocaine, but that Klann wanted cash to pay rent on his apartment.

15

Feller stated that on Thursday evening, September 22, 1988, around 11:00 p.m., he was with Keenan, Espinoza, and D'Ambrosio at D'Ambrosio's apartment drinking.  Feller did not recall D'Ambrosio leaving his apartment for the remainder of that evening.

All four testified that, during an eviction party D'Ambrosio held on Friday-Saturday, September 23-24, 1988, Tony Klann appeared in D'Ambrosio's apartment to alert the partygoers that some individuals were attempting to steal something from one of Keenan's landscaping trucks, parked in the lot behind D'Ambrosio's apartment.  Sicking testified that Klann chased the would-be thieves on foot until they were out of view.  He also asserted that D'Ambrosio did not leave the apartment for the remainder of the evening, passing out in his bed a few hours after the chase occurred.  Hay added that she remembered Klann warning the other partygoers that two individuals were tampering with Keenan's truck.  She also stated that, because she was approximately four months pregnant at the time, she was neither drinking nor using drugs and, thus, believed she recalled the events clearly.  She testified, moreover, that for the same reason, she was up during the night to use the bathroom.  Although she attempted to sleep in D'Ambrosio's waterbed that evening, she testified that she was unable to do so because D'Ambrosio was occupying it.

After the weekend of September 24-25, 1988, Sicking and Feller testified that they left the Cleveland area for employment with Kissel Brothers Carnivals.  Alves and Hay returned to live at the dormitories of Electronic Technical Institute, a vocational school they both attended.  Alves stated that he learned of Klann's death through a friend on the day of Klann's wake.  Thereafter, Alves testified that he learned of Keenan, D'Ambrosio, and Espinoza's arrest for Klann's murder.  Both Alves and Hay testified that, after learning of D'Ambrosio's arrest, they visited him in prison.  At

16

that time, D'Ambrosio denied any involvement in Klann's murder.  D'Ambrosio did not ask them to testify for him at his trial.

## IV. D'AMBROSIO'S GROUNDS FOR RELIEF

In his amended petition, D'Ambrosio asserts fifteen (15) grounds for relief:

1.  Petitioner was deprived of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, since he is factually innocent of the offenses of which he was convicted and for which he was sentenced to death.

2.  Petitioner was deprived of his right to a jury trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

3.  Petitioner was deprived of his right to the effective assistance of counsel as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to request that the presiding judge recuse himself from the three judge panel.

4.  Petitioner was deprived of his right to the effective assistance of counsel as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when trial counsel waived Petitioner's right to a pretrial hearing on Petitioner's motion to suppress.

5.  Petitioner was deprived of his right to the effective assistance of counsel as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution by counsel's failure to file a motion to suppress evidence which included any relevant facts supporting the motion.

6.  Petitioner was deprived of his right to the effective assistance of counsel as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when counsel waived Petitioner's right to confrontation for convenience.

7.  Petitioner was deprived of his right to the effective assistance of counsel as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when defense counsel failed to request a view of the crime scene and other relevant areas which related to the testimony.

8.  Petitioner was deprived of his right to the effective assistance of counsel as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when defense counsel failed to request an independent pathologist or criminalist to assist in his defense.

17

9.     Petitioner was deprived of his right to the effective assistance of counsel as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when trial counsel failed to adequately investigate prior to trial.

10.    Petitioner was deprived of his right to the effective assistance of counsel as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when trial counsel failed to file a notice of alibi prior to trial.

11.    The State of Ohio failed to preserve physical evidence that was material to issues of guilt and punishment.  The state's failure to preserve and disclose this evidence to Petitioner D'Ambrosio deprived him of a fair trial and due process of law in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

12.    The evidence was insufficient as a matter of law to sustain a conviction therefore Petitioner's conviction and death sentence were obtained in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

13.    Petitioner was deprived of his right to the effective assistance of counsel on his direct appeal as of right in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

14.    Petitioner was deprived of his right to the effective assistance of counsel during the mitigation phase of his case in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

15.    Joe D'Ambrosio was denied his right to a fair trial and due process of law because the State of Ohio failed to honor a specific pre-trial request for exculpatory and impeachment evidence in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

## V. THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT ("AEDPA")

D'Ambrosio filed his petition on March 30, 2001, well after the AEDPA's effective date. Consequently, the Court will utilize this standard when analyzing D'Ambrosio's claims.  The AEDPA changed federal habeas corpus law in several important respects.  Among the most significant of these changes is the standard of review to be applied to state court legal and factual determinations.  Under the Act:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any

18

claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

>   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The United States Supreme Court, in (Terry) Williams v. Taylor, 529 U.S. 362 (2000), set forth the standard of review a federal habeas court must apply under § 2254(d).  The Supreme Court provided definitions for the phrases "contrary to," "unreasonable application of," and "clearly established federal law" in § 2254(d)(1).  Id.

The Supreme Court first pointed out that the phrases "contrary to" and "unreasonable application of" must be given independent meanings.  Id. at 404–05.  A state court decision can be "contrary to" the Supreme Court's clearly established precedent in two ways: (1) "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law," and (2) "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" that decision.  Id.

The Williams Court also stated that the word "contrary" "is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'"  Id.  Thus, § 2254 "suggests that the state court's decision must be substantially different from the relevant precedent of [the Supreme Court]."  Id.  The Supreme Court suggested that this phrase would be applicable if the state court applies a rule that contradicts the governing law set forth in prior Supreme Court cases, such as if a state court were to hold that, in order to establish an ineffective assistance of

counsel claim, a defendant must prove it by a preponderance of the evidence, instead of only a "reasonable probability," that the results of the trial would have been different.  Id. at 405–06.  A state court need not, however, cite to United States Supreme Court precedent to avoid the pitfalls of the § 2254, so long as it does not contradict them.  Early v. Packer, 537 U.S. 3, 8 (2003).

The Supreme Court held that an "unreasonable application" occurs when "the state identifies the correct legal principle from this Court's decision but unreasonably applies that principle to the facts of the prisoner's case."[7]  Williams, 529 U.S. at 410; 413 ("For purposes of today's opinion, the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law.")(emphasis in original).  See also Cone v. Bell, 535 U.S. 685, 698-99 (2002)(holding that, for petitioner to succeed on a habeas claim, "he must do more than show that he would have satisfied [the applicable Supreme Court] test if his claim were being analyzed in the first instance, because under 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state court applied [Supreme Court precedent] incorrectly . . . . Rather, he must show that the [state court] applied [Supreme Court precedent] to the facts of his case in an objectively unreasonable manner.").  As the Supreme Court recently reiterated, "[t]he federal habeas

---

[7]     The Supreme Court also discussed a second aspect of the Fourth Circuit's test to determine whether the state court "unreasonably applied" applicable precedent.  See Williams 529 U.S. at 406.  The second part of the Fourth Circuit's test provides that a state court "unreasonably applies" Supreme Court precedent "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  Id.  The Supreme Court had reservations about this prong of the test, because it was imprecise and could be difficult to apply.  The Court stated that, "although that holding may perhaps be correct, that classification does have some problems of precision."  Id. at 408.  Finding that the case in front of it did not require the Court to reach this issue, the Court in Williams decided to leave for another day how such "extension of legal principle" cases should be treated.

20

scheme . . . authorizes federal-court intervention only when a state-court decision is objectively unreasonable . . . whether or not [the federal court] would reach the same conclusion." <u>Woodard v. Visciotti</u>, 537 U.S. 19, 27 (2003).

The <u>Williams</u> Court also pointed out that, to determine the reasonableness of the state court's decision, a court must employ an objective test, not a subjective one.  The Supreme Court, thus, rejected the Fourth Circuit's holding that a state court's application of federal law was only unreasonable "if the state court has applied federal law in a manner that reasonable jurists would all agree is unreasonable." <u>Williams</u>, 529 U.S. at 376.   The Court reasoned that this test was too subjective because a court might "rest[] its determination . . . on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case." <u>Id.</u> at 410.

The <u>Williams</u> Court also provided further guidance for the phrase "clearly established by holdings of the Supreme Court." <u>Id.</u> at 412.  The Court stated that this statutory phrase "refers to the holdings as opposed to its dicta, of this Court's decisions as of the time of the relevant state court decision." <u>Id.</u>  The Sixth Circuit has noted that "this provision marks 'significant change' and prevents the district court from looking to lower federal court decisions in determining whether the state court decision is contrary to, or an unreasonable application of clearly established federal law. . . ." <u>Harris v. Stovall</u>, 212 F.3d 940, 944 (6th Cir. 2000) (<i>quoting</i> <u>Herbert v. Billy</u>, 160 F.3d 1131, 1135 (6th Cir. 1998)).

The <u>Williams</u> Court referred to the jurisprudence it has developed under <u>Teague v. Lane</u>, 489 U.S. 288 (1989), to help guide federal courts as to what qualifies as "clearly established Federal law." <u>Williams</u>, 529 U.S. at 412.  The Court stated, "[w]hatever would qualify as an 'old rule' under

Teague will constitute 'clearly established Federal law, as determined by [this] Court.'" Id. Under

Teague, "a case announces a new rule when it breaks new ground or imposes a new obligation on

the States or the Federal Government." Teague v. Lane, 489 U.S. 288, 201 (1989). In other words,

for Teague to apply, a habeas court must "ascertain the 'legal landscape as it then existed,'and ask

whether the Constitution, as interpreted by the precedent then existing, compels the rule. That is, the

court must decide whether the rule is actually 'new.'" Beard v. Banks, 542 U.S. 406, 124 S.Ct. 2504,

2509 (2004)(quoting Graham v. Collins, 506 U.S. 461, 468 (1993))(further citations omitted).

In his traverse, D'Ambrosio takes issue with the Respondent's assertion that this Court should

apply the AEDPA in its entirety, stating that the standards contained in Chapter 154 are inapplicable

to this proceeding. As this Court previously has determined, the statutorily required representation

of indigent petitioners in state post-conviction proceedings, 28 U.S.C. § 2261, prevents Ohio from

"opting-in" to the expedited procedures of Chapter 154. Thus, the Court will refrain from utilizing

any standards set forth under those provisions in this Opinion.

## VI. PROCEDURAL DEFAULT

Respondent argues that D'Ambrosio is precluded from pursuing many of his stated grounds

for relief because they are procedurally defaulted.[8] The Court will address the question of procedural

---

[8]       Respondent does not contend any of D'Ambrosio's claims are unexhausted.
        Although the state's failure to raise exhaustion does not invariably waive the
        defense, Granberry v. Greer, 481 U.S. 129, 133–34 (1987), and it is petitioner's
        burden to prove exhaustion, Rust v. Zent, 17 F.3d 155, 160 (1994), the Court does
        not engage in a sua sponte analysis of exhaustion where the Respondent has failed
        to raise it.

default with respect to those individual grounds the Respondent attacks on that basis.[9]  As an initial

matter, however, the Court here sets out the applicable law and addresses

D'Ambrosio's more general arguments regarding the application of procedural default.

## A. Legal Standards

Normally, a federal court may not consider "contentions of federal law which are not resolved

on the merits in the state proceeding due to petitioner's failure to raise them as required by state

procedure." Wainwright v. Sykes, 433 U.S. 72, 87 (1977).  If a

> state prisoner has defaulted his federal claims in state court pursuant to an independent
> and adequate state procedural rule, federal habeas review of the claims is barred unless
> the prisoner can demonstrate cause for the default and actual prejudice as a result of
> the alleged violation of federal law, or demonstrate that the failure to consider the
> claims will result in a fundamental miscarriage of justice.

Coleman v. Thompson, 501 U.S. 722, 749 (1991).

In Maupin v. Smith, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit Court of Appeals set out

the analytical framework for determining claims of procedural default.  "When a state argues that a

habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal

court must go through a complicated [four-prong] analysis." Id. at 138.

---

[9]  The Court is not required to engage in a sua sponte analysis of procedural default
where a respondent has declined to raise the issue.  "[P]rocedural default is
normally a defense that the state is obligated to raise and preserve if it is not to
lose the right to assert the defense thereafter." Trest v. Cain, 522 U.S. 87, 89
(1997)(internal quotation marks and citations omitted).  Thus, a habeas court may
forego a procedural default analysis and address the merits of a claim when the
respondent fails to raise this defense. See, e.g., Jamison v. Collins, 100 F. Supp.
2d 521, 597 (S.D. Ohio 1998)(addressing merits of claim when respondent failed
to raise procedural default defense in return of writ or supplement to return of
writ).  The Court does, however, have discretion to apply this procedural bar sua
sponte in some circumstances.  Lorraine v. Coyle, 291 F.3d 416, 426 (6th Cir.
2002); Elzy v. United States, 205 F.3d 882, 886 (6th Cir. 2000).

First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . . Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. [And fourth, if] the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate . . . that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

 Id. (citations omitted).

### B. D'Ambrosio's Challenges to the Application of Procedural Default

D'Ambrosio attacks the Respondent's procedural bar arguments in several ways:  First, D'Ambrosio argues that a federal habeas court need not follow a state court decision unless it serves a legitimate state interest.  Second, D'Ambrosio claims that only issues contained within the trial record may be raised on direct appeal.  Thus, he contends, this Court should not honor any post-conviction court's procedural default determinations for claims that are dependant on evidence de hors or outside of the record.  D'Ambrosio argues that, even where a criminal defendant has failed to comply with procedural rules, under Ohio law a court may consider a claim despite this failure.  D'Ambrosio also asserts that ineffective assistance of trial and appellate counsel should excuse his procedurally defaulted claims.  Finally, he claims that his actual innocence of the murder of Klann should excuse any procedural default pursuant to the miscarriage of justice exception to the procedural default rule.[10]

---

[10]     Because D'Ambrosio presents a similar actual innocence argument in his first ground for relief, the Court will address the merits of that argument when it addresses that ground.

24

## 1. Procedural Default Serves No Legitimate State Interest

In <u>Lee v. Kemna</u>, 534 U.S. 362 (2002), the United States Supreme Court held that, "there are . . . exceptional cases in which exorbitant application of a generally sound [state court] rule renders the state ground inadequate to stop consideration of a federal question." <u>Id.</u> at 376 (*citing* <u>Davis v. Wechsler</u>, 263 U.S. 22, 24 (1923)). There, the Court held that the petitioner's violation of a Missouri state rule requiring that continuance motions be written and accompanied by an affidavit would not bar federal habeas review. Noting that the Missouri procedural rule was both not the basis for the trial court denying the petitioner's motion and that the petitioner, in effect, had substantially complied with the rule's purpose, the Court held that petitioner's failure to comply with the letter of the rule would not bar a merit review in federal habeas court.  <u>Id.</u> at 385; <u>see also</u> <u>Ohio v. Osbourne</u>, 495 U.S. 103, 110 (1990)("[A]lthough we do not doubt the general applicability of the Ohio Rule of Criminal Procedure requiring contemporaneous objection to jury charges, we nevertheless conclude that, in this atypical instance, the Rule would serve no perceivable interest.")(internal quotation marks and citations omitted).

This case presents no exceptional circumstances to overcome any applicable procedural bars. The <u>Kemna</u> Court noted that, unlike here, the state court did not invoke the state procedural rule in denying petitioner's motion for a continuance.  Because a "State remains free to impose proper procedural bars to restrict repeated returns to state court for post-conviction proceedings," <u>Slack v. McDaniel</u>, 529 U.S. 473, 489 (2000), this argument must fail.

## 2. The Perry Doctrine and Evidence Outside the Record

D'Ambrosio asserts that, because only issues contained in the trial record may be raised on direct appeal, this Court may address on the merits claims he asserts are based on evidence <u>de hors</u>

25

the record during post-conviction proceedings.  In State v. Perry, 226 N.E.2d 104 (Ohio 1967), the

Ohio Supreme Court held that any claim that was raised or could have been raised on direct appeal

is barred from review on post conviction under the doctrine of res judicata.  Thus, D'Ambrosio asserts

that this Court should excuse any procedural default for claims barred by the Perry doctrine if they

are based on evidence de hors the record.  The Court declines to express a general conclusion

regarding this issue and will address this argument as it is raised in regards to D'Ambrosio's

individual grounds for relief.

### 3. Contemporaneous objection and plain error analysis

D'Ambrosio next asserts that any claim that the Respondent asserts is procedurally defaulted

because of Ohio's contemporaneous objection rule and concomitant plain error analysis should be

addressed on the merits because those rules are not adequate and independent state grounds to bar

such a review of his claims.  Ohio courts have determined that a failure to contemporaneously object

at trial to an alleged error constitutes procedural default.  State v. Williams, 364 N.E.2d 1364 (Ohio

1977).   If a defendant fails to object to a trial error that would affect a substantial right, then the

appellate courts will conduct a plain error analysis of that claim.  State v. Slagle, 605 N.E.2d 916, 925

(Ohio 1992).[11]  D'Ambrosio asserts, without explaining, that this rule should not apply to bench trials

and claims that, pursuant to Ohio law, a court may consider errors despite a failure to comply with

the contemporaneous objection rule.  As the Court stated above, the only consideration that Ohio

---

[11]      Additionally, Ohio Rule of Criminal Procedure 52(B) states:

> **(B) Plain error**
> Plain error or defects affecting substantial rights
> may be noticed although they were not brought to
> the attention of the court.

courts will give a claim raised despite non-compliance with Ohio Rule of Criminal Procedure 52(B) is plain error analysis.  In <u>Scott v. Mitchell</u>, 209 F.3d 854 (6th Cir. 2000), the Sixth Circuit found that Ohio's contemporaneous objection rule was an independent state ground barring federal habeas review.  <u>Id.</u> at 867.  Moreover, the <u>Scott</u> Court noted that an alternative holding in which the state court performs a plain error analysis does not constitute a waiver of the state procedural bar.  <u>Id.</u> at 867–68.  Finally, in <u>Seymour v. Walker</u>, 224 F.3d 542, 557 (6th Cir. 2000), the Court explicitly held that, "[c]ontrolling precedent in our circuit indicates that plain error review does not constitute a waiver of state procedural default rules."  Thus, the Court finds that any claim to which the Ohio Supreme Court applied a plain error analysis is procedurally defaulted.  To be entitled to a merit review of that claim, D'Ambrosio must demonstrate cause and prejudice or a miscarriage of justice to excuse the default.

### 4. Ineffective Assistance of Counsel as Cause and Prejudice

Finally, D'Ambrosio argues that, to the extent this Court finds the above assertions unpersuasive and his grounds for relief barred by procedural default, he can establish cause and prejudice to excuse such default.  First, D'Ambrosio asserts that one "cause" for procedurally defaulting these claims is ineffective assistance of trial and appellate counsel.  Courts have held that ineffective assistance of counsel, if proved, is sufficient to satisfy the cause prong of procedural default.  <u>See</u>, <u>e.g.</u>, <u>White v. Schotten</u>, 201 F.3d 743, 753 (6th Cir. 2000)*, cert. denied*, 531 U.S. 940 (2000)(holding that appellate counsel acted unreasonably and permitting district court to address merits of claim if petitioner could demonstrate prejudice); <u>Hollis v. Davis</u>, 912 F.2d 1343 (11th Cir. 1990), *cert. denied*, 503 U.S. 938 (1992)(determining counsel's ineffectiveness for failure to challenge racial composition of jury sufficient to establish cause to excuse procedural default).

27

The analysis does not end with this conclusion, however.  D'Ambrosio must demonstrate "that [he] received ineffective assistance of counsel that rose to the level of a violation of [his] Sixth Amendment rights" to demonstrate that counsel's conduct can serve as cause to overcome the procedural default hurdle.  Seymour v. Walker, 224 F.3d 542, 550 (6th Cir. 2000), *cert. denied*, 510 U.S. 969 (1995).  Specifically, a petitioner must satisfy the two-prong test for ineffective assistance of counsel set forth in Strickland v. Washington, 466 U.S. 668 (1984).  First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id.  Second, the petitioner must show that he or she was prejudiced by counsel's errors.  "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Id.

To assert a successful ineffective assistance of counsel claim, a petitioner must point to specific errors in counsel's performance.  United States v. Cronic, 466 U.S. 648, 666 (1984).  Thereafter, the Strickland Court held, a reviewing court must subject the allegations to rigorous scrutiny, determining "whether, in light of all circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  Strickland, 466 U.S. at 690.  A reviewing court must strongly presume that counsel's conduct was reasonable and might be part of a trial strategy.  Id. at 689.  As the Supreme Court recently affirmed in Bell v. Cone, "'Judicial scrutiny of a counsel's performance must be highly deferential'" and . . . 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'"  Bell v. Cone, 535 U.S. 685, 698 (2002)(*quoting* Strickland, 466 U.S. at 689).

28

Here, D'Ambrosio alleges that the facts upon which his third through tenth, thirteenth, and fourteenth grounds for relief are premised establishes counsel's ineffectiveness for purposes of a cause and prejudice analysis.  Because the Court finds that none of these claim have merit, it necessarily must find that D'Ambrosio cannot use them to establish cause and prejudice to excuse any procedural default.  D'Ambrosio's assertion that ineffective assistance of counsel should excuse any procedural default is without merit.

## VII. INDIVIDUAL GROUNDS FOR RELIEF

### A. Fifteenth Ground for Relief

In his fifteenth ground for relief, D'Ambrosio argues that the State of Ohio violated his constitutional rights when it failed to disclose exculpatory evidence prior to trial, as required under Brady v. Maryland, 373 U.S. 83 (1963).  Specifically, D'Ambrosio alleges that the state failed to disclose: (1) evidence that Lewis allegedly raped Klann's roommate, Christopher Longenecker, that Klann had some knowledge of it, and that Lewis was never prosecuted for it; (2) evidence that police identified Lewis as an anonymous caller who called to identifys Klann as the victim and knew information regarding the crime that had not yet been published in the newspaper; (3) the fact that Lewis, in exchange for his testimony, asked police to aid him in resolving a Driving While Under the Influence (hereinafter "DUI") charge; (4) evidence that Detective Leo Allen, the leading investigating detective on the Klann murder case, reported a burglary of Lewis's apartment several days after Lewis claims he had reported it to police;  (5) evidence that police learned there was bloody clothing in Keenan's garage; (6) evidence that the initial investigating detectives on the scene, Ernest Hayes and Melvin Goldstein, believed that Klann was murdered elsewhere and that his body was dumped in Doan's Creek; (7) evidence that a cassette tape containing information "implicating others in this

29

crime" was made by Angelo Crimi; (8) evidence that James Russell and Carolyn Rosel requested help from police in relocating after trial because some individuals, who they believed to be D'Ambrosio's brothers, had threatened them; (9) evidence from the Trace Evidence Department that Klann was not wearing shoes or undershorts when his body was discovered; (10) evidence that the Cleveland Heights Police Department's dispatch log showed that there was a disturbance in the area of Coconut Joe's on Thursday evening/Friday morning; (11) evidence that Therese Farinacci, one of Lewis's neighbors, was awakened at around 4:10 a.m. on Saturday morning and that another couple heard someone say "Let's dump the body" on that same night; (12) evidence that Linda DeBlasis Hudak stated she saw Klann alive late on Friday evening; and, (13) evidence that, while police claimed to have searched Keenan's truck, the company that repossessed his truck subsequently found cocaine in it.

### 1. § 2254(e)(2)

It is undisputed that D'Ambrosio failed to raise a <u>Brady</u> claim in any of his state court proceedings.  Thus, before the Court can allow D'Ambrosio an evidentiary hearing on this claim, it must determine if he "failed to develop the factual basis of a claim in state court proceedings" under 28 U.S.C. § 2254(e)(2).  If D'Ambrosio did fail to develop the factual basis of this claim, the Court may still consider the evidence in support of it presented at the evidentiary hearing if D'Ambrosio demonstrates: (1) the claim relies on a new rule of constitutional law made retroactive to him or the factual predicate of the claim could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim establish, by clear and convincing evidence, that, but for the constitutional error, no reasonable jury would have found him guilty. § 2254(e)(2)(A) & (B).

30

The Court finds that § 2254(e)(2) does not proscribe its consideration of the suppressed evidence D'Ambrosio presented during the evidentiary hearing because he did not "fail to develop" this claim in state court pursuant to the standard set forth in (Michael) Williams v. Taylor, 529 U.S. 420 (2000). As stated above, a failure to develop the factual basis of a claim is not established unless there is "a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Id. at 432. This Court is to focus on D'Ambrosio's efforts to discover the relevant facts, and not on whether D'Ambrosio actually could have discovered these facts. "Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." Id. at 435.

Here, D'Ambrosio's trial counsel moved for discovery and to examine exculpatory and mitigatory evidence on October 17, 1988, prior to the commencement of trial.[12] On October 21, 1988, the prosecution filed a response to the request for discovery, providing the defense with only two documents: (1) a statement indicating that the prosecutors made a deal with Espinoza in exchange for his testimony; and, (2) a statement indicating that, two days after Espinoza made his initial police statement, he made a second statement alleging that the events as he told them may have occurred on Thursday night into Friday morning, rather than Friday night into Saturday morning.

Moreover, during the evidentiary hearing, two members of D'Ambrosio's trial team testified regarding the discovery policy of the Cuyahoga County Prosecutor's Office generally and what discovery they received from that office in D'Ambrosio's case. As noted above, Gabriel first testified

---

[12]       In requesting Brady material, trial counsel asked for "[a]ll evidence known, or which may become known, to the Prosecuting Attorney, favorable to the Defendant and material either to guilt or punishment." Doc. 119, Exh. K, at 2.

that, to the best of his recollection and information, the prosecution never made defense counsel aware that an audio tape of Angelo Crimi existed or that Klann was a potential witness in the Lewis rape case. He also stated that he was present when prosecutors led members of D'Ambrosio's defense team inside the prosecutor's office to view police reports.  He recalled that the defense was not permitted to physically view the police reports and that a prosecutor read them to defense counsel. Gabriel stated that he did not recall any of the alleged <u>Brady</u> evidence ever being presented to the defense team.  Specifically, he did not recall the prosecution providing the defense with information regarding: (1) Hayes and Goldstein's conclusion that Klann was murdered elsewhere and dumped at Doan's Creek; (2) the Lewis rape case; and, (3) Russell's request for protection because he believed that he was being threatened by D'Ambrosio's brothers.

Defense counsel DeFranco also testified that, although he made a discovery request to Marino, he did not receive any of the alleged exculpatory evidence prior to or during trial.  As with Gabriel, he neither saw copies of any police reports nor was made aware of the Lewis rape case.  Furthermore, DeFranco testified that he never learned that the police determined that Lewis was the individual who made an anonymous call regarding Klann after the murder or that an attorney named David Rossi had called the police asserting that he was representing Lewis in connection with the murder investigation. DeFranco testified that he was never shown a police report with a cassette tape from Angelo Crimi implicating others in Klann's murder.  DeFranco testified that he was not made aware that the disturbance at Coconut Joe's, pursuant to police dispatch logs, occurred at 1:30 a.m. on Friday morning.  He received no information that Linda DeBlasis (now Hudak) stated to police that she had seen Klann alive on Friday evening, the night <u>after</u> the events at Coconut Joe's, or that one police statement indicated that a witness in Lewis's apartment building heard someone say "Let's dump the

body" during the early morning hours on Saturday.   DeFranco testified that all of this information would have helped shape a different defense strategy.  He asserted, moreover, that, had he known about the impressions of the initial investigating officers at the crime scene, he would have asked the trial court to provide him with a crime scene expert.

DeFranco stated that he and Marino had a pre-trial conference in which Marino represented to him that the file before them was the entire file.  Additionally, pursuant to Marino's policy, DeFranco was not permitted to copy any police reports.  Instead, he took notes on anything of import to the case.  DeFranco concluded that, had he been in possession of the alleged <u>Brady</u> evidence prior to trial, he could have impeached several of the prosecution's witnesses.

Finally, Martin Keenan testified regarding the connection between Longenecker's rape and Klann's murder.  He stated that, although he questioned Carmen Marino, the prosecutor assigned to handle D'Ambrosio and co-defendant Thomas Michael Keenan's cases, regarding a possible connection between Klann's murder and the Longenecker rape, Marino belittled him, insisting that the two cases were unrelated.  Keenan testified that Marino stated the rape case was a weak one because the witnesses did not appear.

The United States Supreme Court recently has held that defendants are not required to "scavenge for hints of undisclosed <u>Brady</u> material when the prosecution represents that all such material has been disclosed."  <u>Banks v. Dretke</u>, 540 U.S. 668, 695 (2004).  Moreover, courts have held that § 2254(e)(2) was not intended to bar claims which the defense diligently pursued but that remained undeveloped in state court because of the prosecution's concealment of pertinent facts. <u>Jaramillo v. Stewart</u>, 340 F.3d 877, 882 (9th Cir. 2003)(*quoting* <u>Williams v. Taylor</u>, 529 U.S. at 434); <u>see</u> <u>also</u> <u>Albrecht v. Horn</u>, 314 F.Supp.2d 451, 479 n.30 (E.D. Pa. 2004)(finding

33

§ 2254(e)(2) did not bar evidentiary hearing on petitioner's Brady claim if witness statements that were basis of the claim were truly unavailable to petitioner until federal court granted habeas discovery).    It is clear that, under these standards, D'Ambrosio did not fail to develop his Brady claims in state court.  First, defense counsel attempted to gain access to exculpatory information prior to trial through their discovery motion and motion for exculpatory evidence.  Moreover, defense counsel were diligent in attempting to obtain information from the prosecutor's office, but were hindered by the prosecution's representations that they had viewed the entire file.  Based on the prosecutor's representations, defense counsel could not reasonably have discerned the factual predicates of the Brady claim presented in the Amended Petition prior to or during trial.

The Respondent asserts that D'Ambrosio could have discovered much of the alleged information prior to filing his post-conviction relief petition in state court.  The Court disagrees.  First, contrary to the Respondent's assertions, D'Ambrosio could not have made a public records request because the Ohio Supreme Court's decision in State ex rel. Steckman v. Jackson, 639 N.E.2d 83 (Ohio 1994), precluded such a claim.  In Steckman, decided September 7, 1994, the Ohio Supreme Court held that "[a] defendant in a criminal case who has exhausted the direct appeals of her or his conviction may not avail herself or himself of R.C. 149.43[13] to support a petition for postconviction relief."  Id. at 85, syllabus ¶ 6 (overruling State ex rel. Clark v. Toledo, 560 N.E.2d 1313 (Ohio 1990)).  D'Ambrosio's direct appeal did not conclude until August 16, 1995, when the Ohio Supreme Court reaffirmed the Court of Appeals' weighing of the sentencing decision based on the full record.

---

[13]     That statute, known as the Ohio Public Records Act, previously had permitted a criminal defendant to obtain police and other public documents in support of his or her post-conviction relief petition.

34

Thus, by the time D'Ambrosio's case was ripe for post-conviction review, the <u>Steckman</u> holding prevented a Public Records Act request.

The Respondent makes other arguments regarding D'Ambrosio's ability to acquire the alleged <u>Brady</u> information.  These arguments are better addressed when analyzing the procedural default and merits of D'Ambrosio's <u>Brady</u> sub-claims because they pertain to whether D'Ambrosio and his defense team had access to information that he alleges was in the prosecution's specific control, rather than demonstrate D'Ambrosio's diligence in presenting his <u>Brady</u> claims in state court.  The Court concludes here that, for purposes of § 2254(e)(2), D'Ambrosio did not fail to develop his <u>Brady</u> claims in state court.  Thus, when reviewing this claim, the Court will consider evidence D'Ambrosio presented in furtherance of it during the evidentiary hearing.  Moreover, as the Court discusses below, when addressing the cumulative effect of D'Ambrosio's meritorious sub-claims, the Court is convinced that, but for the prosecution's withholding of exculpatory evidence, no reasonable factfinder would have found him guilty of aggravated murder.  28 U.S.C. § 2254(e)(2)(B).

## 2. procedural default and first two Brady prongs

As stated above, it is undisputed that D'Ambrosio failed to raise a <u>Brady</u> claim in state court. Thus, it is procedurally defaulted.  To overcome this procedural bar, D'Ambrosio must demonstrate cause and prejudice to excuse the default.  As the United States Supreme Court has noted, however, the cause and prejudice necessary to excuse procedural default can "parallel two of the three components of the alleged <u>Brady</u> violation itself."  <u>Strickler v. Greene</u>, 527 U.S. 263, 282 (1999).

35

Consequently, the Court will analyze together the procedural status and first two prongs of the three-pronged Brady test.[14]  The Court sets forth the requirements of that test below.

To establish a claim under Brady v. Maryland, 373 U.S. 83 (1963), "the petitioner has the burden of establishing that the prosecutor suppressed evidence; that such evidence was favorable to the defense; and that the suppressed evidence was material." Carter v. Bell, 218 F.3d 581, 601 (6th Cir. 2000)(*citing* Moore v. Illinois, 408 U.S. 786, 794–95 (1972)). "The inquiry is objective, independent of the intent of the prosecutors." Id. (*citing* Brady, 373 U.S. at 87).

To meet the suppression requirement, the petitioner must show that the evidence was in the prosecution's exclusive control.  There is no Brady violation "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose." Coe v. Bell, 161 F.3d 320, 344 (6th Cir. 1998), *cert. denied*, 528 U.S. 842 (1999)(internal quotation marks and citations omitted).  However, as stated above, the United States Supreme Court recently clarified that, while it is the defendant's duty to be vigilant in seeking exculpatory material, a defendant should not be required to "scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed." Dretke v. Banks, 540 U.S. 668, 695 (2004).  In light of the above Supreme Court precedent, the Court now turns to

---

[14]    The Court does not undertake any exhaustion analysis for this claim.  While it may have been possible for D'Ambrosio to return to state court and assert the Brady claim in a successor state post-conviction petition, the time frame for such a filing has expired.  See Ohio Rev. Code § 2953.21.  Moreover, throughout this rather lengthy habeas proceeding, the Respondent has never asserted an exhaustion defense.  Finally, because the Court finds that the state is the party responsible for D'Ambrosio's failure to obtain the Brady evidence in time to present it to the state courts, the State cannot now assert D'Ambrosio's failure to exhaust this claim as a bar to this Court's review of it.

36

D'Ambrosio's individual grounds for relief, analyzing the exculpatory and suppression prongs of

Brady.[15]

### a. Paul Lewis

D'Ambrosio first asserts that he is entitled to relief pursuant to Brady because the prosecutor

failed to disclose that Paul Lewis had been indicted for the rape of Christopher Longenecker, then

roommate to Klann, that Klann had some knowledge of this rape, and that Lewis was never

prosecuted for it.  Furthermore, D'Ambrosio contends, the prosecution withheld evidence that Lewis

anonymously called police to identify Klann's body, that, when he did so, he revealed information

about the murder that had not been made publically available, and that Lewis asked police for help

avoiding a contempt charge for failing to attend school associated with a DUI sentence in exchange

for his testimony against D'Ambrosio.[16]

---

[15]  The Court addresses the materiality requirement of Brady, cumulatively, below.
See Kyles v. Whitley, 514 U.S. at 436 n.10 ("We evaluate the tendency and force
of the undisclosed evidence item by item; there is no other way.  We evaluate its
cumulative effect for purposes of materiality separately . . . .").

[16]  D'Ambrosio also asserts, in summary fashion, that the prosecutor failed to correct
the perjured testimony of both Lewis and Espinoza.  Doc. 117, at 43-44.  To
establish a claim of prosecutorial misconduct on this ground, a petitioner must
demonstrate that: (1) the statement in question was false; (2) the prosecution knew
it was false; and, (3) the statement was material.  Byrd v. Collins, 209 F.3d 486,
518 (6th Cir. 2000)(citations omitted).  Because D'Ambrosio does not elaborate
on how any of his sub-claims meets the above standard, and in light of the Court's
decision regarding the impeachment and/or exculpatory value of some of the
suppressed evidence, the Court declines to analyze this assertion further. In
assessing the materiality of this undisclosed evidence to D'Ambrosio's case,
however, the extent to which Lewis perjured himself regarding knowledge of
Longenecker, and to which he attempted to characterize the altercation at Coconut
Joe' as one directed at Klann alone are important; evidence with which to
impeach those highly relevant assertions would have been of substantial value to
D'Ambrosio.

The Respondent asserts that this sub-claim is procedurally defaulted because D'Ambrosio failed to raise it in any state court proceedings.  The Court already has determined that D'Ambrosio's failure to raise any <u>Brady</u> claim in state court renders his fifteenth ground for relief  procedurally defaulted.  To overcome this default, D'Ambrosio will have to establish cause and prejudice to excuse this procedural bar.

The Respondent asserts that D'Ambrosio knew about the Longenecker rape in 1994 during Keenan's second trial, if not before.  In support of this argument, the Respondent notes that Keenan's counsel mentioned Longenecker when Lewis testified at Keenan's second trial, but decided not to pursue this line of questioning.[17]

The Court finds that co-defendant Keenan's knowledge of a possible nexus between Lewis and Longenecker did not put D'Ambrosio on notice of this connection.  This is especially true given that Lewis testified, obviously falsely, that he did not even know who Longenecker was.  The Court, finds, instead, that the facts surrounding any possible connection between the Longenecker rape and Lewis's testimony at the D'Ambrosio trial came to light only as a result of habeas discovery.  As D'Ambrosio asserted in his Motion to Amend Petition, (Doc. 81, at 3), he first learned that Klann was a possible witness to a rape when Martin Kuz, a reporter for Cleveland Scene Magazine, wrote an article on D'Ambrosio's case in 2001.  In preparing that article, Kuz interviewed Klann's father, who

---

[17]    Specifically, counsel questioned Lewis as follows:

| | |
|---|---|
| Q: | Do you happen to know if Christopher Longenecker; you don't know who he is? |
| A: | The name, I might know him if I seen him, but the name don't sound familiar. |
| The Court: | Any further questions? |
| Counsel: | Judge, no.  We decided there are none.  Thank you. Nothing further. |

Doc. 44, at 1930.

38

relayed that Klann had told him shortly before he was murdered that he had witnessed the rape of Longenecker and that he believed Keenan and Espinoza were involved in that rape. D'Ambrosio's first habeas counsel contacted Kuz, who relayed to them what Klann's father had told him. Thereafter, counsel inspected the Cuyahoga County Court records for any rape indictments against Keenan or Espinoza. Although they found none, they learned that Lewis was indicted for Longenecker's rape shortly before Klann was murdered. Additionally, counsel discovered that Klann was Lewis's roommate at various points during this time, and that both lived in the same building as Longenecker. Thus, the Respondent's assertion that D'Ambrosio knew about the Lewis - Klann connection prior to the instant habeas action is not persuasive.

As stated above, Martin James Keenan testified during the evidentiary hearing regarding the connection he made between Longenecker's rape and Klann's murder during his brother's trial. He stated that, although he questioned Carmen Marino, the prosecutor assigned to handle D'Ambrosio and co-defendant Thomas Michael Keenan's cases, regarding a possible connection between Klann's murder and the Longenecker rape, Marino insisted that the two cases were unrelated. Specifically, Keenan testified that Marino stated the case was a weak one because the witnesses did not appear. This testimony supports D'Ambrosio's assertion that the prosecutor also suppressed this evidence during *his* trial.

The Respondent next asserts that the prosecution was not aware of a possible connection between the two cases because a witness subpoena in the Longenecker rape case was for "Tony L.N.U." Thus, Respondent argues, the prosecution could not have known that it was Klann, the murder victim, who was the potential witness against Lewis. The Court disagrees. First, as noted above, Marino *was aware* of Klann's involvement in the Longenecker rape. Indeed, he aggressively

39

dissuaded Martin Keenan from pursuing a connection between the two cases.[18]  Moreover, Christopher Longenecker testified during the evidentiary hearing that, upon hearing of Klann's murder, Longenecker called either the Victims of Violent Crimes or the Sex Crimes Unit of the Cleveland Police Department to notify them that he believed that Klann's murder was connected to his rape case.

---

[18]    Quoting another capital habeas corpus petitioner's brief, the Sixth Circuit has noted the "shameful" record of this prosecutor, including misconduct occurring during D'Ambrosio's trial:

Mr. Lott's trial prosecutor, Carmen Marino, has a shameful track record of breaking rules to win convictions. See State v. Liberatore, 433 N.E.2d 561 (1982)("the prosecutorial blunders in this case are too extensive to be excused."); State v. Owensby, 1985 WL 8623, *3 (1985)("prosecutor's comments clearly outside the bounds of mere 'earnestness and vigor[.]' "); State v. Heinish, 1988 WL 236144, *19 (1988)( "Clearly the prosecutor improperly commented on excluded evidence."); State v. Harris, 1990 Ohio App. LEXIS 5451 (1990)(prosecutorial misconduct found, but harmless); State v. Hedrick, 1990 Ohio App. LEXIS 5647 (1990) (prosecutorial misconduct by making improper comments on matters outside of record and on defendant's failure to testify.); State v. Durr, 568 N.E.2d 674 (1991)(improper comments on the appellant's unsworn statement, the appellant's prior convictions, and mitigating factors held harmless.); State v. Keenan, 613 N.E.2d 203 (1993)(presenting an "aggravated example" of prosecutorial misconduct); State v. D'Ambrosio, 616 N.E.2d 909 (1993)(prosecutorial misconduct found, but either waived or harmless); State v. Johnson, 1992 Ohio App. LEXIS 4256, *17 (1993) (prosecutorial misconduct "[rose] to the level of being constitutional errors."); State v. Matthews, 1999 WL 135264, *2 (1999)(prosecutor denied making a deal with witnesses, however, "[t]here is ample evidence to suggest that [the witness] at least did in fact receive just what the assistant county prosecutor said he would not give him."); State v. Larkins, 2003 WL 22510579 (Ohio Ct. App. Nov. 6,  2003)(affirming grant of new trial upon finding that Marino withheld eyewitness descriptions not matching Larkin; hid a deal he struck to obtain the testimony of the only claimed eyewitness; then stood silent as she lied about the deal and her criminal record during trial).

Lott v. Coyle, 366 F.3d 431, 433 n.1 (6th Cir. 2004)(parallel citations omitted).

Citing United States v. Joseph, 996 F.2d 36, 41 (3d Cir. 1993), the Respondent asserts that a prosecutor is not responsible for knowing about the exculpatory contents of an unrelated case. While it is true that the Third Circuit held that Brady does not require the prosecutor to search unrelated case files, not only was that opinion issued prior to the United States Supreme Court's decision in Kyles v. Whitley, 514 U.S. 419 (1995), it is also factually distinguishable. The Kyles Court stated that, "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." Id. at 437. Thus, knowledge or information in the possession of the police generally is imputed to the prosecutor for purposes of Brady. Accordingly, Longenecker's call to the Cleveland Police Department and detective Allen's dealings with Lewis would have been sufficient to put Marino on notice regarding the relationship between the two cases. Unlike the circumstances in Joseph, moreover, these cases were not wholly unrelated. Klann was the only third party witness in the rape case, the police knew Lewis was the anonymous tipster in the Klann case, Lewis testified in the Klann murder trial on behalf of the prosecution, and both the detective investigating the Klann murder and the prosecutor prosecuting it were aware of the charges against Lewis.

In light of all of these facts, the Court concludes that the prosecution withheld the evidence connecting Klann to Lewis's rape charge. In so finding, it also concludes that D'Ambrosio can establish "cause" to excuse the procedural default of this sub-claim.

The Court next must determine whether this evidence has exculpatory or impeachment value. Clearly, evidence of the Longenecker rape and Klann's role as a witness to it, Lewis's contact with police, his knowledge of non-public facts regarding the murder, the fact that it was he who first led police to the co-defendants, as well as Lewis's request that police assist him on other charges in

41

exchange for his testimony "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." <u>Kyles</u>, 514 U.S. at 441.  During trial, D'Ambrosio's defense was to blame Espinoza for Klann's murder.  D'Ambrosio testified that, upon leaving Klann's truck, he went into his apartment alone, leaving the pair as they went off to "party."  In essence, the factfinder was charged with either believing Espinoza's or D'Ambrosio's version of the events leading up to Klann's murder.  Had the defense been in possession of the information regarding Lewis, they could have developed an entirely different strategy of defense, sowing the seeds of reasonable doubt regarding D'Ambrosio's participation in the murder by focusing on Lewis's motive to get rid of Klann and Lewis's involvement in the investigation of his murder.

The defense also could have used the suppressed information to impeach Lewis's testimony during trial.  While the Respondent claims that Lewis's testimony was merely peripheral and corroborated that of other witnesses, if given the suppressed evidence regarding Lewis, the defense may have decided to expand the scope of his testimony.  Indeed, impeachment of Lewis with this information would have had the broader effect of impeaching the state's <u>entire</u> theory of the case.  While the Court will address the impact of impeaching Lewis's testimony in more detail in the context of its materiality review, below, it finds here that D'Ambrosio has established cause and prejudice to excuse the procedural default and has thereby satisfied the first two <u>Brady</u> prongs.

### b. bloody clothing

D'Ambrosio next asserts that the prosecution withheld evidence that police learned that there was some bloody clothing in Keenan's garage, and that police knew the clothing could not fit both Espinoza and D'Ambrosio because of the great difference in their sizes.  D'Ambrosio procured this information only after this Court granted him discovery to obtain the Cleveland Police Department

files during the habeas proceeding.  Included in the file is a document that states: "Bloody clothes in Keenan's Garage" with the name "Donnie" appearing under that sentence.  Doc. 118, Exh. B, at 136. Below that are height and weight descriptions for D'Ambrosio and Espinoza.  D'Ambrosio asserts that these writings demonstrate that police knew of bloody clothing in Keenan's garage and that, when noting the height and weight disparity between the two co-defendants, police knew that the clothes could only belong to one of them.[19]  This document was not in the form of a police report, but appears to be the notes of one of the police detectives investigating the Klann murder.

D'Ambrosio suggests that, if the clothes <u>were</u> his size, the prosecution certainly would have used them as evidence at his trial.  He contends, accordingly, that an inference can be drawn that the clothes <u>would</u> <u>not</u> have implicated him and, in fact, may have contradicted Espinoza's version of the events by putting Espinoza in direct contact with the victim and his blood at the time of the murder.

While it is clear these notes were not provided to counsel, it is less clear that they lend themselves to the exculpatory inferences D'Ambrosio would have the Court draw.  Despite the opportunity for discovery, other than this cryptic notation, D'Ambrosio did not produce any evidence that any bloody clothes actually existed or, if so, whether they could be tied to the victim.  Thus, while the notes might have been of interest to the defense, D'Ambrosio offers nothing but speculation in support of his claim that they would have been exculpatory.

---

[19]     The notation on the document states that "Joe" is 6 feet, 2 inches tall and weighs 175 pounds and that "Ed" is five feet, seven inches tall and weighs 145 pounds. No party has disputed the accuracy of these descriptions.

### c. Hayes/Goldstein Reports

When a jogger discovered Klann's body in Doan's Creek on September 24, 1988, Hayes and Goldstein were the first Cleveland Police Detectives on the scene.  As stated above, they observed that there was neither blood on the creek bed surrounding the body, nor signs of a struggle. Additionally, there were no tire marks leading up to the bank where Klann's body was discovered. From these observations, the detectives surmised that the individual had been killed elsewhere and dumped in Doan's Creek.  In fact, during the evidentiary hearing, Goldstein testified that Doan's Creek was often used as a dumping ground and a place of criminal activity.  Doc. 185, at 9.  As with the Longenecker evidence, the Court finds that D'Ambrosio only discovered this evidence as a result of counsel's discovery requests in light of the Kuz article in 2001.  Thus, this sub-claim is not procedurally defaulted.

The Court also finds that the defense undoubtedly could have used this evidence to impeach Espinoza's testimony during trial.  As stated above, Espinoza testified that Keenan and D'Ambrosio murdered Klann at Doan's Creek.  Thus, any information that would tend to undercut Espinoza's account of the murder could have been used to impeach him.  Kyles v. Whitley, 514 U.S. 419, 433-34 (1995)(citing United States v. Bagley, 473 U.S. 667, 676-77 (1985)).  This is especially true, moreover, since, as will be discussed below, there is a serious conflict in the evidence with respect to Espinoza's testimony regarding the timing of the murder and there is other evidence which would support a defense contention that the murder occurred elsewhere.

The Respondent urges the Court to find that, despite its substantial impeachment value, this evidence does not constitute Brady evidence because it was merely the opinion of the initial investigating officers.  She asserts that this opinion testimony would have been inadmissible under

44

the Ohio Rules of Evidence.  Thus, the Respondent contends, the defense would have had to qualify the detectives as experts under Ohio Rule of Evidence 702 for their testimony to be admissible.

The United States Supreme Court has held that there is no <u>Brady</u> violation where the prosecution withheld evidence that would have been inadmissible during trial.  In <u>Wood v. Bartholomew</u>, 516 U.S. 1, 6 (1995), the Supreme Court found that the prosecution's failure to reveal the results of polygraph tests did not constitute a <u>Brady</u> violation because such evidence was not admissible under state law.  The <u>Wood</u> Court opined that, because the polygraph tests were inadmissible, they did not constitute "evidence."  Thus, it concluded, the failure of the prosecutor to disclose the results of these tests had no direct impact on the trial's outcome.  <u>Id.</u>

This case is easily distinguishable from <u>Wood</u> because, pursuant to Ohio law, a police officer's opinion regarding how a homicide occurred is admissible as lay opinion testimony pursuant to Ohio Rule of Evidence 701.  That rule states:

**Evid R 701 Opinion testimony by lay witness**

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue.

Ohio R. Evid. 701.  Several Ohio courts have interpreted this Rule to permit a police officer to testify about his or her own crime scene conclusions based on that officer's personal observations.  For example, in <u>State v. Kehoe</u>, 729 N.E.2d 431, 439-40 (Ohio Ct. App. 1999), the Twelfth District Court of Appeals held that the trial court did not abuse its discretion in admitting the lay opinion testimony of the lead investigating officer regarding the occurrences that led to the defendant's attempted murder charges.  In his testimony, the officer stated that glass fragments from the window of the

vehicle in which the defendant was seated were consistent with a bullet being shot from inside the vehicle.

The Twelfth District Court of Appeals first found that the officer had testified regarding his own personal observations, satisfying the first requirement under Rule 701. That court additionally found that, based on the officer's description of how he came to the conclusion, his testimony had a rational basis and was, therefore, admissible during trial. Id. at 440. Other Ohio courts have held similarly. See, e.g., State v. Griffin, No. C-020084, 2003 WL 21414664, at * 8 (Ohio Ct. App. June 20, 2003)(finding no trial court error in admitting police officer's lay testimony regarding blood-spatter stain patterns); State v. Whittsette, No. 70091, 1997 WL 67764, at *4 (Ohio Ct. App. Feb. 13, 1997)(holding no reversible error in trial court's admission of police officer testimony excluding .22 caliber gun as murder weapon based on his experience with guns and prior observation of murder victims). Based on this law, it is clear that Detectives Hayes and Goldstein would have been permitted to testify regarding their impressions of how Klann met his demise. Thus, the Respondent's arguments to the contrary are without merit.

The Respondent next asserts that Hayes and Goldstein's opinions are merely first impressions based on their initial observations of the crime scene. Additionally, the Respondent asserts, both detectives' memories are faulty regarding both the conditions of Doan's Creek and the extent of injury to Klann's body upon its discovery. Based on the evidentiary hearing testimony, however, it is clear that Hayes and Goldstein's suppositions regarding where Klann was murdered were not merely based upon their initial observations, but were firm and lasting impressions to which they continue to

adhere.[20]  Thus, the Court finds that their opinions constitute meaningful impeaching evidence, requiring disclosure under Brady.

The Respondent asserts that prosecutorial disclosure was unnecessary, however, because D'Ambrosio could have obtained Hayes's and Goldstein's opinions from another source.  On September 25, 1988, the Plain Dealer reported that the body of an unidentified white male was found in Doan's Creek.  This article names Detective Goldstein as a homicide detective on the scene, stating that, "Goldstein said police believe the man was killed elsewhere and dumped in the creek."  Doc. 119, at 67.

The Sixth Circuit has held that "[n]o Brady violation occurs where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source."  Byrd v. Collins, 209 F.3d 486, 517 (6th Cir. 2000)(internal quotation marks and citations omitted).   In Byrd and its predecessors, however, the prosecution made the circumstances surrounding the exculpatory facts known to the defendant, but the defendant failed to further investigate the information.  Id.   Contrary to Respondent's assertions, the Court finds this case to be similar to United States v. Stifel, 594 F.Supp. 1525, 1540 (N.D. Ohio 1984), in which another judge on this Court held that the "mere publication of [newspaper] articles and their general availability to the public [does] not provide the defendant with notice that the government possessed exculpatory evidence."  There, the Court found that the publication in several

---

[20]    The Court expresses its concern that the Respondent repeatedly attempted to paint the detectives' conclusions as preliminary and open to reconsideration.  It became clear during the evidentiary hearing, however,  that the detectives' initial conclusions were firm ones, still held today, and that affidavits submitted earlier by the Respondent were misleading at best.  Indeed, it appears that the state may have manipulated the phrasing in those affidavits to create mis-impressions of the detectives' views.

newspapers of the statements of witnesses who made exculpatory statements was not sufficient to notify the defense regarding their existence.  Thus, the Court held, the prosecution was under a duty to disclose these statements to the defense.  Id.

The Court finds that the Plain Dealer article was insufficient to notify D'Ambrosio about Hayes and Goldstein's opinion of how the murder occurred.  It does not identify Klann as the victim found in Doan's Creek.  Thus, to discover it, the defense team would have had to recognize the Plain Dealer's reference to an unidentified victim found in Doan's Creek as Klann.  While counsel has a duty to investigate a case on behalf of his or her client, Wiggins v. Smith, 539 U.S. 510, 527-28 (2003), the Sixth Amendment does not require counsel's search to extend to scouring a local paper for obscure references to the murder.  Instead, it is the responsibility of the prosecutor and police department attendant thereto to present this information to the defense, thereby affording due process to the criminal defendant.  Brady, 373 U.S. at 87.  Accordingly, the Court finds that Detectives Hayes's and Goldstein's conclusions that Klann was killed elsewhere and dumped at Doan's Creek was exculpatory evidence suppressed by the prosecution.

### d. Crimi cassette tape

D'Ambrosio next claims that the prosecution withheld the police report and attached cassette tape of Angelo Crimi, in which, according to the report, Crimi implicated other suspects in the murder.  D'Ambrosio procured the police report and its reference to the cassette tape as a result of the discovery D'Ambrosio's counsel conducted during the instant habeas action.  Thus, D'Ambrosio was not able to raise this claim during his state court appeals.

The Court first finds that the police report is exculpatory.  Because Espinoza's account of the murder only includes the three co-defendants, if others were implicated in Klann's murder, that

48

account would be suspect.  Thus, at the very least, information regarding others who may have participated in Klann's murder could have impeached Espinoza's testimony at trial, even if the contents of the tape would not have exonerated D'Ambrosio directly.

Moreover, as stated above, defense counsel DeFranco testified that he did not receive this police report prior to or during trial.  The Court finds his recollection particularly credible because he testified that he knew Crimi from his neighborhood.  Thus, unlike other documents, about which DeFranco stated he simply had no recollection, it is likely he would have recalled receiving information in which Crimi's name was mentioned.   Consequently, the Court finds that the prosecution suppressed this exculpatory police report and the tape.

The Court finds, moreover, that the parties' current inability to locate the tape does nothing to undercut the exculpatory nature of the report itself.  If the tape were missing or destroyed as of the original trial date – and, thus, not available to confirm the report's description of its contents – that fact would itself have been exculpatory.  The defense could have asked the jury to infer, from the tape's unavailability, that the content of the tape would have been unfavorable to the prosecution or inconsistent with its theory of the case.

### e. Russell relocation request

In D'Ambrosio's next sub-claim, he asserts that James "Lightfoot" Russell and his girlfriend, Carolyn Rosel, requested help from police in relocating after trial.  Russell testified during trial about the visit he received from the three co-defendants at his apartment.  He stated that they entered his apartment looking for Lewis and claimed they wanted to kill Lewis.  Russell contacted police prior to D'Ambrosio's trial and his call was recorded in a police report.  It stated that:

> about 2 weeks ago 2 goons came looking for [Russell].  He said late at night 2 large
> white males came knocking at his door looking for James Lightfoot.  He denied that

he was him and said that Lightfoot wasn't there.  They seemed satisfied and left . . .
. Russell was unable to describe them any better and when he was asked if he knew
who they were he was hesitant for fear of reprisals [sic] but stated that he thought
that they were brothers of Joe D'Ambrosio.

Doc. 118, Exh. B, at 30.  The police report further indicates that Russell is "genuinely afraid for him

and his family and is requesting help in relocating after the trials."  Id.

While this police report certainly did not exculpate D'Ambrosio from the crime, it would have

provided the defense team a means by which to impeach Russell's credibility by demonstrating that

a purportedly independent witness had grounds to testify against D'Ambrosio in retaliation for

perceived threats.  The Court also finds, as with much of the evidence raised in the previous sub-

claims, that this evidence was suppressed by the prosecution.  D'Ambrosio did not obtain this police

report until the discovery this Court permitted him.

### f. trace evidence report

D'Ambrosio next asserts that the prosecutor violated Brady by failing to furnish him with a

trace evidence report from the Cuyahoga County Coroner.  In this report, the Coroner's Trace

Evidence Department notes that Klann was not wearing shoes or undershorts when he was

discovered.  Knowledge of this report, D'Ambrosio asserts, would have enabled the defense team to

impeach Espinoza's account of where and how the murder occurred.  He reasons that, contrary to

Espinoza's claim that the co-defendants found Klann walking along Mayfield Road  toward Murray

Hill and took him to Doan's Creek to kill him, the lack of shoes or undershorts indicates that Klann

was killed in a more familiar surrounding, in which he might not be wearing either item.  Indeed, this

evidence when taken in conjunction with the conclusions of Hayes and Goldstein, and the witness

statements discussed in subsection i , below, would have provided the defense with powerful grounds

upon which to refute Espinoza's version of events.  It is simply not logical that Klann would have

50

been walking along Mayfield Road heading towards his home after a night of drinking in bars, as Espinoza claimed, with neither his shoes nor his underwear.  It is meaningful, moreover, that in describing the murder, including Klann's initial attempts to flee, Espinoza did not mention that the victim was barefoot.

The Court finds that the defense team could and would have used this evidence to impeach Espinoza's testimony.  It finds, moreover, that the prosecution did not furnish defense counsel with this report prior to or during trial.

### g. Detective Allen's report of the Lewis burglary

In this sub-claim, D'Ambrosio asserts that the prosecution withheld the fact that, although Lewis claimed to have reported the entry to his apartment to police immediately after its occurrence, Cleveland Police Detective Leo Allen reported the burglary personally and did so much later.  During trial, Lewis testified that, after spending the night of the murder "partying" at a barmaid's house, he went to his apartment and found out that the door had been kicked in.  He then testified that he called police to report it to them on that same morning.  The Cleveland Police Department files produced during habeas discovery reveal a Supplementary Report indicating that,  after interviewing Lewis, "we called in an aggravated burglary/ theft and arrest report in the name of Paul Lewis."  Doc. 118, Exh. B, at 44.  Thus, it does appear that it was Allen, and not Lewis himself, who called-in the burglary on Lewis's behalf and that this did not occur until Lewis emerged as a potential witness who was volunteering evidence against D'Ambrosio.  If available to them, defense counsel could have used this information to impeach Lewis.  Specifically, counsel could have undercut any impression Lewis attempted to convey that he was either surprised by the fact that his door had been kicked-in or in doubt about who might have done it.  While, standing alone, this item has only marginal

51

significance and, thus, would not normally factor-in to the Court's <u>Brady</u> analysis, when considered in conjunction with the also undisclosed fact that it was Lewis who anonymously identified Klann's body as the body found in Doan's Creek and the fact that it was Lewis who directed Allen to the co-defendants, the Court finds that the impeachment value of this information was sufficiently strong as to be exculpatory under <u>Brady</u>.

### h. Cleveland Heights Police dispatch log

D'Ambrosio's next sub-claim is that the prosecution failed to provide him with a dispatch log from the Cleveland Heights Police Department indicating that the disturbance at Coconut Joe's occurred on Friday, September 23, 1988, at 1:30 a.m. and <u>not</u> on Saturday morning as the stated had posited.  D'Ambrosio claims that he could have used this report to buttress his defense that the events culminating in Klann's death could not have occurred as the state contended.

The Court finds that, while this evidence certainly would have aided D'Ambrosio during trial, he cannot establish that the prosecution suppressed this evidence.  As stated above, the Sixth Circuit has held that "[n]o <u>Brady</u> violation occurs where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source."  <u>Byrd v. Collins</u>, 209 F.3d 486, 517 (6th Cir. 2000)(internal quotation marks and citations omitted).   While the Court found that a newspaper article which failed to note the victim's name was not sufficiently "available" to the defense team to put them on notice of the initial investigating officer's conclusions, it finds that defense counsel should have known that it could procure the Cleveland Heights Police log form to ascertain when the Coconut Joe's disturbance occurred.  At trial, several witnesses testified regarding these events, including the fact that Coconut Joe's management contacted police regarding this disturbance.

52

Because D'Ambrosio's defense was centered on the state's inability to pinpoint the day of the murder, this issue was of great import to defense counsel; counsel should have known that a police log might reveal material information and could be publically procured. The Court finds that no <u>Brady</u> violation can be premised on the prosecution's failure to provide this log to the defense.

### i. Therese Farinacci and neighbor statements

In this sub-claim, D'Ambrosio asserts that Therese Farinacci, a neighbor of Lewis's, reported to Detective Allen, as he recorded in his police report, that, after returning around midnight on Friday evening/Saturday morning, she noticed a black pickup truck parked on the street and, at approximately 4:10 a.m., was awakened by yelling and pounding on the door. This same police report states that, the owner of the building, a Mr. Pizone, "stated that an older couple who live at 2026 Murray Hill were heard to have made the comment that they heard someone at about the same time that the truck was on Fairview Court say 'Let's dump the body in the basement.'" Doc. 118, Exh. B, at 46.

The Court finds that this information would have had meaningful exculpatory value for D'Ambrosio. First, as D'Ambrosio asserts, Farinacci's statements are "consistent with D'Ambrosio's contention that Espinoza was using Keenan's truck Friday night," Doc. 117, at 12.[21]   More importantly, however, this testimony undercuts the state's theory that the murder occurred following the events at Coconut Joe's, and provides support to the conclusions of detectives Hayes and Goldstein that the murder occurred somewhere other than Doan's Creek. Indeed, to the extent this evidence implies that the murder occurred at or near Lewis's apartment, it could also have supported a defense theory implicating Lewis in the murder. For these reasons, the Court concludes that the

---

[21]     The description of the vehicle Farinacci saw fit the description of Keenan's truck.

53

state's failure to provide this exculpatory evidence was inconsistent with its obligations under <u>Brady</u>.

### j. Hudak police statement

D'Ambrosio also asserts that the prosecution unconstitutionally withheld a police report in which Linda Hudak states that she saw Klann alive the night <u>after</u> the events at Coconut Joe's.  This statement is irreconcilable with the state's theory that the fight at Coconut Joe's occurred on the same evening as Klann's murder.  Espinoza testified during trial that the events at Coconut Joe's occurred on Friday evening, hours before Klann's murder and that the events of that evening included a continuous search for Lewis, which led to Klann's murder when Klann would not disclose Lewis's whereabouts.  Thus, the defense could have used Hudak's statement that she saw Klann alive more than twenty-four hours after the altercation at the bar to impeach Epinoza's testimony.  During the course of this habeas proceeding, Hudak asserted both by affidavit and during her evidentiary hearing testimony that the police statement was incorrect.  Instead, she claims, she either mis-spoke when providing the police statement or the officer who took it recorded it incorrectly.  She now asserts that she saw Klann later in the evening on which the Coconut Joe's altercation occurred and that she does not recall seeing him on Friday evening after all.  Her recantations, however, are immaterial to the Court's <u>Brady</u> inquiry.  A habeas court must review the exculpatory value of a document withheld from the defense in the context of its usefulness to the defense during trial.  Thus, the Court is to determine whether the police document constituted exculpatory evidence at the time of trial that was suppressed by the prosecution.  The Court finds both to be the case.  It addresses the materiality of this statement below.

### k. Keenan's truck search and potential testing

Finally, D'Ambrosio asserts that, because the repossession company found cocaine in Keenan's truck, even though police already had searched it, it is clear that police were not diligent in their search.   While it was initially unclear what the value of this evidence might be to D'Ambrosio, a careful analysis of the hearing testimony indicates that this evidence arguably would have been meaningful in two separate ways.

First, the fact that cocaine was found in Keenan's truck is powerful proof that a police search of that vehicle, if any, was far from thorough. This is important because it implies that no meaningful forensic effort was made to assess whether Klann's body may have been transported in that vehicle to Doan's Creek where it was found.  It goes without saying that a detailed forensic exam of the truck would have uncovered the cocaine.  While, in the absence of a forensic exam, the Court would be hard-pressed to say that this evidence would have been exculpatory in any <u>direct</u> manner, it may have had some impeachment value.   Specifically, given the opinions of Hayes and Goldstein, and the witness statements indicating that Keenan's truck may be been used to "dump the body," information regarding the cocaine may have been useful in impeaching any state witnesses who opined that the murder occurred at Doan's Creek, as Espinoza claimed.  The state's own failure to undertake basic investigative efforts to confirm the location of the murder would have undercut any evidence or argument the state proffered on that issue.

The fact that cocaine was found in Keenan's truck may have been useful to the defense for an entirely different reason, moreover – it could have supported a defense theory that Lewis was actually found by whoever was searching for him prior to Klann's murder.  Espinoza claimed that the search for Lewis was prompted by the fact that Lewis had stolen a substantial quantity of cocaine

from Keenan and that Klann was killed because he either could not or would not lead Espinoza, Keenan and D'Ambrosio to Lewis and, thus, to Keenan's drugs. The fact that cocaine was in the truck when it was found could have been used to impeach Espinoza's claim that Lewis was never found and that Klann was killed as the search for Keenan's drugs was continuously frustrated by dead-ends in that search. Again, since Espinoza was the only witness to the murder proffered by the state, <u>any</u> evidence which could have been used to impeach his version of events would have been meaningful.

Thus, while the Court declines to classify evidence regarding the search of Keenan's truck (or absence thereof) as exculpatory, it does find that it would have had impeachment value for the defense.

### 3. materiality analysis

When analyzing the materiality of <u>Brady</u> evidence, the United States Supreme Court has held that a reviewing court must examine its cumulative effect. In <u>United States v. Bagley</u>, 473 U.S. 667, 681 (1985), the Supreme Court noted that there are three situations in which a <u>Brady</u> claim might arise, two of which are inapplicable here. In the third situation, in which the government fails to volunteer exculpatory evidence that was either never requested or requested in only a general way – as was the case here – the Supreme Court has held that the evidence is material and the Constitution was violated by the government's failure to disclose exculpatory evidence "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Id.</u> at 682.

In <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995), decided ten years after <u>Bagley</u>, the Supreme Court clarified the materiality requirements of <u>Brady</u>. First, the <u>Kyles</u> Court examined <u>Bagley</u>'s "reasonable

56

probability" test.  It noted that the test does not require a reviewing court to determine "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434.  Moreover, the Kyles Court held, "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." Id. at 436-37.  Thus, there is no requirement that the government maintain an "open file" policy to remain on constitutionally solid footing.  The prosecution must, however, use its discretion in determining the *cumulative* effect of suppression and disclose favorable evidence "when the point of 'reasonable probability' is reached."  Id. at 437.  Thus, when examining whether the suppression of favorable evidence constitutes a constitutional violation, a reviewing court must look at its collective impact on the defendant's due process right to a fundamentally fair trial.  Applying this standard, the Court now turns to D'Ambrosio's individual sub-claims.

The Court first examines the materiality of the prosecution's failure to disclose the Longenecker rape, Lewis's request for police aid in reducing a DUI sentence, and Lewis's anonymous calls leading police to the co-defendants.  D'Ambrosio has argued throughout this proceeding that, the disclosure of this evidence would have permitted the defense not only to impeach Lewis's testimony regarding the events allegedly leading to the murder and to alter the entire strategy of the defense from one in which D'Ambrosio's testimony was pitted against the state-supported Espinoza's, to one in which he could implicate another suspect in the crime, laying the foundation for reasonable doubt.  A jury could have accepted this theory of the murder, D'Ambrosio asserts, because Lewis had a motive to kill Klann because he was the only third-party witness to the Longenecker rape.

57

This assertion has merit. The defense could have used the Longenecker rape and request for police assistance to impeach Lewis's testimony. While much of Lewis's testimony was corroborated by defense witnesses Gaines, Oliver, and even D'Ambrosio, one key fact – the date of the Coconut Joe's altercation – distinguished Lewis's depiction of the events from those witnesses' accounts. Lewis testified during trial that he and Keenan had conducted some "business" in Keenan's truck and that he thereafter entered Coconut Joe's, observing the presence of the three co-defendants and Klann therein. He next stated that he heard Espinoza and Klann apparently having an altercation in the restroom, and, similar to Gaines's testimony, stated that the three co-defendants were asked to leave Coconut Joe's. He then testified that he spent the night partying at "a barmaid's" residence, only to return the following day and notice that his door had been kicked in. While much of this information is cumulative of the other witnesses' testimony, Lewis was the first state witness to assert that the murder occurred on the same night as the events at Coconut Joe's and that those events began on Friday evening, not Thursday. Thus, D'Ambrosio could have used the Longenecker rape and police assistance request to impeach Lewis's credibility and to raise suspicions about his insistence that the events at Coconut Joe's occurred on Friday night, as the state posited at trial.

Moreover, D'Ambrosio asserts, the value of the suppressed evidence lies not only in its ability to impeach Lewis, but in its failure to provide the defense an alternative defense strategy. Rather than corroborating the events Espinoza stated led up to the murder, such as Klann's ride in the truck with Keenan and the stops at both Lewis's residence as well as Russell's, D'Ambrosio could have chosen to assert that Lewis, in an attempt to silence Klann about the Longenecker rape, either killed him or induced Espinoza or others to kill him (perhaps by pinning the theft of Keenan's cocaine on Klann rather than himself) and thereafter directed police to D'Ambrosio to deflect attention from himself.

While this assertion is not without defect, it does have some merit.  Lewis testified during trial that he spent the night of the murder with a barmaid, presumably Hudak, leaving after the sun already had risen the following morning.  During the evidentiary hearing, Hudak appeared to corroborate this account when she testified that Lewis and two other males entered her apartment with a large quantity of cocaine.  She stated that, because she had ingested a large amount of the cocaine during the evening, she could not specifically recall whether Lewis remained at her residence for the entire evening.  While both counsel attempted to elicit what day of the week Lewis's visit occurred, Hudak stated that she had no independent recollection of the day of the week, meaning it could have occurred Thursday evening or could have been on Friday – she simply can not say,   Thus, Hudak's testimony may or may not have substantiated Lewis's alibi during the time of Klann's murder.  Given Hudak's cocaine addiction at the time these events occurred and her failure to come forward with this testimony at the time of Klann's murder,[22] there is a serious question about whether the three-judge panel would have found her testimony credible.

This Court's indecision about her believability buttresses its finding that the prosecution's failure to disclose this evidence is material.  It must be left to fact finders, in the first instance, to decide these credibility issues.  Thus, whether or not D'Ambrosio would have succeeded in his effort to establish Lewis as Klann's killer, the prosecution should have disclosed this evidence to the defense team.  Because the prosecution failed to do so, the Court finds that its confidence in

---

[22]     The Court notes that Hudak also was not completely forthright with counsel for the Respondent when contacted. Specifically,  she did not disclose that she and Lewis had ingested a large quantity of cocaine together around the time of Klann's death and that she may, accordingly, have a less than clear recollection of the events of those critical days.

D'Ambrosio's capital murder conviction is undermined.  Accordingly, it concludes that the state's withholding of this evidence is material.

Of equal import are the suppressed Crimi tape, the opinions of Detectives Hayes and Goldstein, the evidence regarding the statements by Lewis's neighbors, the fact that Keenan's truck likely was never examined or searched by police, and the Trace Evidence Report.  All these items undercut Espinoza's testimony about how and where Klann's murder occurred and, therefore, could have been used to impeach it and, ultimately, to undercut the state's whole theory of its case.  Because Espinoza was the only witness who testified regarding the events of the actual murder, the ability to impeach this testimony could have impacted greatly the panel's verdict.  The Court finds the prosecution's failure to disclose this evidence materially impacted the outcome of D'Ambrosio's trial.

Finally, Hudak's police statement to the defense team could have impacted the verdict.   In her police statement, the only evidence then available to the prosecution, Hudak stated that  Klann visited her to ask for money on Friday evening, a full twenty-four hours after the fight at Coconut Joe's.  Because the state already was committed to Lewis's and Espinoza's testimony that the altercation at Coconut Joe's occurred on the same night as Klann's murder and that both occurred on Friday evening, Hudak's police statement (or, presumably her testimony), would have undercut the state's theory of the events leading up to the murder.  Although she testified during the evidentiary hearing that her original statement was incorrect, for the reasons stated above, her current recantations do not affect this Court's analysis.  Thus, the Court finds that the prosecution's failure to provide the defense with the police report containing Hudak's statement was material.

The cumulative impact of the prosecution's failure to disclose the above evidence undermines the Court's confidence in the panel's verdict.  In undertaking its materiality analysis, the <u>Kyles</u> Court

stated that the exculpatory evidence withheld from the defense resulted in "a significantly weaker case than the one heard by the first jury, which could not even reach a verdict."  Kyles, 514 U.S. at 454. Similar to the Kyles Court's analysis, this Court finds that the impact of both impeaching the state's principal and only witness regarding how the murder occurred, as well as shifting the trial strategy to one which suggested that another individual had a motive to kill Klann, particularly in the absence of the state providing D'Ambrosio with such a motive, and with knowledge that the person who did have the motive to kill Klann (or see to it that he was killed) was also the one who directed police to D'Ambrosio, is too great to be ignored.  On direct appeal from Keenan's first conviction, the Ohio Supreme Court stated that its decision to find prosecutorial misconduct was buttressed by the weak evidence provided in the case.[23]  This Court also finds that the suppressed evidence likely impacted the outcome of D'Ambrosio's trial based on the limited evidence the state supplied in support of D'Ambrosio's guilt. The state's case depended almost exclusively on the testimony of Espinoza, who received substantial benefit from describing others as the principal perpetrators of the crime.

Because it does not have confidence in the trial's outcome, the Court finds that the sub-claims regarding Paul Lewis (the Longenecker rape, the DUI request for assistance, and the fact that Lewis

---

[23]     In reversing the Eighth District Court of Appeals' decision to affirm on grounds of prosecutorial misconduct, the Ohio Supreme Court found that
> Without overwhelming evidence of guilt, we cannot know what the verdict might have been had not the prosecutor clouded the jury's vision with improper tactics. Cf. Darden [v. Wainwright, 477 U.S. 168, 182 (1986)]. To declare as nonprejudicial the conduct of the assistant prosecutor in this case would be to announce a new standard for the prosecution of death penalty cases--a standard that falls dramatically short of that which is guaranteed to any person accused of a capital crime by both the Ohio and United States Constitutions

State v. Keenan, 613 N.E.2d 203, 210 (Ohio 1993).

61

anonymously called police about Klann's body and led them to the co-defendants), Detectives Hayes and Goldstein's conclusion about where the murder occurred, the Crimi cassette tape, the statements of Lewis's neighbors,  the Hudak police statement, and the Trace Evidence Report are all well-taken.

Conversely, the Court finds that the prosecution's failure to disclose that Russell had asked police for assistance in relocating is not material.  First, while defense counsel could have impeached Russell's testimony by demonstrating that it was influenced because two males had been looking for him prior to testifying, this evidence undoubtedly would have had a prejudicial effect on D'Ambrosio.  Thus, any benefit derived from demonstrating Russell's testimony was biased would have been vitiated by providing the panel with the knowledge that two individuals who, if not related to D'Ambrosio were at least purportedly acting in his behalf, had attempted to intimidate a state witness.  Consequently, the Court finds that the disclosure of this evidence would not have impacted the result of the trial.

### 4. conclusion

For the foregoing reasons, the Court finds none of D'Ambrosio's <u>Brady</u> sub-claims are barred from federal habeas review based on the restrictions of § 2254(e)(2) because D'Ambrosio was diligent in requesting exculpatory information in state court.  Moreover, none of these sub-claims are procedurally defaulted as D'Ambrosio was not capable of presenting them to the state court prior to obtaining the evidence to support them during habeas discovery.  Finally, the Court finds that sub-claims (a), (c), (d), (f), and (j), as described above, are well-taken.

### B. First Ground for Relief

It is unclear from the Petition whether D'Ambrosio is asserting an actual innocence claim to excuse any procedural default – a so-called "gateway" actual innocence claim – a free-standing actual

innocence claim, or both.   Thus, the Court reviews D'Ambrosio's actual innocence claim pursuant

to the standards as set forth in Herrera v. Collins, 506 U.S. 390 (1993).[24]   Prior to doing so, however,

---

[24]  The Court does not analyze D'Ambrosio's assertion of actual innocence as a "gateway" to excuse the procedural default of any other claims raised in the Amended Petition.  In Schlup v. Delo, 513 U.S. 298, 314-15 (1995), the Supreme Court held that, where a petitioner seeks to utilize claims of actual innocence as a gateway to assert he was wrongly convicted of a crime, the petitioner must demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Id. at 327 (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986)).   To constitute the necessary "probability," the petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."  Id.   Thus, the Schlup Court concluded, if a habeas petitioner presents evidence of his innocence that is so strong that a habeas court cannot have confidence in the trial's outcome unless it is also of the belief that the trial was free of constitutional error, a habeas petitioner should be entitled to a merit review of his underlying claims.  Id. at 316.
  Here, D'Ambrosio proffered new evidence during the evidentiary hearing both to assert his actual innocence claim and to assert his Brady and spoliation claims.  As is discussed above, the Court finds that D'Ambrosio's Brady sub-claims are not procedurally defaulted.  Thus, there is no need for a Schlup analysis to excuse their default.  Moreover, while the Court finds that other claims D'Ambrosio raises in the Amended Petition are procedurally defaulted, the Court finds that none of these defaulted claims are strong enough to present it with a Schlup-type circumstance, i.e., none of those claims come close to undermining the Court's confidence in a constitutionally obtained verdict.  Consequently, the Court finds that, based on the merits of any procedurally defaulted claims, it is unnecessary to undertake a Schlup analysis to excuse their procedural default.

it must subject the claims to the limitations set forth in § 2254(e)(2).[25]  Thus, it now analyzes that claim pursuant to the statute.

### 1. § 2254(e)(2)

The only direct evidence of actual innocence that D'Ambrosio proffered during the evidentiary hearing was that of the four alibi witnesses, Nemo Sicking, Matthew Alves, Michael Feller, and Karen Hay.[26]  Thus, the Court's first decision must be whether it can consider this evidence in reviewing the merits of D'Ambrosio's actual innocence claim in light of the diligence requirement of 28 U.S.C. § 2254(e)(2).   It is undisputed that D'Ambrosio failed to raise a claim of actual innocence at any juncture in his state court appeals.  Thus, before the Court can consider the evidence submitted at the evidentiary hearing on this claim, it must determine if D'Ambrosio "failed to develop the factual basis of a claim in state court proceedings" under the statute.  Id.  If D'Ambrosio did fail to develop the factual basis of this claim, the Court may only consider the evidence proffered in

_____

[25]        If D'Ambrosio were merely raising a gateway actual innocence claim, i.e., a claim that the failure to review a discreet, substantive claim would be a miscarriage of justice based on his actual innocence, then there would be no need to analyze this evidence under § 2254(e)(2).  That statute speaks only of an applicant's failure to develop *claims* in state court, but does not appear to address a petitioner's assertion of actual innocence as a defense to procedural default.
        The Sixth Circuit recently noted that the heightened actual innocence standard under § 2254(e)(2) that a petitioner must demonstrate to be entitled to an evidentiary hearing did not alter the standard a habeas court must utilize when reviewing a gateway actual innocence claim pursuant to Schlup v Delo, 513 U. S. 298 (1995).  Souter v. Jones, 395 F.3d 577, 590 n.5 (6th Cir. 2005).

[26]        While much of the evidence D'Ambrosio presented in support of his Brady claim also tangentially supports his actual innocence by undercutting the state's theory of how the murder occurred, the testimony supplying D'Ambrosio with an alibi during the time in which the state asserts Klann's murder occurred is the only affirmative evidence D'Ambrosio presented during the hearing that he is actually innocent of Klann's murder.

support of that claim if D'Ambrosio demonstrates: (1) the claim relies on a new rule of constitutional law made retroactive to him or the factual predicate of the claim could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim establish, by clear and convincing evidence, that, but for the constitutional error, no reasonable jury would have found him guilty. § 2254(e)(2)(A) & (B).

First, the Court notes that D'Ambrosio does not assert that the United States Supreme Court has enunciated a new rule of law made retroactively applicable to his case.  Consequently, to overcome the § 2254(e)(2) hurdle, D'Ambrosio must demonstrate that he both could not have discovered the factual predicate of his actual innocence previously through due diligence and that the facts underlying the claim establish, by clear and convincing evidence, that, and but for constitutional error, no reasonable factfinder would have found him guilty.[27]

The Court finds that D'Ambrosio has not demonstrated that he could not have discovered the testimony of the four alibi witnesses previously through due diligence.  During the evidentiary hearing, D'Ambrosio's counsel asserted that the publication of a Cleveland Scene Magazine article in 2001 prompted the four alibi witnesses to recall and come forward with testimony that they: (1) were with D'Ambrosio for the entire evening on the night that the state asserts D'Ambrosio murdered Klann; and,(2) saw Klann alive on the night after the events at Coconut Joe's, as he notified

---

[27]    As discussed below, a free-standing claim of actual innocence pursuant to Herrera v. Collins, 506 U.S. 390 (1993), is grounded on the assertion that the Eighth Amendment's Cruel and Unusual Punishment Clause would proscribe the execution of one who is actually innocent.  Thus, that type of claim is asserted independent of any constitutional violations that may or may not have occurred during trial.  Based on its conclusions as articulated below, the Court finds it unnecessary to determine whether § 2254(e)(2) would be satisfied in a constitutionally error-free trial.

partygoers in D'Ambrosio's apartment that some individuals were attempting to steal items from Keenan's truck, parked outside.  Thus, counsel asserted, D'Ambrosio could not have presented this testimony to the state court during post-conviction proceedings, which concluded in 2000.

Counsel also argued that D'Ambrosio did not come forward with this information himself previously because the four alibi witnesses had scattered shortly after Klann's murder.  Additionally, counsel asserted, "Mr. D'Ambrosio, as he testified in his trial, didn't recall the exact names of people, so he wasn't able to aid as much as he would have liked to, though he was still consulting with his attorneys and getting them going in the right direction."  Doc. 187, at 468.

The Court finds these arguments present it with a close question.  The testimony of two of the four witnesses appears to undercut D'Ambrosio's assertion that he was unable to locate them.  After hearing about Klann's murder and D'Ambrosio's subsequent incarceration, both Alves and Hay testified that they went to visit D'Ambrosio in prison to discern whether they could aid him in any manner.  Alves testified that he first learned that D'Ambrosio, Keenan, and Espinoza had been arrested for Klann's murder on the day of Klann's wake.  Id. at 362-3.  He went to visit D'Ambrosio in prison after he was arrested.  Hay also indicated that she visited D'Ambrosio in prison soon after his arrest.  Id. at 413.  Thus, D'Ambrosio's assertion at the hearing that the alibi witnesses scattered after his arrest and were, thus, not available to him, is not wholly accurate.

It is unclear why D'Ambrosio could not have invoked the aid of these two alibi witnesses to exonerate him during or after their visit to him in prison.  Feller testified during the evidentiary hearing that, after visiting with D'Ambrosio, Alves "left him our address" so that D'Ambrosio could contact them if there was anything that they could do.[28]  Doc. 186, at 251.  The visit presumably

---

[28]     Feller testified that he lived with Alves during this time period.  Doc. 186, at 251.

occurred some time in late September or early October, 1988.[29]  D'Ambrosio, however, never proffered their names as alibi witnesses prior to trial.  Because the exact dates of the visit relative to the time-frame in which the trial court appointed counsel for D'Ambrosio and the state's theory of the murder emerged is unclear, however, the Court finds that it is a close question whether D'Ambrosio acted diligently in discovering the alibi witnesses.  And, given the Court's decision regarding the merits of D'Ambrosio's free-standing actual innocence claim, the Court declines to answer it.

### 2. exhaustion and procedural default

Even if the Court were to find that D'Ambrosio was diligent, the Court may conclude that this claim is unexhausted because of D'Ambrosio's failure to raise it at any point in state court.  A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding.  28 U.S.C. § 2254(b), (c); Rose v. Lundy, 455 U.S. 509 (1982).  Exhaustion is required once a state supreme court provides a convicted defendant an opportunity to review his or her claims on the merits.  O'Sullivan v. Boerckel, 526 U.S. 838 (1999).  A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims.  Rust v. Zent, 17 F.3d 155, 160 (6th Cir. 1994); Manning v. Alexander, 912 F.2d 878, 881 (6th Cir. 1990).  If under state law there remains a remedy that petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim.  Rust, 17 F.3d at 160.  If a petitioner has no state remedy available yet he has never presented a claim to state court, a federal habeas court must deem this claim

---

[29]     Alves testified that he learned of D'Ambrosio's arrest on the date of Klann's wake, which was, presumably, shortly after September 24, 1988, the day his body was discovered.

to be procedurally defaulted and may address it only upon petitioner's showing of cause and prejudice.  Id.

D'Ambrosio could, conceivably, return to state court and present his claim in a motion for a new trial pursuant to Ohio Rule of Criminal Procedure 33.[30]  The Respondent did not raise this issue during this habeas action.  Although the state's failure to raise exhaustion does not invariably waive

---

[30]     That Rule states in pertinent part:

> **(A) Grounds**
>  A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantive rights:
>
>               * * *
>
> (6) When new evidence to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial.  When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case.  The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.
>
> **(B) Motion for new trial; form, time**
>
>               * * *
>
> Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where the trial by jury has been waived.  If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

Ohio R. Crim. P. 33.

68

the defense, <u>Granberry v. Greer</u>, 481 U.S. 129, 133–34 (1987), and it is the  petitioner's burden to prove exhaustion, <u>Rust v. Zent</u>, 17 F.3d 155, 160 (1994), the Court will not engage in a <u>sua</u> <u>sponte</u> analysis of exhaustion where the Respondent has failed to raise the issue.

### 3. merits

Once again assuming that D'Ambrosio's claim and the evidence used to support it are properly before this Court, the Court finds that D'Ambrosio has failed to demonstrate that he is "probably innocent" of Klann's murder under the <u>Herrera</u> standard, set forth below.

As stated above, the Court assumes that D'Ambrosio is asserting a free-standing claim of actual innocence, <u>i.e.</u>, that there is clear proof of his innocence which should entitle him to issuance of the writ, regardless of whether any constitutional error infected his trial.  The first threshold D'Ambrosio must cross with respect to his free-standing actual innocence claim is to convince this Court that such a claim exists.  In his effort to do so, D'Ambrosio cites <u>Herrera v. Collins</u>, 506 U.S. 390 (1993).  In that case, the petitioner alleged, as D'Ambrosio does, that newly acquired evidence would exonerate him of the crime of which he was convicted.  The petitioner argued that, because he was innocent, his execution would offend the Eighth and Fourteenth Amendments of the Constitution.  <u>Id.</u> at 398.  The Court noted that "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."  <u>Id.</u> at 404.  At the close of the opinion, however, the Court reasoned, *arguendo*, that the execution of a truly innocent person would violate the Constitution, but opined that the threshold showing for such a case "would necessarily be extraordinarily high."  <u>Id.</u> at 417.  Finding that the petitioner did not meet this abstract standard, the <u>Herrera</u> Court denied his actual innocence claim.

69

In the wake of Herrera, circuit courts, unsurprisingly, have divided on whether to recognize a habeas petitioner's free-standing actual innocence claim. In Carriger v. Stewart, 132 F.3d 463 (9th Cir. 1997), *cert. denied*, 523 U.S. 1133 (1998), for example, the Ninth Circuit held that Herrera did recognize this claim. Adopting the standard for actual innocence that Justice Blackmun announced in his dissenting opinion in Herrera, the Ninth Circuit determined that a habeas petitioner "must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." Id. at 476 (*citing* Herrera, 506 U.S. at 442–44). Other circuits, however, have determined that the Herrera Court never meant to hold that free-standing actual innocence claims were cognizable on habeas review, and merely assumed that the execution of an innocent person would be unconstitutional for argument's sake. See, e.g., Sellers v. Ward, 135 F.3d 1333, 1339 (10th Cir. 1998), *cert. denied*, 525 U.S. 1024 (1998)(holding that a free-standing actual innocence claim is not a basis for obtaining a writ of habeas corpus); Lucas v. Johnson, 132 F.3d 1069, 1074 (5th Cir. 1998)(holding that the language throughout the Herrera opinion denying habeas petitioner's right to free-standing actual innocence claim is controlling).

The Sixth Circuit has yet to provide definitive guidance on whether a free-standing actual innocence claim is cognizable in a habeas proceeding. In a series of unpublished decisions, it has stated that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." Davis v. Burt, No. 02-2333, 2004 WL 771224, at *8 (6th Cir. Apr. 9, 2004)(*quoting* Herrera, 506 U.S. at 400); see also Marine v. Mack, No. 03-3142, 2004 WL 237430, at *1 (6th Cir. Feb. 6, 2004)(same); Campbell v. Berghuis, No. 02-2185, 2003 WL 22435657, at *2 (6th Cir. Oct. 23, 2003)(same). As the Sixth Circuit has noted, however, [i]t is well-

70

established law in this circuit that unpublished cases are not binding precedent." Bell v. Johnson, 308

F.3d 594, 611 (6th Cir. 2002).

      In its published opinions, the Sixth Circuit has not denounced the existence of a free-standing

actual innocence claim so forcefully.  In Zuern v. Tate, 336 F.3d 478, 482 (6th Cir. 2003), the Sixth

Circuit stated, without finding, that Herrera precludes a free-standing claim of actual innocence.  Id.

at n.1.  Similarly, the Sixth Circuit, again without expressly accepting or rejecting a free-standing

claim of actual innocence, determined that a habeas petitioner failed to meet this standard.  In re

Byrd, 269 F.3d 544, 547–48 (6th Cir. 2001), the Court concluded that the petitioner's evidence

intending to prove his actual innocence "fail[ed] to meet the standard set forth in Herrera v. Collins."

(citation omitted).  Although Judge Merritt clearly found in House v. Bell, 386 F.3d 668 (6th Cir.

2004), cert. granted, 125 S. Ct. 2991 (June 28, 2005), that a free-standing claim of actual innocence

is cognizable in a federal habeas proceeding, his findings were contained in one of that Court's

dissenting opinions.  Id. at 686-709 (Merritt, J., dissenting).[31]

      Assuming, without deciding,  that a habeas petitioner can assert a free-standing actual

innocence claim, the Court now analyzes D'Ambrosio's assertion of actual innocence, using the

Herrera dissent's standard, i.e., "the petitioner must show that he probably is innocent."  Herrera, 506

U.S. at 442 (Blackmun, J., dissenting).  The Court finds that, while the events depicted through the

---

[31]    Two judges on this Court have determined that Herrera bars free-standing actual
innocence claims. See Hartman v. Bagley, 333 F.Supp.3d 632, 653 (N.D. Ohio
2004)(Gwin, J.)(holding that the Herrera Court has held that free-standing claims
of actual innocence are not cognizable in federal habeas proceedings but noting
that it recognized such claims could theoretically exist in dicta); Spirko v.
Anderson, No. 3:95CV7209, 2000 WL 1278383, at *19-20 (N.D. Ohio July 11,
2000) (Carr, J.)(opining that a habeas court's sole responsibility lies in ensuring
that the state afforded the petitioner a constitutionally sound trial, not to correct
errors of fact).

alibi witnesses' testimony may have occurred, and that the witnesses, for the most part, appeared credible, the version of events they describe is contradicted in important ways by D'Ambrosio's own trial testimony, by the testimony he provided in co-defendant Keenan's second trial and by the fairly precise testimony of at least one independent eye witness.  The Court outlines D'Ambrosio's trial testimony, describing his activities from Thursday evening, September 22, 1988, through Monday, September 26, 1988:

D'Ambrosio testified that he arrived at Coconut Joe's at approximately 10:00 to 10:30 p.m. on Thursday evening.  After Espinoza and Klann argued, the three co-defendants were asked to leave Coconut Joe's.  While walking down Coventry Road, they were stopped by Cleveland Heights Police Officers, who asked them several questions, Keenan then headed to another bar on Coventry Road called The Saloon to meet up with his girlfriend, Cindy Calire.  D'Ambrosio testified that he and Espinoza then went back to his apartment.  Doc. 23, at 309.  He testified that he was moving that weekend and was expecting a female friend to come to his apartment and assist him in the move. D'Ambrosio stated that it was approximately 2:00 a.m. when he returned to his apartment.  Id.   He further testified that he and Espinoza were alone at that time.  Id.

Worried about his friend's failure to appear, D'Ambrosio testified that he asked Keenan, who had returned to D'Ambrosio's apartment to retrieve his truck, to drive him around the neighborhood to look for his friend.  He stated that Keenan told him he also was looking for someone, but did not specifically state who it was.  Id. at 311.  While on the search, D'Ambrosio stated that Klann flagged down Keenan in order to procure a ride home, as it was raining at that time.  D'Ambrosio stated that they stopped at "Adam's" house, that Keenan got out first, then Espinoza, and that they were absent from the truck for approximately five or six minutes, but then returned.  D'Ambrosio testified that

72

he remained in the truck with Klann at that time. Id. at 314. From there, D'Ambrosio stated that the four men went to another residence, in which he was unfamiliar with the occupants, and learned that Keenan was looking for Lewis. Id. at 318.

After departing the second residence, D'Ambrosio asserted that Calire, who had been following the truck since it left the Coventry area, was growing increasingly angry. Thus, as they were leaving the Little Italy section of Cleveland at the intersection of Murray Hill and Mayfield Road, Keenan departed from the truck and joined Calire in her car. D'Ambrosio then stated to Espinoza and Klann that he wanted to return to his apartment so that he could pack. Id. at 321. He testified that they dropped him off at this apartment and that Klann was alive at that point. He further stated that he was alone that evening, packed for an hour or so, then went to sleep. Id. at 322.

D'Ambrosio stated that he worked during the day on Friday, September 23, 1988, until about 7:30 p.m. After dropping Espinoza (who worked with him) off at his apartment, D'Ambrosio testified that he went with Keenan to complete a painting job Keenan had procured until approximately 9:00 p.m. He then went back to Keenan's house. Keenan then informed D'Ambrosio that he could use Keenan's truck to help him move. After dropping Keenan off at a hotel room where Calire was living, D'Ambrosio testified that he drove Keenan's truck back to his apartment:

> A:   I dropped him off. I came back to the apartment. And when I came back to the apartment Eddie [Espinoza] was there, and there was a bunch of people already there. And Anthony's sister was there at the same time.
>
> Q:   Saturday?
>
> A:   This was - - no, this was Friday.
>
> Q:   Friday night.
>
> A:   This was Friday night. Friday night they were there. Everybody stayed. People were helping me pack until about one, one thirty. Everybody left and

> we went to sleep.  Eddie said something about he was going to use the truck,
> because he had the keys for - - .  He said Michael wouldn't mind anyhow.  So
> I didn't care.  I was going to sleep. So I went to sleep.

Id. at 325.   D'Ambrosio then testified that he worked all day on Saturday and Sunday and that he

was arrested on Monday, September 26.[32]

While some of this testimony corroborates that of the four alibi witnesses, other portions

undercut it.  Like the alibi witnesses, D'Ambrosio asserts that he was moving on the weekend in

question and that numerous people were at his apartment to aid him in his move and to party on

Friday evening.  Contrary to the assertions of the alibi witnesses, however, D'Ambrosio testified that

everyone except for Espinoza left his apartment at approximately 1:00 or 1:30 a.m.  This statement

conflicts with that of Karen Hay, who testified during the evidentiary hearing that she slept at

D'Ambrosio's apartment on Friday evening/Saturday morning, viewing him in his bed throughout

the night.[33]   This discrepancy between the four witnesses' testimony and D'Ambrosio's is crucial

----

[32]     D'Ambrosio's 1994 testimony regarding his whereabouts on the nights in
question largely duplicates his 1989 trial testimony.  When describing the events
of Friday evening in 1994, D'Ambrosio omits mentioning that others were in his
apartment when he arrived home.  He stated only that he and Espinoza were in his
apartment on Friday evening, September 23, 1988:

    A:    I went back to the apartment, like I say, gave the keys to Eddie,
          told him that we would start at 11:00 o'clock, and I started to finish
          packing.  I continued packing.
    Q:    What time did you go to bed?
    A:    About 1:00, 1:30.
    Q:    Who was there when you went to bed?
    A:    Mr. Espinoza was.  He said he was going to go out.

Doc. 44, at 2090.

[33]     The alibi witnesses also testified that Keenan was at D'Ambrosio's apartment on
Friday evening.  D'Ambrosio testified during his trial, however, that he drove
Keenan to Keenan's hotel room before borrowing Keenan's truck and returning to
his apartment.

74

because, had it not been contradicted, the alibi witnesses could have provided D'Ambrosio with an alibi for Friday evening/Saturday morning, September 23 and 24, 1988 – the time during which the state maintained the murder occurred.

Although less significant, D'Ambrosio's trial testimony also differs from that of the alibi witnesses' because he makes no mention of Klann's appearance at his apartment.  While the alibi witnesses neither stated (nor were asked) whether D'Ambrosio was aware of Klann's brief appearance and warning about the would-be thieves of Keenan's truck, all four witnesses testified that D'Ambrosio participated in the chase of these individuals.  See e.g., Doc. 185, at 184; Doc. 186, at 245. Though it is conceivable that D'Ambrosio may have participated in the chase without being aware of the person who was the impetus for it, it is somewhat unlikely.  Finally, Feller testified that on Thursday evening, September 22, 1988, around 11:00 p.m., he was with Keenan, Espinoza, and D'Ambrosio at D'Ambrosio's apartment drinking.  He also stated that he did not recall D'Ambrosio leaving his apartment for the remainder of that evening.  This testimony contradicts D'Ambrosio's trial testimony, in which he stated that, after leaving Coconut Joe's and being stopped briefly by the Cleveland Heights Police, he arrived at his apartment with Espinoza at around 2:00 a.m.  Moreover, he stated that he departed with Espinoza in Keenan's truck shortly thereafter.

Because of the conflicts between the alibi witnesses and D'Ambrosio's own trial testimony, particularly D'Ambrosio's assertion that he went to bed alone in his apartment on Friday evening, the Court cannot find, as it must under Herrera, that D'Ambrosio has proven that he is "probably innocent" of Klann's murder.   Moreover, the Court cannot discount the trial testimony of independent witnesses, such as Adam Flanik, who stated that he observed D'Ambrosio holding a

75

knife to Klann's throat while sitting inside Keenan's truck.  Unlike other state witnesses such as Lewis and Espinoza, Flanik derived little or no benefit from his testimony.

While the Court finds that D'Ambrosio has failed to meet the "extraordinarily high" standard set forth in Herrera, it feels compelled to observe that its view of this evidence might have been different if the Court were hearing this case in the first instance.  Although D'Ambrosio does not meet his burden, heavy of demonstrating innocence, the alibi witnesses' testimony, along with the evidence that the state withheld in violation of Brady, surely would have undermined the state's ability to carry *its* burden of proving D'Ambrosio's guilt beyond a reasonable doubt.  Thus, if this Court were sitting in judgment in another forum, applying a different burden, its conclusions also may have differed.  For the foregoing reasons, however, the Court must find that D'Ambrosio's first ground for relief is not well-taken.

### C. Second and Thirteenth Grounds for Relief

In his second and thirteenth grounds for relief, D'Ambrosio alleges that issues with his jury waiver render his trial and appeal fundamentally unfair.  First, he contends that the waiver was not knowing, voluntary, and intelligent.  He next asserts that, because the jury waiver was file-stamped seven years after his trial, he was denied the right to a fundamentally fair trial based on the Ohio Supreme Court's decision in State v. Pless, 658 N.E.2d 766 (Ohio 1996).  Finally, he argues that his appellate counsel were ineffective for failing to raise the time stamp issue on direct appeal.  The Court addresses the merits of each sub-claim as well as whether each sub-claim is procedurally defaulted individually.

### 1. knowing, voluntary, and intelligent waiver

D'Ambrosio first asserts that his initial waiver was not knowing, voluntary, and intelligent and, thus, was constitutionally defective.  He raised this claim to the Ohio Supreme Court, which addressed it on the merits.  Therefore, it is not procedurally defaulted.

The right to a jury trial is a fundamental constitutional right.  Duncan v. Louisiana, 391 U.S. 145, 149 (1968).  To effectively waive this right, a criminal defendant must meet the following four conditions: (1) the waiver must be in writing; (2) the government attorney must consent to the waiver; (3) the trial court must consent to the waiver; and, (4) the defendant's waiver must be knowing, voluntary and intelligent.  Spytma v. Howes, 313 F.3d 363, 370 (6th Cir. 2003)(*citing* United States v. Martin, 704 F.2d 267, 272 (6th Cir. 1983)).  For a waiver to be knowing, voluntary, and intelligent, the defendant must possess the mental capacity to comprehend what he is waiving, as well as be sufficiently informed about the consequences of his decision.  Specifically, a defendant should know that the jury is composed of 12 members, that he may participate in jury selection, that the jury must be unanimous in reaching a verdict, and, if the defendant elects to waive this right, the judge alone will decide the defendant's guilt or innocence.  Id.

Although it is preferable for the trial court to conduct an on-the-record colloquy of the waiver, there is no constitutional right to such a colloquy.  Sowell v. Bradshaw, 372 F.3d 821, 832 (6th Cir. 2004)(*following* Martin, 704 F.2d at 273).  Moreover, failure to conduct an on-the-record colloquy "does not *ipso facto* constitute reversible error."  United States v. Cochran, 770 F.2d 850, 853 (9th Cir. 1985).   Once a waiver is effectuated, the burden is on the petitioner to demonstrate that the waiver of the jury trial right was *prima facie* invalid.  Sowell, 372 F.3d at 832;  Milone v. Camp, 22 F.3d 693, 704 (7th Cir. 1994).   Whether the jury trial waiver was invalid depends on the factual

77

circumstances of the case.  Lott v. Coyle, 261 F.3d 594, 615 (6th Cir. 2001)(*quoting* Martin, 704 F.2d at 272).  On habeas review, a state court's determination that a petitioner's jury trial waiver was valid is a finding of fact entitled to a presumption of correctness pursuant to § 2254(e)(1) unless the petitioner can overcome this presumption by clear and convincing evidence.  Spytma v. Howes, 313 F.3d at 371.  "In the absence of contemporaneous evidence outside of the written waiver showing that the waiver was [not] knowing and intelligent, [a court] must give presumptive force to [the] written document."  Id.

In the instant case, D'Ambrosio provided the trial court with a written waiver that both he and defense counsel signed.  Doc. 188, Exh. 1.  Moreover, the trial court conducted the following colloquy prior to accepting D'Ambrosio's waiver:

> The Court:  Mr. D'Ambrosio, on an earlier date you executed a waiver form that was incorporated and made part of the record.  I take it you again discussed that with your attorneys?
>
> The Defendant:  Yes, I have.
>
> The Court:  Is it still your desire to go forward with a three judge panel as opposed to a jury?
>
> The Defendant:  Yes, it is, Your Honor.

Doc. 23, at 4.

The Court finds that, while this colloquy admittedly  is brief, it cannot find that the Ohio Supreme Court's and Eighth District Court of Appeals' findings on this issue were unreasonable.  The latter court, in particular, examined this claim in detail and held:

> In the case *sub judice* defendant signed a written form which advised him that he had a constitutional right to a jury trial. At the time of the signing, defendant was represented by counsel. At the beginning of trial defendant was asked if he had *again* discussed a waiver with his counsel to which defendant replied affirmatively. The trial judge then specifically inquired whether defendant desired to be tried by a three-judge

78

panel as opposed to a jury. Defendant again replied affirmatively. The trial court was under no obligation to explain the waiver issue in any more detail. There is nothing in the record to suggest defendant was confused, hurried or in any way misled. The record reveals defendant signed the jury waiver approximately a month and a half prior to trial, hence, defendant had ample time to discuss with his counsel, clarify any questions he may have had and mull over in his own mind the ramifications of a jury waiver. Defendant discussed the matter at least twice with his counsel and was well aware he could opt for a jury trial. Therefore, defendant knowingly, voluntarily, and intelligently waived his right to a jury trial.

State v. D'Ambrosio, No. 57448, 1990 WL 125453, at *4 (Ohio Ct. App. Aug. 30, 1990).

Lott v. Coyle, 261 F.3d 594, 615 (6th Cir. 2001), is also instructive here.  In that case, the Sixth Circuit found that, based on the trial court's on-the-record colloquy, the sufficiency of the jury waiver issue was a close question. It noted that the trial court in that case had not discerned the extent of the petitioner's conversation with counsel regarding the ramifications of waiving a jury trial.  Id. Although the Lott court, as this Court, noted that there were several statements absent from the colloquy, the Sixth Circuit found that no error occurred.  Finally, although not binding authority, the Court finds that case law discussing the analogous Federal Rule of Criminal Procedure 23(a) provide it with guidance.  Those cases have held that a written waiver "creates a presumption that the wavier is a voluntary, knowing, and intelligent one." United States v. Sammons, 918 F.2d 592, 597 (6th Cir. 1990), cert. denied, 510 U.S. 1204 (1994)(quoting United States v. Cochran, 770 F.2d 850, 851 (9th Cir. 1985)).  The  written waiver along the with the on-the-record colloquy were sufficient to notify D'Ambrosio about the rights he was foregoing.  While a more extensive colloquy would be preferable, the Court cannot find that D'Ambrosio has rebutted the state court's finding that his jury waiver was knowing, voluntary, and intelligent with "clear and convincing evidence, as is required in order to obtain habeas relief."  Spytma, 313 F.3d at 371 (citing Rickman v. Bell, 131 F.3d 1150, 1153-54 (6th Cir. 1997)); 28 U.S.C. § 2254(e)(1).   Thus, he cannot succeed on this claim.

79

## 2. trial court lacked jurisdiction to hear case

D'Ambrosio next asserts that the trial court lacked jurisdiction to hear his case because it did not comply with the requirements of Ohio Revised Code § 2945.05. Specifically, the trial court failed to time stamp the jury waiver form prior to trial. Although signed on December 14, 1988, prior to trial, the time stamp was not affixed to the jury waiver form until over seven years after D'Ambrosio's conviction, on January 18, 1996. Thus, D'Ambrosio asserts, the trial court did not comply with § 2945.05 and had no jurisdiction to hear his case. Consequently, D'Ambrosio asserts, his trial violated his Fourteenth Amendment right to due process of law and the right to a fundamentally fair trial. The Respondent asserts that this claim is procedurally defaulted because D'Ambrosio failed to raise this issue at any point in his state court proceedings. This Court agrees and finds that the claim is procedurally defaulted.

This claim lacks merit in any event. Ohio Revised Code § 2945.05 sets forth specific requirements to which trial courts must adhere when accepting a criminal defendant's jury waiver. It states:

> **Defendant may waive jury trial.**
> In all criminal cases pending in courts of record in this state, the defendant may waive a trial by jury and be tried by the court without a jury. Such waiver by a defendant, shall be in writing, signed by the defendant, and filed in said cause and made a part of the record thereof. It shall be entitled in the court and cause, and in substance as follows: "I . . . . . . , defendant in the above cause, hereby voluntarily waive and relinquish my right to a trial by jury, and elect to be tried by a Judge of the Court in which said cause may be pending. I fully understand that under the laws of this state, I have a constitutional right to a trial by jury."
> Such waiver of trial by jury must be made in open court after the defendant has been arraigned and has had opportunity to consult with counsel. Such waiver may be withdrawn by the defendant at any time before the commencement of the trial.

Ohio Rev. Code § 2945.05.

80

The Ohio Supreme Court has issued a number of opinions that directly address the degree of statutory compliance necessary to effectuate a valid waiver.  In its earlier decisions, some Ohio courts did not appear to require strict compliance with § 2945.05.  See, e.g., State v. Griffin, 469 N.E.2d 1329, 1331 (Ohio Ct. App. 1979)(holding § 2945.05 does not require open court colloquy or that waiver be made part of record to be presumed valid).  In subsequent decisions, however, the Ohio Supreme Court held strict compliance necessary to uphold the waiver as a valid one.  See, e.g., State ex rel. Larkins v. Baker, 653 N.E.2d 701 (Ohio 1995); State ex rel. Jackson v. Dallman, 638 N.E.2d 563 (Ohio 1994).

Finally, in State v. Pless, 658 N.E.2d 766 (Ohio 1996), the Ohio Supreme Court synthesized its previous strict compliance cases, disregarding earlier opinions that appear not to have required rigid compliance with the statute to effectuate jury waiver.  The Pless court held that, "[a]bsent strict compliance with the requirements of R.C. 2945.05, a trial court lacks jurisdiction to try the defendant without a jury."  Id. at ¶ 1 of the syllabus.  Additionally, it held that a defendant may only obtain a remedy for the trial court's failure to comply with the jury waiver statute on direct appeal.  Id. at ¶ 2 of the syllabus.

D'Ambrosio seizes upon the jurisdictional requirement in the Pless holding to assert that, because the trial court lacked jurisdiction to try his case, he was deprived of the right to a fair trial and due process of law.  The Respondent, however, asserts that this claim is a state law claim, not cognizable in a federal habeas court.  Respondent's argument is not without force.  The issue D'Ambrosio raises most certainly relates to the interpretation of a state statute.  It seems likely, however, that if a trial court lacked jurisdiction to try a case, a defendant's Fourteenth Amendment

81

right to due process would be implicated.  Thus, the Respondent's opposition to D'Ambrosio's jurisdictional claim does not provide the Court with the means by which to deny it.

Instead, the Court finds the Sixth Circuit's reasoning in Lott v. Coyle, 261 F.3d 594 (6th Cir. 2001), dispositive of this issue.  In that case, the petitioner raised the precise jurisdictional/waiver requirement as D'Ambrosio raises here.  Presented with this issue, the Sixth Circuit determined it unnecessary to find whether the petitioner's three-judge panel was without jurisdiction to hear the case because, "at the time [the petitioner] sought to waive his right to a jury trial, it was an open question whether *strict* adherence to § 2945.05 was required to execute a valid waiver and confer jurisdiction on a three-judge panel."  Id. at 610 (emphasis in original).  Finding that the pre-Pless standard of substantial compliance was met even though the petitioner's waiver was not made part of the record, the court denied the petitioner habeas relief.  Id.

Lott waived his right to a jury trial on June 23, 1987, less than eighteen months before D'Ambrosio signed his jury waiver form.  Because both Lott and D'Ambrosio waived their right to a jury trial in roughly the same time period and before the Ohio Supreme Court issued the Pless opinion, the Court finds that the Lott holding forecloses D'Ambrosio's claim.  As D'Ambrosio's trial court, like Lott's, was subject to the pre-Pless standard, the Court finds that D'Ambrosio's signed, written waiver, on which there was an open court colloquy, resulted in the trial court's substantial compliance with Ohio Revised Code § 2945.05.  The trial court, therefore, was not without jurisdiction to try D'Ambrosio's case.  Accordingly, the Court finds D'Ambrosio's claims to the contrary lack merit.

### 3. ineffective assistance of appellate counsel

82

Finally, D'Ambrosio alleges that his appellate counsel were ineffective for failing to raise the time stamp issue on direct appeal.  The Respondent asserts that D'Ambrosio's ineffective assistance of appellate counsel claim is procedurally defaulted on two grounds: First, the Respondent asserts that his claim is barred because the Eighth District Court of Appeals found his application to reopen was untimely.  Second, the Respondent asserts procedural default because D'Ambrosio failed to appeal the Eighth District Court of Appeals' decision to the Ohio Supreme Court.

D'Ambrosio contends that this Court should disregard the Court of Appeals' finding that his application to reopen was time barred under Rule 26(B).  He asserts that Rule 26(B) is not an adequate and independent state ground upon which to premise a finding of procedural default.  D'Ambrosio then cites, Landrum v. Anderson, 185 F.Supp.2d 868, 873 (S.D. Ohio 2002), for this proposition.  In that case, the court held that the "good cause" exception to Rule 26(B) was not consistently applied by Ohio courts.  Id.  If D'Ambrosio is correct, this Court could find that D'Ambrosio's ineffective assistance of appellate counsel claim is not procedurally defaulted on this ground because the procedural rule on which the state would base its decision to deny D'Ambrosio's application to reopen would not require deference by this Court.  Coleman v. Thompson, 501 U.S. 722, 731-32 (1991).

The Sixth Circuit has determined, arguably in *dicta*, that the good cause exception to Rule 26(B) *is* an adequate and independent state ground on which to find a claim procedurally defaulted. In Monzo v. Edwards, 281 F.3d 568, 578 (6th Cir. 2002), the Court held that, because the Ohio Supreme Court sufficiently explained the good cause standard under Rule 26(B) in State v. Reddick,

83

647 N.E.2d 784, 786 (Ohio 1995), there can be no debate, at least as to decisions post-dating Reddick, that the procedural bar of Rule 26(B) is firmly established.[34]

The Court declines to decide this issue in light of an alternative ground for finding this claim to be procedurally barred.  As the Respondent notes, D'Ambrosio failed to appeal the denial of the Muranahan application to the Ohio Supreme Court.  Thus, D'Ambrosio failed to exhaust the ineffective assistance of appellate counsel claim in state court.  A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims.  Rust v. Zent, 17 F.3d 155, 160 (6th Cir. 1994); Manning v. Alexander, 912 F.2d 878, 881 (6th Cir. 1990)  If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim.  Rust, 17 F.3d at 160.  The Court finds that D'Ambrosio failed to file a timely appeal of his application to reopen to the Ohio Supreme Court.[35] Thus, it finds D'Ambrosio's ineffective assistance of appellate counsel claim to be procedurally barred.

---

[34]    The Landrum decision predates the Monzo decision by eighteen days.  Another judge on this Court, in granting a certificate of appealability on this issue to the Sixth Circuit, has also noted these disparate holdings.  See Davie v. Mitchell, 324 F.Supp.2d 862, 871 (N.D. Ohio 2004)(Carr, J.)(finding that "[t]he Monzo and Landrum holdings underscore the conclusion that jurists of reason could differ on this issue.").

[35]    The Ohio Supreme Court Practice Rule II, Section 2 states in relevant part:
            (A) *Perfection of Appeal*
                    (1)(a) To perfect an appeal from a court of appeals to the Supreme Court, . . . , the appellant shall file a notice of appeal in the Supreme Court within 45 days from the entry of the judgment being appealed.
        Supreme Ct. Practice R. II.

84

Were it not defaulted, the Court would find that it lacks merit. A defendant is entitled to effective assistance of counsel in his first appeal as a matter of right. Evitts v. Lucey, 469 U.S. 387, 396 (1985). The two-part test enunciated in Strickland, is applicable to claims of ineffective assistance of appellate counsel. Thus, D'Ambrosio must demonstrate that his appellate counsel's performance was deficient, and that the deficient performance so prejudiced the appeal that the appellate proceedings were unfair and the result unreliable. Strickland, 466 U.S. at 687. An appellant has no constitutional right to have every non-frivolous issue raised on appeal, Jones v. Barnes, 463 U.S. 745, 750–54 (1983), and tactical choices regarding issues to raise on appeal are properly left to the sound professional judgment of counsel. United States v. Perry, 908 F.2d 56, 59 (6th Cir.), *cert. denied*, 498 U.S. 1002 (1990). "[O]nly when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." Joshua v. DeWitt, 341 F.3d 430, 441 (6th Cir. 2003)(internal quotation marks and citations omitted).

The Court finds that D'Ambrosio can establish neither prong of the Strickland test. First, he does not articulate, beyond mere assertion, why appellate counsel were objectively unreasonable in failing to assert this claim on appeal. In fact, the Eighth District Court of Appeals has rejected an argument identical to D'Ambrosio's in State v. Otte, No. 64617, 2000 WL 1900396 (Ohio Ct. App. Dec. 20, 2000). Otte had filed an application to reopen pursuant to Rule 26(B), arguing that his appellate counsel were ineffective for failing to raise a jury waiver form issue nearly identical to the one D'Ambrosio raises here. He claimed, as does D'Ambrosio, that appellate counsel should have asserted that the trial court lacked jurisdiction to hear his case because it did not comply with § 2945.05. In denying the application, the Eighth District Court of Appeals held that, because Otte's direct appeal concluded prior to the 1996 Pless decision, his "appellate counsel cannot be declared

85

ineffective for failing to anticipate the future development of the law in the area of jury waiver." Id. at *3.  Similarly, this Court cannot find that D'Ambrosio's appellate counsel acted unreasonably in failing to assert this claim three years prior to the Pless holding.   Accordingly, the Court finds this claim lacks merit.

### D. Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Grounds for Relief

In these grounds for relief, D'Ambrosio alleges that his trial counsel were ineffective during the pre-trial and culpability phases of trial.  To obtain habeas relief based on this claim, a petitioner must satisfy the two-prong test for ineffective assistance of counsel set forth in Strickland v. Washington, 466 U.S. 668 (1984).   As stated above, a petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687.  Second, a petitioner must show that he or she was prejudiced by counsel's errors.  "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.

To ascertain whether counsel's performance prejudiced a criminal proceeding, a reviewing court does not speculate whether a different strategy might have been more successful, but a court must "focus on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). In light of this standard, the Court now reviews D'Ambrosio's individual grounds for relief.

### 1. third ground for relief

In his third ground, D'Ambrosio alleges that counsel were ineffective for failing to move that Judge Michael Corrigan, the presiding judge at his trial, recuse himself.  Immediately prior to presiding over D'Ambrosio's trial, Judge Corrigan presided over co-defendant Keenan's jury trial.

86

D'Ambrosio notes that Espinoza testified during that trial as part of a plea bargain agreement with the state.   An essential part of the plea bargain was that Espinoza had to testify truthfully.   Thus, concludes D'Ambrosio, Judge Corrigan must have found Espinoza's testimony to be truthful or he would have voided the plea bargain.   Because Judge Corrigan already had decided that Espinoza's depiction of Klann's murder was truthful during Keenan's trial, D'Ambrosio concludes, he was not impartial when deciding D'Ambrosio's proceeding.   D'Ambrosio asserts that trial counsel's failure to object to Judge Corrigan's presence on the panel rendered that representation constitutionally infirm.   The Respondent concedes that D'Ambrosio raised this claim on direct appeal to the Ohio Supreme Court.   Thus, it is not defaulted and the Court may address it on the merits.

The Ohio Supreme Court's decision on this claim was cryptic brief.   In summarily finding that his claim was devoid of merit, the court cited its review of D'Ambrosio's first ground for relief – the distinct trial court bias claim – as dispositive of the issue.   When reviewing that claim, the court found that Judge Corrigan was not required to recuse himself.   In addition, it held:

> Defendant's contention that Judge Corrigan would have abrogated the plea bargain had he not affirmatively believed Espinoza's testimony is debatable.  Judge Corrigan may have been unsure of Espinoza's truthfulness but unwilling to abrogate the plea bargain without affirmative evidence of perjury – especially without a request by the state.  Even assuming, *arguendo*, that Judge Corrigan formed an opinion, that would be no guarantee that he would believe Espinoza in a later trial.

State v. D'Ambrosio, 616 N.E.2d 909, 913 (Ohio 1993).

While the Ohio Supreme Court did not specifically cite to Strickland as the United States Supreme Court standard it must use when adjudicating an ineffective assistance of counsel claim, it was not required to do so. See Early v. Packer, 537 U.S. 3, 8 (2002)(holding that, to avoid pitfalls of § 2254(d), state court is not required to make a "citation of our cases--indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state court decision

contradicts them.").  Instead, the Ohio Supreme Court's decision is entitled to deference pursuant to the AEDPA if it was not clearly contrary to any Supreme Court precedent.    Implicit in the Ohio Supreme Court's finding that the underlying judicial bias claim lacked merit, was the court's determination that counsel's inactions did not prejudice the trial.[36]  While it certainly would have preferable for the Ohio Supreme Court to identify <u>Strickland</u> as its standard and set forth its reasoning pursuant to it, the Court cannot find that the Ohio Supreme Court's holding contradicts <u>Strickland</u>.  Thus, this Court's inquiry ends.[37]

## 2. fourth and fifth grounds for relief

In these grounds for relief, D'Ambrosio asserts his counsel were ineffective for filing a motion to suppress that was not sufficiently tailored to his claims.  He also contends counsel were ineffective for later withdrawing this motion.   The Respondent alleges that both claims are procedurally defaulted.

---

[36]     In its review of this claim, the Ohio Supreme Court stated:
> In the third proposition of law, defendant contends that his trial counsel should have challenged Judge Corrigan's alleged bias, presumably by either seeking his disqualification or attempting to withdraw the jury waiver.  Upon review of the trial record we find this argument is devoid of merit, especially in light of our reasoning under defendant's first proposition of law.

<u>State v. D'Ambrosio</u>, 616 N.E.2d 909, 914 (Ohio 1993).

[37]     Were it not for the AEDPA, the Court may well have decided this claim differently.  There is no doubt that it would have been more prudent for Judge Corrigan to recuse himself.  The Court also questions the Ohio Supreme Court's conclusions that participating in the earlier Keenan trial likely had no effect on Judge Corrigan's objectivity in D'Ambrosio's trial.   Under the strict constraints of the AEDPA, however, the Court is not permitted to review this issue in the first instance or to supplant its judgment for that of the Ohio Supreme Court.  <u>See</u> <u>Joshua v. DeWitt</u>, 341 F.3d 430, 448 (6th Cir. 2003)(holding that, "federal courts are limited to evaluating habeas claims 'through the lens of § 2254(d).'")(*quoting* <u>Price v. Vincent</u>, 538 U.S. 634, 639 (2003)).

In reviewing the fourth ground for relief on direct appeal, the Eighth District Court of Appeals made the following factual findings:    After identifying Klann's body at the Cuyahoga County Morgue, Lewis, Russell, and Flanik spoke with police.  Thereafter, police went to D'Ambrosio's apartment.  Espinoza, who was living with D'Ambrosio, let the police enter the apartment.  Officers observed a baseball bat and two knives in plain view.  They arrested D'Ambrosio and Espinoza. During D'Ambrosio's trial, the state adduced evidence tending to demonstrate that the seized knives could have been the murder weapons used to kill Klann.   State v. D'Ambrosio, No. 57448, 1990 WL 125453, at *2-3 (Ohio Ct. App. Aug. 30, 1990).

D'Ambrosio alleges that, when filing a pre-trial motion to suppress, his counsel merely filed a motion containing "boilerplate" and not asserting any arguments specific to his case.  The Respondent alleges that this claim is procedurally defaulted because D'Ambrosio did not raise it at any juncture in his state court appeals.  The Court, thus, finds the claim to be procedurally defaulted and will not address it on the merits.[38]

D'Ambrosio also asserts that his counsel were ineffective for withdrawing the motion to suppress.   The Respondent asserts that this claim is procedurally defaulted because, while D'Ambrosio raised it on direct appeal to the Eighth District Court of Appeals, he failed to raise it to the Ohio Supreme Court.  It was only after the Eighth District Court of Appeals returned the case to the Ohio Supreme Court after that court remanded it that D'Ambrosio raised this claim to the Ohio

---

[38]    This claim is without merit in any event.  D'Ambrosio fails to address in either the Petition or the Traverse what information counsel should have provided in the motion to suppress that would have tailored it to his case and how it would have impacted his trial.  Without advising the Court as to how counsel acted unreasonably during his pre-trial and trial proceedings, the Court cannot find that counsel's conduct prejudiced them.

Supreme Court.  The Ohio Supreme Court held the claim to be barred on grounds of res judicata.

State v. D'Ambrosio, 652 N.E.2d 710, 713 (Ohio 1995).   Thus, the Court finds this claim to be

procedurally defaulted.[39]

### 3. sixth and seventh grounds for relief

D'Ambrosio's sixth and seventh grounds for relief are that trial counsel were ineffective for

waiving the cross-examination of Detective Hayes and for failing to request a crime scene view.

D'Ambrosio's counsel stipulated during trial that Detective Leo Allen could testify regarding what

Detective Hayes observed at the crime scene.  D'Ambrosio argues that these failures to act were

unreasonable because counsel was then ill-equipped to challenge Espinoza's account of Klann's

murder.  Had counsel cross-examined Hayes, D'Ambrosio surmises, counsel could have gleaned

Hayes's impression that the murder occurred elsewhere and that Klann's body was dumped in Doan's

Creek.  Furthermore, he concludes, had counsel requested a view of the crime scene, they would have

been able to undercut portions of Espinoza's testimony.

The Respondent asserts that both claims are procedurally defaulted because D'Ambrosio

failed to raise them at any juncture in state court.  D'Ambrosio does not counter this assertion

pertaining to his sixth ground, but claims in response to the seventh ground that this claim was raised

in his post-conviction relief petition.  A review of that petition reveals that, while D'Ambrosio alleged

ineffective assistance of counsel, he did not raise it under the same theory as he does here.  Because

that claim differs from the one presented here, the Court finds this claim to be procedurally defaulted.

---

[39]     Like the previous claim, the Court finds that this claim would not be well-taken
even if it were not defaulted. Once again, D'Ambrosio fails to specify why
counsel's decision to withdraw the suppression motion was an unreasonable one.
Without such pertinent information, the Court would find that this claim lacks
merit.

See Wong v. Money, 142 F.3d 313, 322 (6th Cir. 1998)(holding that, to exhaust a claim, a petitioner must present it "to the state courts under the same theory in which it is later presented in federal court.").

Were the Court to address the merits of the claims, it would find them to be without merit. Without the prosecution revealing the conclusions of Detectives Hayes and Goldstein, it is difficult to fault counsel for not insisting that Hayes testify or for failing to request a crime scene view.  In short, defense counsel did not receive any noteworthy information that should have triggered a duty to investigate this aspect of the case further.  Consequently, counsel's investigation regarding where and how the murder occurred was reasonable based on information known to counsel at the time. See Wiggins v. Smith, 539 U.S. 510, 527-28 (2003)(cautioning habeas court that it "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").  While, in hindsight, it would have been preferable for counsel to have addressed Hayes in open court, because of the state's Brady failures, counsel could not have known that at the time.

### 4. eighth ground for relief

In his eighth ground for relief, D'Ambrosio asserts that his counsel were constitutionally ineffective for failing to hire a pathologist and criminologist.  During trial, the state and defense counsel stipulated that one of the knives found in D'Ambrosio's apartment was tested but that no blood was found on it.  The Cuyahoga County Coroner testified that it was "possible" that the knives were those used to kill Klann.  D'Ambrosio now asserts that, had counsel obtained an independent expert, they could have disputed the Coroner's conclusions regarding the knives.  The Respondent

asserts that this claim is procedurally defaulted because D'Ambrosio failed to raise it at any point in his state court appeals.  The Court agrees and will not address the merits of this claim.

### 5. ninth ground for relief

In this ground for relief,  D'Ambrosio asserts that counsel were ineffective for failing to interview and procure a statement from Aileen Keeling Osborn.  Ms. Osborn revealed to D'Ambrosio's appellate counsel that she saw Klann in the morning hours of Saturday, September 24, 1988.  D'Ambrosio asserts that her testimony could have aided him because he admitted to riding in Keenan's truck with Klann on Thursday evening into Friday morning, September 22-23, 1988.  Thus, counsel's failure to interview Osborn and procure her testimony was constitutionally deficient.

As with the above ineffective assistance claims, the Respondent asserts that this claim is procedurally defaulted because D'Ambrosio failed to raise it in state court.  Moreover, the Respondent asserts, appellate counsel, Paul Mancino, averred in an affidavit that he had this information in 1990, yet failed to raise any issue pertaining to it on direct appeal.  D'Ambrosio also did not raise this claim during post-conviction proceedings.  The Court finds that this claim is procedurally defaulted.

### 6. tenth ground for relief

D'Ambrosio's final ineffective assistance of counsel claim is that defense counsel were ineffective for failing to file a notice of alibi with the court.  Counsel are required to file such a notice pursuant to Ohio Rule of Criminal Procedure 12.1.[40]  The Respondent asserts that this claim is

---

[40]       That Rule states:
> **Crim R 12.1    Notice of alibi**
> Whenever a defendant in a criminal case proposes to offer testimony to establish an alibi on his behalf, he shall, not less than seven days before trial, file and serve upon the prosecuting attorney a notice in writing of his

92

procedurally defaulted because D'Ambrosio failed to raise it at any point in his state court appeals. D'Ambrosio does not challenge this assertion. Thus, the Court finds this claim to be procedurally defaulted.

### E. Eleventh Ground for Relief

In this ground, D'Ambrosio asserts that he was denied due process of law and a fair trial because the state failed to preserve evidence of Klann's murder that was material to issues of guilt and punishment. Specifically, he asserts that the state did not preserve a pile of bloody clothing in Keenan's garage, a cassette tape of a conversation between an informant and Angelo Crimi, which was attached to a police report that indicated that it "may incriminate others in this crime," and allowed a repossession company to procure Keenan's truck without a thorough search of it beforehand. The Respondent asserts that this claim is procedurally defaulted because D'Ambrosio failed to raise it at any point in his state court proceedings. Similar to his Brady claim, the Court finds that D'Ambrosio was diligent in pursuing information that led to the grounds for his spoliation of evidence claims. While he did not raise this claim in state court, he could not have done so prior to obtaining the discovery this Court permitted during the pendency of this habeas proceeding. Thus, D'Ambrosio can establish "cause" for failing to raise this claim in state court.

In California v. Trombetta, 467 U.S. 479 (1984), the United States Supreme Court held that a state violates a defendant's right to due process pursuant to the Fourteenth Amendment when it destroys material exculpatory evidence. To constitute "material exculpatory evidence," it "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a

_____

intention to claim alibi.
Ohio R. Crim. P. 12.1.

nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  Id. at 488-89; United States v. Wright, 260 F.3d 568, 570 (6th Cir. 2001). Subsequent to Trombetta, the Supreme Court held that, when reviewing a spoliation claim involving evidence that was not material and exculpatory but merely "potentially useful," a defendant must withstand a three-prong test to argue successfully that the state has violated his or her right to due process.  Arizona v. Youngblood, 488 U.S. 51, 57-8 (1989).  In instances where the destroyed evidence was "potentially useful," the Court held, a defendant must demonstrate: (1) that the state acted in bad faith in failing to preserve the evidence; (2) that the exculpatory nature of the evidence was apparent at the time of its destruction; and, (3) that the defendant is unable to obtain similar evidence.  Id.; Hamblin v. Mitchell, 354 F.3d 482, 495 (6th Cir. 2004).  The Sixth Circuit has found that "[w]hen the government is negligent, or even grossly negligent, in failing to preserve potentially exculpatory evidence, bad faith is not established."  Monzo v. Edwards, 281 F.3d 568, 580 (6th Cir. 2002).

Based on the applicable law, the Court cannot ascertain whether the destroyed evidence presented in this claim was material exculpatory evidence.  While the bloody clothes, the Crimi tape, and Keenan's truck all constitute evidence that D'Ambrosio could not obtain through other means, D'Ambrosio cannot demonstrate, as he must under Trombetta, that it possessed an apparent exculpatory value before it was destroyed.[41]  Although both the bloody clothing and Crimi cassette tape may have exonerated D'Ambrosio, they also may have further implicated him in Klann's murder.

---

[41]     While the Court held previously in this Opinion that the state's failure to provide the defense with the Crimi tape was a Brady violation, it so held because of the tape's usefulness in impeaching Espinoza's testimony.  The Court did not find that it had an apparent exculpatory value.

94

Thus, unlike a taped confession of a co-defendant for example, these items do not appear to be patently exculpatory.  D'Ambrosio's assertion that trace evidence found in Keenan's truck may have exculpated him is pure speculation, moreover.  Thus, the Court cannot find that these items possess an intrinsic exculpatory value.[42]

Consequently, the Court finds that the destroyed evidence was "potentially useful" to D'Ambrosio's defense.  As stated above, D'Ambrosio also must demonstrate that the state acted in bad faith when it destroyed this evidence. D'Ambrosio has offered not explanation for the destruction of the evidence, however, presumably because the state has proffered no explanation for it.  Because the Court does not know what the evidence would have proven, moreover, it cannot infer bad faith from the mere fact of its destruction. Thus, it appears at least, that the burden is on petitioner to show bad faith, as Trobetta and its progeny indicate, that burden cannot be satisfied here. Ultimately, the Court finds that it need not resolve this issue given that it found that much of the evidence D'Ambrosio asserts the state later destroyed was withheld from the defense at the time of the trial in violation of Brady v. Maryland, 373 U.S. 83 (1963).

### F. Twelfth Ground for Relief

D'Ambrosio's twelfth ground is that there was insufficient evidence to support an aggravated murder conviction or death sentence.  He claims that the testimony during trial regarding when the murder occurred, as well as the events leading up to it, fail to demonstrate that he is guilty of these

---

[42]     The Court notes the inherent unfairness in a strict application of the Trombetta standards – if it is unclear what destroyed evidence would have shown, placing the burden on a petitioner to prove materiality seems to create an impossible hurdle – once the evidence is destroyed, materiality effectively becomes unprovable.  That unfairness must have been apparent to the Supreme Court, however, and to the Sixth Circuit, who have revisited these standards and their concomitant burdens on several occasions.

crimes beyond a reasonable doubt.  The Respondent asserts that, while D'Ambrosio raised a sufficiency of the evidence claim to the Ohio Supreme Court on direct appeal, the grounds on which he raised that claim were that there was insufficient evidence of prior calculation and design and of felony-murder.  The precise grounds on which D'Ambrosio is raising this claim are not entirely clear in the Petition and Traverse.  Thus, the Court will presume that the grounds on which D'Ambrosio is asserting his insufficiency claim here are identical to those he raised in state court.[43]

In Jackson v. Virginia, 443 U.S. 307 (1979), the Supreme Court explained the standard of review a habeas court must employ when reviewing an insufficiency of evidence claim.  It concluded that the habeas court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  In applying Jackson, this Court must limit itself to evidence adduced during trial because a "sufficiency of the evidence review authorized by Jackson is limited to 'record evidence.'  Jackson does not extend to non-record evidence, including newly discovered evidence."  Herrera v. Collins, 506 U.S. 390, 402 (1993)(citing Jackson, 443 U.S.).

On appeal, the Ohio Supreme Court analyzed the evidence adduced during trial, finding there was sufficient evidence to support both charges of aggravated murder.  It correctly identified Jackson as the standard by which to review D'Ambrosio's insufficiency claims.  The Ohio Supreme Court then found that there was sufficient evidence for the panel to find that D'Ambrosio killed with prior calculation and design.  It reasoned:

> [I]n our view the evidence submitted at trial supports a finding of prior calculation and design. Defendant held the victim in the truck at knifepoint, suggesting that he gave

---

[43]     To the extent that D'Ambrosio is raising new insufficiency claims, the Court finds that they are procedurally defaulted.

"studied consideration," id., 414 N.E.2d at 1042, to using the knife on the victim. Moreover, the victim knew defendant and could identify him to police, thus militating against any suggestion that this was a random encounter. Jenkins, 355 N.E.2d at 828-829.

Defendant's actions at Doan's Creek also imply prior calculation and design. According to Espinoza, defendant watched while Keenan cut the victim's throat, leaving defendant in no doubt about the meaning of Keenan's command to "finish him off." Instead of using the smaller knife he often carried with him, he took the larger one from Keenan's hand, jumped into the creek and chased Klann through the water. Defendant stabbed the victim three times while the victim pleaded, "[P]lease don't kill me." Defense wounds on Klann's arms indicate that he resisted.

Although defendant's actions took only "a minute or two," they clearly indicate his "determination to follow through on a specific course of action," which supports a finding that he previously "adopted a plan to kill." State v. Toth (1977), 371 N.E.2d 831, 836, *overruled on other grounds*, State v. Muscatello (1978), 378 N.E.2d 738, 740, fn. 3. We therefore overrule defendant's seventh proposition of law.

State v. D'Ambrosio, 616 N.E.2d at 918-19 (parallel citations omitted).

The Ohio Supreme Court also found sufficient evidence of felony-murder to support a conviction when it opined:

Analysis of defendant's claim in this respect requires analysis and review of the indictment. The felony-murder count of the indictment (count two) does not state which subsection of R.C. 2905.01 defendant was charged with violating. However, count three of the indictment, the kidnapping count, lists the elements of kidnapping under R.C. 2905.01(A)(1) and (A)(3). Reading count two in *pari materia* with count three, we believe that the state had to prove the elements of kidnapping under R.C. 2905.01(A)(1) or (A)(3) in order to convict defendant on count two.

R.C. 2905.01(A) provides in pertinent part:

"No person, by force, threat, or deception * * * shall remove another from the place where he is found or restrain him of his liberty, for any of the following purposes:

"(1) To hold * * * as a shield or hostage;

" * * *

"(3) To terrorize, or to inflict serious physical harm on the victim or another[.]"

97

The evidence indicated that defendant restrained the victim by "force [or] threat." Flanik testified that defendant held the victim at knifepoint in the back of Keenan's truck. Defendant argues that Flanik's "visual perceptions were inaccurate." However, this court cannot retry Flanik's credibility on appeal. State v. DeHass (1967), 227 N.E.2d 212, paragraph one of the syllabus; Jackson v. Virginia, *supra*. Moreover, the trial court could reasonably find that defendant had a purpose "to inflict serious physical harm on the victim," since defendant killed him under circumstances indicating prior calculation and design.

Defendant argues that the state did not prove him guilty of the mental state required by R.C. 2905.01(A)(2), and that the state also failed to prove a violation of R.C. 2905.01(B). However, defendant was not charged under those portions of the kidnapping statute.

Id. at 919.

The Court agrees with the Ohio Supreme Court and finds that the evidence adduced during trial was sufficient, pursuant to Jackson, so that a rational factfinder could find guilt beyond a reasonable doubt. Flanik's testimony as well as Espinoza's recount of the events leading up to the murder all tended to support D'Ambrosio's guilt. This Court finds that the Ohio Supreme Court did not unreasonably apply Jackson. D'Ambrosio's twelfth claim for relief is without merit.

### G. Fourteenth Ground for Relief

In his fourteenth ground for relief, D'Ambrosio asserts that his counsel were ineffective during the mitigation phase of trial for failing to investigate his social background and family history. He takes issue with counsel's failure to request a social worker or an independent psychologist to examine him. The Respondent asserts that this claim is procedurally defaulted because, while D'Ambrosio raised this claim in his post-conviction petition to the trial court, he failed to appeal the trial court's decision to deny the claim. Thus, the Respondent contends, D'Ambrosio did not avail himself to all avenues of relief in state court. The Court agrees and finds this claim to be unexhausted

98

– because D'Ambrosio failed to raise it during his post-conviction appeal – and procedurally defaulted because the Court of Appeals would now find this claim to be time barred.[44]

This claim is without merit in any event.  As stated above, to assert a successful ineffective assistance of counsel claim, a petitioner must point to specific errors in counsel's performance. United States v. Cronic, 466 U.S. 648, 666 (1984).  Moreover, the Strickland Court held, a reviewing court must subject the allegations to rigorous scrutiny, determining "whether, in light of all circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690.

The United States Supreme Court recently expounded on this standard relative to claims that trial counsel failed to investigate and present mitigation evidence regarding a defendant's background. In Wiggins v. Smith, 539 U.S. 510 (2003), the Supreme Court held that counsel failed to investigate and present to the jury mitigating evidence during trial.  There, the Court held that trial counsel's failure to discover evidence of the petitioner's difficult childhood was a Sixth Amendment violation.[45]

---

[44]    Ohio Rule of Appellate Procedure 4(A) states:
**App R 4 Appeal as of right – when taken**
**(A) Time for appeal**
> A party shall file the notice of appeal required by App.R. 3 within thirty days of the later of entry of the judgment or order appealed or, in a civil case, service of the notice of judgment and its entry if service is not made on the party within the three day period in Rule 58(B) of the Ohio Rules of Civil Procedure.

Ohio R. App. P. 4(A).

[45]    The Court noted the extensive hardships the petitioner faced during childhood:

> [P]etitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage.  Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked.  . . .  Petitioner's first and second foster mothers abused him

99

The Court found that counsel's decision not to expand their investigation in the wake of reviewing several documents diagnosing the petitioner's mother as an alcoholic and the petitioner's placement in several foster homes was an abdication of the duties imposed on counsel pursuant to Strickland.

The Wiggins Court cautioned, however, that "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Id. at 527. While Strickland established that strategic decisions can be virtually unchallengeable, the Wiggins Court emphasized that these decisions are not immune from attack if they are founded upon an unreasonable investigation. Id. Finding that the information the petitioner's trial counsel already had reviewed triggered a duty to investigate the petitioner's background further, the Court held that trial counsel's actions were objectively unreasonable under Strickland.

Following the Wiggins Court's example, the Sixth Circuit recently held in Hamblin v. Mitchell, 354 F.3d 482, 486 (6th Cir. 2003), that courts must review trial counsel's actions in light of the American Bar Association's guidelines. Those guidelines suggest the need for counsel to explore a petitioner's medical, educational, and employment history, as well as obtain a family and social history through, *inter alia*, contact with family members. Id. at 487 n.2. The guidelines also state the necessity of reviewing a multitude of records to provide counsel with clues regarding the client's "childhood abuse, retardation, brain damage, and/or mental illness . . . ." Id.

---

physically and . . . the father in his second foster home repeatedly molested and raped him.

Id. at 2533 (citations omitted).

100

Lastly, in the recent Frazier v. Huffman, 343 F.3d 780 (6th Cir. 2003), *cert denied*, 541 U.S. 1095 (2004), the Sixth Circuit held that counsel acted in violation of Strickland.  In that case, the petitioner sustained a brain injury that impaired his brain functioning.  Id. at 794.  Although aware of this injury, counsel did not investigate its occurrence or the possible impact it may have had on the petitioner's behavior and commission of the crime.  Moreover, counsel failed to present any mitigating evidence, other than the petitioner's unsworn statement, during the mitigation phase of trial.  The Sixth Circuit held that counsel's failure to investigate could not be part of a reasonable trial strategy.  Id. at 795.  Thus, it concluded, the state court had unreasonably applied Strickland in its contrary finding.

In light of the above law, the Court finds that D'Ambrosio's claim is without merit.  Although he asserts that counsel failed to investigate his background and failed to request an independent psychologist and social worker to aid in preparing for mitigation, D'Ambrosio fails to allege that counsel's failures prejudiced the outcome of the preceding.  He cites to no information that an independent psychologist or social worker would have produced that would have aided him.  This failure is not surprising, given that the dissent in the Ohio Supreme Court appeal noted his "excellent military record" and gainful employment record were reasons why D'Ambrosio would be a good candidate for rehabilitation.  State v. D'Ambrosio, 652 N.E.2d 710, 716-17 (Ohio 1995)(Wright, J., dissenting).  Because it appears from the record that D'Ambrosio did not endure a childhood or early adulthood similar to the Wiggins petitioner, he cannot establish that, had counsel procured these experts, the outcome of his sentencing trial would have been different.  As D'Ambrosio cannot establish that his counsel's inactions prejudiced that proceeding, as he must to prevail under Strickland, the Court finds this claim is not well-taken.

101

## VIII. CONCLUSION

The Sixth Circuit has found that a district court need not wait until a petitioner moves for a Certificate of Appealabilty (hereinafter "COA") before issuing a COA for claims raised in the petition.  Castro v. United States, 310 F.3d 900 (6th Cir. 2002).  There, the Court reasoned that, because a district judge who has recently denied a writ of habeas corpus will have "an intimate knowledge of both the record and the relevant law and could simply determine whether to issue the certificate of appealability when she denies the initial petition," it stands to reason that the proper time to determine whether to grant a COA is at the conclusion of the opinion granting or denying the writ. Id. at 901 (internal quotation marks and citations omitted).

Furthermore, in two other Sixth Circuit decisions, the court held that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." Porterfield v. Bell, 258 F.3d 484, 487 (6th Cir. 2001); see also Murphy v. Ohio, 263 F.3d 466 (6th Cir. 2001)(remanding motion for certificate of appealability for district court's analysis of claims).  Thus, in concluding this opinion, it is now appropriate to determine whether to grant a COA as to any of the claims D'Ambrosio presented in his petition pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

　　　***
(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court

102

***

>(2) A certificate of appealability may issue under paragraph (1) only if the applicant
>has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA statutes,

requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole difference between

the pre- and post-AEDPA statutes is that the petitioner now must demonstrate he was denied a

*constitutional* right, rather than the federal right that was required prior to the AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the pre-

and post-AEDPA versions of the statute in <u>Slack v. McDaniel</u>, 529 U.S. 473 (2000).  In that case, the

Court held that § 2253 was a codification of the standard it set forth in <u>Barefoot v. Estelle</u>, 463 U.S.

880 (1983), but for the substitution of the word "constitutional" for "federal" in the statute.  <u>Id.</u> at 483.

Thus, the Court determined that

>"[t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial
>showing of the denial of a constitutional right, a demonstration that, under <u>Barefoot</u>,
>includes showing that reasonable jurists could debate whether (or, for that matter,
>agree that) the petition should have been resolved in a different manner or that the
>issues presented were "'adequate to deserve encouragement to proceed further.'"

<u>Id.</u> at 483-4 (*quoting* <u>Barefoot</u>, 463 U.S. at 893 n.4).

The Court went on to distinguish the analysis a habeas court must perform depending upon

its finding concerning the defaulted status of the claim.  If the claim is not procedurally defaulted,

then a habeas court need only determine whether reasonable jurists would find the district court's

decision "debatable or wrong."  <u>Id.</u> at 484.    Specifically, the petitioner must "demonstrat[e] that

jurists of reason could disagree with the district court's resolution of his constitutional claims or that

jurists could conclude the issues presented are adequate to deserve encouragement to proceed

further."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).  A more complicated analysis is required,

103

however, when assessing whether to grant a COA for a claim the district court has determined procedurally defaulted.  In those instances, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  Slack, 529 U.S. at 484 (emphasis supplied).

After taking the above standard into consideration, the Court finds that four issues merit further review.  The Court discusses each claim and its defaulted status below.

First, the Court finds that D'Ambrosio's first ground for relief (actual innocence) merits issuance of a COA.  While the Court found that D'Ambrosio's own trial testimony undercuts that of the four alibi witnesses, and, thus, prevents satisfaction of the extremely high Herrara standard, reasonable jurists could differ on this point (assuming a Herrara claim exists under current law).  Thus, the Court's resolution of this claim is debatable.

The Court also finds that D'Ambrosio's second ground for relief (jury waiver not knowing, voluntary, and intelligent) is debatable among jurists of reason.  While this Court found that the Ohio Supreme Court's decision on this issue was not clearly contrary to any United States Supreme Court precedent, a reasonable jurist could disagree and find that the trial court's failure to conduct a meaningful colloquy failed to ensure that D'Ambrosio's decision to forego the right to a jury trial was a knowing and intelligent one.  Thus, a jurist of reason could conclude that, the Ohio Supreme Court's decision to the contrary was an unreasonable one.  Accordingly, a COA will issue for this claim.

The Court will not issue a COA for D'Ambrosio's thirteenth ground for relief (ineffective assistance of appellate counsel for failure to raise jury waiver issue on direct appeal).  While the Court has noted that jurists of reason already have disputed the adequacy and independence of Ohio Rule

104

of Appellate Procedure 26(B) and its time for filing requirement, there is no dispute that D'Ambrosio's failure to appeal the Eighth District Court of Appeals' decision to the Ohio Supreme Court renders the claim both unexhausted and procedurally defaulted. A reasonable jurist would not debate this conclusion.

Conversely, D'Ambrosio's third ground for relief (ineffective assistance for failure to request presiding judge's recusal) is debatable among reasonable jurists. First, a reasonable jurist could find that, when reviewing this ground for relief, the Ohio Supreme Court did not correctly identify Strickland v. Washington, 466 U.S. 688 (1984), as the United States Supreme Court precedent under which it must review D'Ambrosio's ineffective assistance of counsel claim. Moreover, a jurist of reason could conclude that, because Judge Corrigan accepted Espinoza's testimony in co-defendant Keenan's trial, he possessed an inherent bias against D'Ambrosio when presiding over his trial. Thus, a reasonable jurist could conclude, counsel's failure to file a recusal motion was unreasonable conduct that prejudiced the outcome of the trial. Accordingly, a COA will issue for this claim.

No COA will issue for D'Ambrosio's fourth and fifth grounds for relief (ineffective assistance of counsel for filing a "boilerplate" motion to suppress and subsequently withdrawing that motion), because these claims are procedurally defaulted. It is unequivocal that D'Ambrosio's failure to raise the fourth ground for relief at any point in his state court proceedings renders that claim procedurally defaulted. Equally undisputable is the conclusion that D'Ambrosio's fifth ground for relief is procedurally defaulted because he failed to raise it to the Ohio Supreme Court during his first direct appeal. Reasonable jurists would not disagree.

No COA will issue for claims six, seven, eight, nine, and ten (ineffective assistance of counsel for waiving defendant's right to cross-examine Hayes, failure to request a crime scene view, failure

to request an independent pathologist and criminologist, failure to procure statement from Osborne, and failure to file a notice of alibi), on similar grounds.  D'Ambrosio failed to raise ineffective assistance of counsel on these grounds at any point during this state court appeals.  Thus, they are procedurally defaulted.  No jurist of reason would dispute this finding.

Jurists of reason could debate the Court's finding regarding D'Ambrosio's eleventh ground for relief (spoliation of evidence).  A reasonable jurist might conclude that some of the destroyed evidence was patently exculpatory and material to D'Ambrosio's defense. Alternatively, reasonable jurists may consider reshaping the burden of proof applicable where the state chooses to destroy evidence, with no explanation for doing so; in such circumstances, it may be appropriate to place the burden on the state to disprove materiality and bad faith, or at least to permit the drawing of an inference of the same in petitioner's favor.   Accordingly, the Court will issue a COA for this claim.

No jurists of reason could debate the Court's conclusion that D'Ambrosio's twelfth ground for relief (insufficient evidence), lacks merit.  As stated above, based on the evidence presented to the trial court at the time, particularly Espinoza's testimony, a rational factfinder could find D'Ambrosio guilty beyond a reasonable doubt.  Thus, no COA will issue for this claim.

Finally, the Court will not issue a COA for D'Ambrosio's fourteenth ground for relief (ineffective assistance of counsel during mitigation phase).  D'Ambrosio has failed to demonstrate what evidence counsel's alleged lack of investigation should have produced.  Without showing that defense counsel's mitigation investigation (or lack thereof) prejudiced the outcome of the penalty phase of trial, D'Ambrosio cannot substantiate his assertion of a <u>Strickland</u> violation.  No reasonable jurist would disagree.

106

This Court finds that all but one of the grounds raised by D'Ambrosio in his writ of habeas corpus are not well-taken - on the merits, or because of a procedural bar, or both.  The Court does find meritorious, however, D'Ambrosio's fifteenth ground for relief, where he challenges the constitutionality of the trial court's imposition of his conviction for aggravated murder.  Specifically, the Court finds that D'Ambrosio was denied the right to due process pursuant to the Fourteenth Amendment as interpreted in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), to be apprized of all material, exculpatory and impeachable information within the hands of the prosecution.

Accordingly, the Court grants D'Ambrosio's petition and issues a writ of habeas corpus as follows.  The Respondent shall either: (1) set aside D'Ambrosio's conviction for aggravated murder and the death sentence attendant thereto; or (2) conduct another trial.  The Respondent shall retry D'Ambrosio, or set aside his conviction and sentence for aggravated murder within 180 days from the effective date of this Order.  On this Court's own motion, execution of this Order and, hence, its effective date, is stayed pending appeal by the parties.

**IT IS SO ORDERED.**

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Date: March 24, 2006**

S:\00cv2521final.wpd

107

S:\00cv2521final.wpd