# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOE D'AMBROSIO, | ) | CASE NO. 1:00CV2521 |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | JUDGE KATHLEEN M. O'MALLEY |
| | ) | |
| MARGARET BAGLEY, WARDEN, | ) | <u>MEMORANDUM OF OPINION</u> |
| | ) | <u>& ORDER</u> |
| Respondent. | ) | |

Before the Court is a Joint Motion for Extension of Time to Comply with the Mandate to Retry Petitioner (ECF No. 211), filed by the Respondent (hereinafter, "the Warden") and the Cuyahoga County Prosecutor's Office (hereinafter, "the State") on March 4, 2009.[1]  On September 11, 2008, this Court issued a conditional writ of habeas corpus instructing the State to either set aside Petitioner Joe D'Ambrosio's (hereinafter, "D'Ambrosio") conviction and death sentence or retry him within 180 days.  (ECF No. 209.)  Although the 180-day deadline imposed by the Court's conditional writ was set to expire on March 10, 2009, the Warden and the State asked the Court to continue that deadline.  On March 5, 2009, following an on-the-record discussion with the parties, the Court issued a preliminary ruling extending its mandate for the limited purpose of allowing the parties sufficient time to file briefs and present testimony on this request in an evidentiary hearing. (ECF No. 217.)

---

[1]     At the same time, the Cuyahoga County Prosecutor's Office also moved to intervene in this action.  Because that request was supported by the Warden, was unopposed by D'Ambrosio, and appeared well-taken, this Court granted the State's request on March 5, 2009.  (ECF No. 210.)

For the following reasons, the Court **DENIES THE REQUEST TO EXTEND THE EXISTING MANDATE** and **ORDERS D'AMBROSIO'S RECORD EXPUNGED**, but will **NOT BAR THE STATE'S REPROSECUTION** of D'Ambrosio. Accordingly, the Court issues an unconditional writ of habeas corpus and orders the expungement of the existing state criminal records, but does not prohibit the State from proceeding with a reprosecution of D'Ambrosio to the extent the state courts continue to authorize such action. The Court delays its issuance of an unconditional writ for fifteen (15) days from the date of this Order, to allow time for the state trial court to resolve any bond issues raised by this ruling.[2]

### I. Procedural History

### A. Initial State Court Proceedings

This case has a lengthy history that is discussed in detail in this Court's prior rulings. *See D'Ambrosio v. Bagley*, No. 00-CV-2521, slip op. (N.D. Ohio Mar. 24, 2006). The Court, accordingly, only summarizes certain pertinent facts here.

On September 24, 1988, a jogger found the body of Estel Anthony Klann in Doan Creek in Cleveland, Ohio. Shortly thereafter, on October 6, 1988, D'Ambrosio was indicted along with co-defendant Thomas Michael Keenan (hereinafter "Keenan"), and charged with aggravated capital

---

[2]     While the Court issues an unconditional writ, the State remains free to retry D'Ambrosio on the charges in the *original* indictment. *Fisher v. Rose*, 757 F.2d 789, 791 (6th Cir. 1985) (citations omitted). Because D'Ambrosio's prior conviction is now expunged, however, it is at least arguable that his bond status could change. Because the state court appears to have taken into consideration the fact that his original conviction was vacated when making its bond determination, it is also equally possible that no change of conditions is warranted and, that it would be appropriate to reinstate the current bond. The Court leaves that determination to the discretion of the state trial judge, but allows time for the exercise of that discretion.

murder.  D'Ambrosio pleaded not guilty to the charges and proceeded to trial before a three-judge

panel on February 6, 1989.  The trial court sealed the verdict on February 9, 1989, until the

resolution of Keenan's trial. On February 21, 1989, largely on the testimony of a third co-defendant,

Edward Espinoza (hereinafter, "Espinoza"), the court pronounced D'Ambrosio guilty on all counts.

On February 23, 1989, the court sentenced D'Ambrosio to death.  The Ohio Supreme Court upheld

the conviction and sentence on appeal.  *State v. D'Ambrosio*, 616 N.E.2d 909 (Ohio 1993).

Keenan's trial proceeded before a jury, which found him guilty of aggravated murder and

sentenced him to death.  On direct appeal, the Ohio Supreme Court reversed Keenan's conviction.

*State v. Keenan*, 613 N.E.2d 203 (Ohio 1993).  After retrial, Keenan again was convicted and

sentenced to death in 1993.  The Ohio Supreme Court upheld this conviction and death sentence.

*State v. Keenan*, 689 N.E.2d 929 (Ohio 1998).

**B. Federal Habeas Proceedings**

**1. The Petition and Evidentiary Hearing**

After his state court appeals and post-conviction efforts concluded, D'Ambrosio filed a notice

of intent to file a petition for a writ of habeas corpus with this Court on October 3, 2000.  (ECF No.

1.)[3]  After filing a petition, (ECF No. 22), D'Ambrosio subsequently filed an amended petition that

included a claim pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).  (ECF No. 81.)  D'Ambrosio

also requested and received discovery pertaining to his *Brady* claim.  (ECF No. 100.)  On December

2, 2002, the Court ordered the Cuyahoga County Prosecutor, the Cuyahoga County Coroner, the

Cleveland Police Department, and the Cleveland Heights Police Department to provide

---

[3]      Keenan also filed a petition for a writ of habeas corpus.  That petition remains
pending before another judge of this Court.

D'Ambrosio's habeas counsel with materials in their possession.  Of particular relevance to the

instant proceedings, the Court instructed the State to provide the following:

1. The complete and unredacted case files in the matter of <u>State v. D'Ambrosio</u>, Case No. CR 232189-A.

2. The complete and unredacted case files in the matter of <u>State v. Keenan</u>, Case No. CR 232189-B.

3. The complete and unredacted case files in the matter of <u>State v. Espinoza</u>, Case No. CR 232189-C.

4. The complete and unredacted case materials in the possession of the Cuyahoga County Coroner, Case No. 201989; Autopsy Case No. 57381 **as well as all materials collected and reports made by the investigating S.I.U. unit**;

\* \* \*

6. Any and all reports noting the collection and/or testing or test results of biological evidence, including but not limited to D.N.A., blood, saliva, semen, hair, fingernail scrapings that may be in the possession of the Cuyahoga County Coroner and the Cuyahoga County Prosecutor S.I.U. which were collected in relation to the investigation of Anthony Klann's murder.

(ECF No.100, at 1-2) (emphasis added).

After believing he had acquired all Court-ordered discovery, D'Ambrosio filed a motion for

summary judgment and a motion for an evidentiary hearing.  (ECF Nos. 114; 116.)   In an Order

dated March 4, 2004, the Court denied D'Ambrosio's motion for summary judgment without

prejudice, but granted the motion for an evidentiary hearing on three of the grounds for relief raised

in the petition: actual innocence, spoliation of evidence, and the *Brady* claim.  (ECF No. 158.)

The Court held a three-day evidentiary hearing, during which D'Ambrosio developed his

*Brady* and spoliation claims by establishing that the State withheld and/or did not produce evidence

that both undermined the State's theory of how the murder occurred and implicated another

individual's motive to commit it.  Trial counsel Ralph DeFranco testified that, had he been in

-4-

possession of the alleged *Brady* evidence prior to trial, he could have impeached several of the prosecution's witnesses, especially their most crucial witness, Espinoza.  Habeas counsel also attempted to demonstrate D'Ambrosio's actual innocence through the testimony of four alibi witnesses who testified that they were with D'Ambrosio on the night of Klann's murder.  (ECF No.193, at 10-17.)

### 2. The Court's Order Granting D'Ambrosio's Petition

The Court issued an Opinion granting in part and denying in part D'Ambrosio's petition on March 24, 2006.  (*Id.*)  The Court found that D'Ambrosio's actual innocence claim was not well-taken, in large measure because of the extraordinarily high standard of review applied to such a claim.  The Court reasoned that D'Ambrosio could not demonstrate that he was "probably innocent" under the *Herrera v. Collins*, 506 U.S. 390 (1993), standard of actual innocence because of certain discrepancies between the evidentiary hearing witnesses' testimony and D'Ambrosio's own trial testimony.  (*Id.* at 76.)

The Court did, however, issue a conditional writ of habeas corpus based on the State's *Brady* violations.  The Court held that the State failed to provide D'Ambrosio with: (1) information that another individual, Paul "Stoney" Lewis, had a motive for killing Klann; (2) reports indicating that two detectives initially assigned to the Klann murder investigation concluded that Klann actually had been killed elsewhere and his body subsequently dumped at Doan Creek; (3) a cassette tape of a call to police from Angelo Crimi, who implicated other suspects in Klann's murder; (4) trace evidence reports indicating that Klann was not wearing shoes or undershorts when his body was discovered; and (5) a police report in which Linda Hudak stated that she saw Klann alive the night *after* the State

-5-

asserted Klann was killed. (ECF No. 193, at 62.)[4]  Because of these violations, the Court ordered the

Respondent either to set aside D'Ambrosio's conviction for aggravated murder and his sentence of

death or to retry him within 180 days.[5]  (*Id.* at 107.)  On its own motion, the Court stayed its issuance

of the conditional writ pending the parties' appeal.

The parties cross-appealed the Court's decision, which the Sixth Circuit affirmed in

*D'Ambrosio v. Bagley*, 527 F.3d 489, 499 (6th Cir. 2008).  The Sixth Circuit found that, "[b]ecause

the evidence that the prosecution suppressed would have had the effect of both weakening the

prosecution's case and strengthening the defense's position that someone else committed the murder,

there is a reasonable probability that the outcome of the trial could have been different." *Id*.  It

thereafter issued its mandate.  (ECF No. 208.)  On September 11, 2008, this Court issued an order

in compliance with the Sixth Circuit's mandate, stating that, "[t]he Respondent shall either: (1) set

aside D'Ambrosio's convictions and sentences as to all counts of the indictment, including the

sentence of death; or (2) conduct another trial.  This shall be done within 180 days from the effective

date of this Order."  (ECF No. 209.)  The Court also lifted the stay of the proceedings, permitting

D'Ambrosio's retrial to go forward. (*Id.*)

### C. The State Court Retrial

---

[4]      The relevance of these various items of evidence is discussed at length in this
Court's March 24, 2006 Opinion.  (ECF No. 193.)  The Court does not repeat that
discussion here, but incorporates it by reference.

[5]      The Court also reviewed D'Ambrosio's spoliation claim, but ultimately decided it
was unnecessary to "resolve this issue [because] . . . much of the evidence
D'Ambrosio asserts the state later destroyed was withheld from the defense at the
time of the trial in violation of *Brady v. Maryland*, 373 U.S. 83 (1963)." (ECF No.
193, at 75.)

In September, 2008, the State requested a retrial, which Cuyahoga County Common Pleas Court Judge Joan C. Synenberg set for March 2, 2009, eight days before the expiration of the conditional writ.  Defense counsel filed a motion for discovery on November 3, 2008 and a supplemental motion for discovery on December 23, 2008.[6]  (ECF Nos. 222-3; 222-4.)  The State did not respond in writing to either request.  In early January 2009, D'Ambrosio's counsel asked the State for an inventory of all materials in its possession, but the State declined to provide one.  Instead, the State turned over a searchable, indexed CD-ROM of Keenan's second trial (hereinafter, "*Keenan* II CD") and informed defense counsel that the State intended to present the same evidence at D'Ambrosio's retrial that it used to convict Keenan.  Not satisfied that the State had provided all discovery to which D'Ambrosio was entitled, D'Ambrosio's counsel complained to the state court regarding the inadequacy of the State's compliance with its discovery obligations under Rule 16 of the Ohio Rules of Criminal Procedure.  The trial court ordered the State to supply the defense with all pertinent discovery by no later than February 13, 2009.  (ECF No. 214-2, at 17.)  After furnishing the defense with certain additional discovery, including a never-before disclosed tissue sample taken from Klann, the State filed a notice on February 20, 2009, indicating that defense counsel had "actual possession or actual knowledge" of all discoverable materials relating to the matter.  (ECF No. 222-6.)  On that same day, the State also represented to the trial court that "[the defense] has everything and they've had everything from day one."  (ECF No. 218-2, at 12.)

### 1. The State's Discovery of Additional Evidence

Late in the day on February 20, 2009, Matthew Meyer, an Assistant Cuyahoga County

---

[6]     D'Ambrosio's counsel filed this written motion after the State indicated that it would not provide <u>any</u> discovery for the retrial in the absence of a formal request. (ECF No. 218, at 10.)

Prosecutor assigned to D'Ambrosio's retrial, contacted defense counsel and disclosed that some evidence gathered in the course of Klann's murder investigation remained in the Cleveland Police Department's possession and had not been produced previously to D'Ambrosio's counsel.  On February 23, 2009 the parties appeared before Judge Synenberg to discuss these new discovery materials.  Meyer informed the court that, on February 20, 2009, he discovered that four envelopes containing two soil samples, one latent boot print, and blood samples taken from D'Ambrosio's apartment during the course of the murder investigation were still in the Special Investigation Unit (hereinafter, "SIU") lab.  (ECF No. 214-3, at 7.)  He assured the trial court that he had immediately alerted defense counsel upon learning of the existence of these materials.  (*Id.*)  At the close of the February 23, 2009, proceedings, Judge Synenberg informed the parties that she would address the implications of this newly discovered evidence at a hearing already scheduled for the following day, February 24, 2009, and specifically would address a defense motion to continue the trial as a sanction for the State's delayed discovery.

### 2. The Defense Motion for Sanctions

On the morning of February 24, 2009, D'Ambrosio filed a written motion for sanctions for failure to comply with Ohio Rule of Criminal Procedure 16.  In that motion, D'Ambrosio asked the trial court to sanction the State by either: (1) dismissing the case in its entirety; (2) dismissing the capital aspects of the case; or (3) continuing the trial date to allow the defense sufficient time to test and assess the newly discovered evidence.

### i. The February 24th Hearing

The state court and the parties convened to consider, among other matters, the defense motion for sanctions.  Counsel for D'Ambrosio, Jeffry Kelleher, argued that the discovery of this evidence

and production of the other new evidence on February 13, 2009 had collectively "changed the landscape of [the] case as far as the defense [was] concerned." (ECF No. 215-2, at 16.)  He claimed, for instance, that, while D'Ambrosio's prior counsel had been aware that police had recovered blood evidence from D'Ambrosio's apartment based on his own trial testimony, "the substance itself" had neither been subjected to DNA analysis, nor matched to any individuals. (*Id.* at 23.)   Kelleher emphasized that, while the County Coroner had testified at some point during trial that there were *no* blood samples taken from Klann that were suitable for testing, the defense "learned subsequently in the last week and a half that there are histological samples, meaning tissue and/or swabs of . . . blood or other bodily fluids, taken from  Klann that may well be suitable for DNA testing." (*Id.*)

The State thereafter recounted what had occurred on February 20, 2009.  Mark Mahoney, the lead prosecutor, explained:

> What the state learned was that the actual items existed and the envelopes were shown to us.  We immediately, upon learning that information, within an hour, contacted Mr. Tobik and asked him Friday at, I believe, 3:30, to come over to our office.  I want the court to be aware that once the state was aware of the existence of those envelopes, we had immediately contacted the defense.

> I know that this case has a history.  It has a history with finding prosecutor misconduct, *Brady* violations, and the like.  Those occurred in 1988 and 1989.  Today when the state became aware of this, we immediately notified the defense, because these attorneys are aware of our obligations.

(*Id.* at 34.)

Meyer also disclosed that the state was unaware of the envelopes "because copies of the envelopes were not in the State's file for our inspection."  (ECF No. 215-2, at 37-39.)  He indicated that he had only learned of this evidence himself when he called the SIU lab on February 20, 2009, which he had done to verify that the State had disclosed all evidence pertaining to the Klann murder

investigation.[7]  Meyer explained that the State had relied on averments of the Cleveland Law Department (made in 2002 in response to this Court's discovery order) when it mistakenly assured the trial court that *all* evidence had been turned over to D'Ambrosio.  (*Id.* at 60.)

While the State contended that D'Ambrosio's counsel also had been remiss in not asking about the physical evidence, since the record of the earlier Klann-related trials contained evidence that most of these items had been gathered during the initial investigation,[8] it did not deny that D'Ambrosio's desire to test this evidence was reasonable.  The prosecution asked Judge Synenberg to deny D'Ambrosio's motion to dismiss the indictment or the death-penalty specifications therein, and, instead, encouraged the Court to continue the trial so as to "get to the trial in a way that is constitutionally appropriate."  (ECF No. 215-2, at 55-6) ("Given the state of the evidence, I think it would be appropriate to continue to accomplish forensic testing.").

### ii. The February 25th Ruling

On February 25, 2009, the state court reconvened the proceedings and ruled on D'Ambrosio's motion for sanctions.  Judge Synenberg delivered a ruling from the bench in which she accepted the State's proposal that she impose the least restrictive sanction available and continue the trial to allow for forensic testing of the newly located evidence in the four SIU envelopes.  She held: "This Court will not proceed with another unconstitutional trial.  The parties do not dispute that due process

---

[7]     While it is unclear why Meyer did this given his earlier representations that all materials had been produced, it appears to have been prompted by Tobik's inquiry about the adequacy of the State's disclosure's, which, in turn, was prompted by his surprise over the production of the Klann histological samples in mid-February 2009.

[8]     Meyer maintained that the defense especially should have known about the existence of blood evidence, because D'Ambrosio had testified about the blood found in his apartment during his trial.

-10-

requires a testing of the evidence.  Justice requires a continuance." (ECF No. 239, February 25, 2009 transcript, at 5.)[9]

### 3. The State's Post-February 25, 2009 Conduct

The trial court held another pre-trial hearing on March 2, 2009.  At that point, the State attempted to file a written brief in response to the same motion for sanctions the Court had heard and ruled upon the previous week.  The trial court did not accept this belated filing, indicating that no previous request had been made to submit it and that the matter was fully resolved.  (ECF No. 214-4, at 38.)

The court then turned to the question of how long the previously granted delay in the trial should be.  Despite its earlier indications that a continuance was both reasonable and necessary to assure a "constitutionally appropriate" trial, the State now claimed it wished to go forward with the trial prior to this Court's  March 10, 2009, deadline.  The State maintained that it did not wish to test any of the physical evidence prior to trial, and that the defendant's request to do so was unreasonable in light of the limited relevance of the evidence.  The State argued that the court should proceed with the trial without further delay.  The defense vigorously objected to the State's posture, arguing new evidence was indeed relevant, and pointing out other remaining concerns regarding discovery that still needed to be addressed.  Judge Synenberg declined the State's request to reconsider her

---

[9]    While this particular transcript was not filed by either of the parties, it is part of the record of the very proceedings the parties have asked this Court to consider. The Court may take judicial notice of the existence of prior proceedings and the record in the case before it, or in closely related cases; as to the February 25, 2009, transcript, the Court does so.  Fed. R. Evid. 201(b)(2); *Rodic v. Thistledown Racing Club, Inc.,* 615 F.2d 736, 738 (6th Cir. 1980).

earlier ruling and continued D'Ambrosio's trial until May 4, 2009.[10]   (ECF No. 211-3.)

The State then asked Judge Synenberg to recuse herself, asserting that she could not be impartial.  (*Id.* at 45.)  The State claimed it had evidence that she had represented Keenan in connection with Klann's murder while in private practice in 1993.  This assertion surprised the Judge, who said the State's claim was inaccurate.  Judge Synenberg invited the State to file a motion seeking her recusal if it had information it believed would merit such a request.

### D. Return to Federal Court

After the trial court reset the trial for May 4, 2009, the State and Warden filed the Joint Motion for Extension now pending before the Court.  As noted above, the State and the Warden ask the Court to expand the time within which it may retry D'Ambrosio until some point after the now-scheduled state trial date.

On March 6, 2009, the Court held a conference and issued a preliminary order extending the deadline in its mandate.  It also barred retrial to give the parties an opportunity to brief the issue and to allow the Court to conduct an evidentiary hearing and issue this ruling.  (ECF No. 217.) D'Ambrosio filed a brief in opposition to the motion, to which both the State and the Warden filed replies.  (ECF Nos. 222; 223; 224.)   Also filed with the Court were hearing transcripts, orders, and

---

[10]     At this point in the proceedings, the prosecutor became combative with the trial court.  As the trial court described:

The Court:    Your remarks have been personal, Mr. Meyer. This Court is not going there. You mischaracterized things.  Off the record you said that I called you a liar. You made that up. I never did any such thing.

(*Id.* at 79.)  The trial court thereafter admonished counsel to act professionally. (*Id.*)

journal entries from the state court proceedings.  Finally, the State filed a document it characterized as "supplemental authority," which was a copy of an Affidavit of Disqualification filed with the Ohio Supreme Court in which the State seeks to disqualify Judge Synenberg from presiding over additional proceedings in this matter.  (ECF No. 225.)

After considering the briefs, the Court conducted the hearing on April 1 and 2, 2009.

### 1. Mahoney Testimony

The State first called Assistant Cuyahoga County Prosecutor Mahoney to testify.  His testimony focused on the degree to which he believed the defense should have known about, or could have procured, the SIU envelopes and their contents.  Mahoney stated that information regarding the contents of the four envelopes had been provided to D'Ambrosio through the *Keenan* II CD.  (ECF No. 237, at 11.)  He explained that he previously had informed defense counsel that the State would use the witnesses and exhibits from the *Keenan* II trial to reprosecute D'Ambrosio.  Mahoney also observed that the police reports noting the collection of soil and blood samples had been turned over to the defense by no later than the habeas proceedings in this Court.  Moreover, he maintained, the defense must have known about the blood sample collections, because D'Ambrosio testified about them during Keenan's trial, where he had explained that he had cut himself and that the blood was his own. (*Id.* at 17.)  Mahoney argued that, though the defense was aware of the blood evidence, it failed to request a review of it.

Mahoney's testimony about his own knowledge of the envelopes was contradictory.  He first testified that he personally knew of the existence of the envelopes prior to February 20, 2009.[11]  This

---

[11]     Mahoney testified:

I was aware that the envelopes existed.  I knew they existed and I knew where

was surprising, because he had asserted the opposite before the state trial court. When this Court queried Mahoney about this striking inconsistency, and read portions of his testimony from the February 24, 2009, hearing to him, Mahoney equivocated, stating either that he "misspoke" when he expressed his surprise at discovering the envelopes to Judge Synenberg, or that, because he was preoccupied with trying another capital case at the time, he was confused. (ECF No. 237, at 52.) Mahoney, confusingly, even avoided answering directly whether he was aware that the envelopes themselves had been provided previously to the defense.  After several attempts by defense counsel and the Court itself to elicit a direct response, Mahoney finally conceded that he "wasn't aware that these photocopies, the envelopes themselves, had been photocopied and provided to the defense," but again asserted that the defense should have realized that any physical evidence in this case could be procured from the appropriate Cleveland Police Department homicide unit.  (ECF No. 237, at 54.)

Mahoney then discussed at length his understanding of the State's discovery obligations, in large measure repudiating the expansive view of those obligations espoused to the state court by he and Meyer on February 23 and 24, 2009.  Specifically, Mahoney explained his belief that the State had no obligation to search for or produce physical, tangible items of evidence unless and until defense counsel orally requested the production of specific items, or sought review of items housed at specific locations.  Mahoney asserted that, because references to the collection of blood and soil samples could be found upon review of the original police reports, which, in turn, were referenced

_____

> they likely would be found.  Again, whether it's narcotics that are seized in a traffic stop, a firearm, any type of physical evidence from any type of a crime, a fingerprint from an aggravated burglary that was committed in 1995, if I needed to know where that was I would contact the law enforcement agency.  And I would know exactly where to go.
> (ECF No. 237, at 51.)

in the *Keenan* II trial and were locatable through a search of the *Keenan* II CD, defense counsel was obligated to identify and ask to see those items of evidence before the State was obligated to search for them.  When pressed on whether it was his view that D'Ambrosio's two written requests for the production of all tangible items in the State's possession were insufficient to trigger the State's obligations to produce the blood and soil samples, Mahoney said yes.

At the hearing, Mahoney's evasiveness regarding the State's discovery obligations was palpable, and somewhat frustrating.  Although it is difficult to convey on the printed page, the following lengthy excerpt from his testimony gives an impression of his reluctance to answer the simple question of whether he believed defense counsel failed to ask for the evidence in the SIU lab.

> [BY MR. LEWIS:]
> . . .
> In this case you said to Mr. Tobik, you know what, I'm going to get a conference room at the SIU Department, and I'm going to lay out all the physical evidence the state has in its possession, and you know, here it is, here it is, because I know that you filed this written discovery request in 2008, November 2008, so here it all is, here it is on the table. You did that. You're saying that you did that in this case?
>
> A. If Mr. Tobik, Mr. Kelleher, and although he's not an attorney of record, Mr. Lewis, if they had made that request that would have been accomplished.
>
> Q. You agree with me that it wasn't accomplished in this case?
>
> Mr. Dowling: Objection.
>
> A. I agree.
>
> THE COURT: Overruled.
>
> Q. Okay. So your view is that the request was never made; is that right?
>
> A. Outside of the veiled general reference for Mr. Tobik that was never followed up upon, I received no verbal or written request from the defense to review every piece of physical evidence.
>
> Q. And you didn't view this November 2008 filing, which is a written document filed

with the state court requesting tangible objects, you didn't view that as request from Mr. D'Ambrosio's counsel to view tangible objects?

MR. DOWLING: Objection.

THE COURT: Overruled.

THE WITNESS: May I see that document, Your Honor?

THE COURT: Sure. It's the one that was on the screen before.

THE WITNESS: It's no longer on the screen.

MR. LEWIS: May I approach the witness, Your Honor?

THE COURT: Yes. Why don't you let him have a copy of it.

THE WITNESS: Thank you, Mr. Lewis. What again was your question?

BY MR. LEWIS:
Q. My question is, did you view this November 2008 written discovery request filed in the state court as a request to see tangible objects in the possession of the state in this case? Did you view it that way or not?

A. I reviewed this as all filings, I reviewed it. I know it to be a standard discovery request that ask for books, papers, documents, photographs, tangible objects, buildings, or places, or copies of portions thereof which are material for preparation of the defense or intended for use by the prosecuting attorney as evidence at trial.

Q. In response to this November 2008 written discovery request, Mr. Mahoney, very simple question, did you view it as a request to see the physical evidence that was in the possession of the state in 2008?

A. No.

Q. You did not view it that way?

A. No.

. . .

(Recess had.)

. . .

-16-

BY MR. LEWIS:

Q. Where we left off, Mr. Mahoney, was you didn't view the November 2008 discovery request filed by D'Ambrosio as a request for the state to come forward and produce the physical evidence it had in its possession; isn't that right?

A. I viewed this request under Criminal Rule 16 as my obligation to make available for photocopy or inspection all items that the state intended to use at trial or that may be material to the defense.

THE COURT: So that would include physical evidence, right?

THE WITNESS: Yes.

THE COURT: Okay.

BY MR. LEWIS:

Q. Okay. So that's a little different than what you told me before.

MR. DOWLING: Objection.

Q. So I want to ask a follow-up question.

THE COURT: Well, the transcript will be what it is. Okay.

BY MR. LEWIS:

Q. So you viewed the November 2008 discovery request filed by D'Ambrosio as requiring the state to come forward and either produce, or put out on a table, or make available physical evidence in the state's possession?

A. If requested to by the defense attorneys, as I indicated, yes. If Mr. Tobik, Mr. Kelleher, or you, Mr. Lewis, had come to me and said look, we would like you to pull all the items from the Cleveland Police Department and have them made available in the conference room, or I've done it in a jury room, but again I would not take physical possession of an item of evidence and disturb a chain of custody or potentially disturb a chain of custody, I would make them available either in my office through the detective, in the jury room, or in the example I provided earlier, at a local law enforcement agency.

Q. Okay. Let's just assume for a minute in your mind that the request that you were waiting for had been made. Okay. You were waiting for something. And had something occurred, some request been made in your mind, you would have taken some action; is that right? That action included let's setup a meeting in the conference room and we'll put it all on the table.

-17-

A. If Mr. Tobik or anyone else had made an oral request, or otherwise, I would have taken the steps necessary to accomplish[] that, yes, absolutely.

Q. And the steps that you would have taken are that you would have arranged for a meeting at the location of where the physical evidence was so that defense counsel can come over and look at the table and see the physical evidence that the state had in its possession. That's one way you would do it, isn't it?

A. That is one of a couple of ways that I would achieve that.

Q. Okay. And it's your testimony that the written request filed by the state court in November of 2008 was insufficient to you to start taking the steps necessary to effectuate what you just told us you would do? Do you understand what I'm asking, sir?

A. No, I don't.

Q. Okay.

A. Honestly.

Q. You laid out a number of steps that you would take if in your mind a proper request had been made of you to produce physical evidence; is that right?

A. It was.  And I did produce the evidence by way of the CD.  I mean the CD had all of the --

Q. I'm not talking about the CD, Mr. Mahoney. We only have a limited amount of time here. So let's focus on what I'm asking you, sir.

MR. DOWLING: Objection.

Q. I'm talking about physical --

THE COURT: I understand the debate with respect to the CD. Let's just talk about the physical evidence. And whether that's meaningful or not, [is] up to me to decide.

THE WITNESS: Understood.

THE COURT: Okay.

BY MR. LEWIS:
Q. I'm talking about physical evidence. You laid out for me the steps that you would

-18-

take, sir, if you, in your mind, had a proper request from defense counsel to produce physical evidence, right? I mean we talked about that right?

A. Um-hum. Yes.

Q. And my question to you is, you did not view this written discovery request filed in the state court as sufficient [for] you to start to take the steps that you've outlined you would take if a proper request had been made; isn't that right?

A. I would indicate, Mr. Lewis, that typically, and routinely defense attorneys would ask me specifically, I would like to see all of the evidence, or I would like to see portions of it. If it was voluminous, such as the Parma case, then I would contact the law enforcement agency and we would go to them. If it was something that could be carried, or hand carried, or in a box, or so, it would be brought over either to my office or to the jury room in a particular case. That's how it is done. That is how I have done it for 16 years. And again, to be real clear, had the gentlemen for the defense made any request whatsoever to see any specific item of physical evidence, whether it was available within the Cleveland Police Department or like the drugs that were destroyed, I would have taken all of the necessary steps to make sure that that was done. I believed that I had covered my duty and responsibility because I had given them, as I indicated, the blueprint for the entire case by way of the CD, and then the oral discovery that had been exchanged between the parties.

THE COURT: So I guess -- I'm just trying to get an answer to the question. So you're saying that that written request wasn't enough, you had to have an oral follow-up to that request to trigger your obligation?

THE WITNESS: Typically, Your Honor, the defense attorney asks. By way of example, if this were a narcotics case --

THE COURT: Okay. I understand. But really he asked you a question. And if the answer is no, I didn't think that was enough, that's fine. But you still haven't answered the question. So he gives you a written request for discovery, and you -- what you're saying is that, no, you didn't think that was enough to trigger it, you needed something more?

THE WITNESS: My answer, to nail it down then, would be, yes, Your Honor. I was waiting for the defense to say to me when can we go see this stuff, how can we best accomplish it, will it be in your office, will it be in the jury room, or do we have to get you to come with us to the Cleveland SIU lab. I mean it was done in this case on February 27 when Mr. Tobik made a request to go over and see the items, that was accomplished within a matter of days. I was not present because I was in Judge Stuart Friedman's room in trial. When Mr. Tobik made that request it was accomplished --

-19-

THE COURT: Okay.

(Doc. 237 at 73-81.)

### 2. Meyer Testimony

The State next called Assistant County Prosecutor Meyer to testify.  He indicated that his responsibilities in D'Ambrosio's retrial consisted primarily of drafting legal memoranda and conducting legal research.  Despite this limited role, Meyer explained that, prior to February 20, 2009, he did have general discussions with Tobik about discovery. He recalled that he had admonished Tobik to be specific regarding items he wished to inspect.  (*Id.* at 116.)  Meyer testified that, although the defense requested an inventory of all discoverable materials the State had in its possession, he did not feel furnishing such an inventory to the defense was required under Ohio Criminal Rule of Procedure 16.  He explained that the Rule merely required him to make the material available to the defense and that providing police reports that referred to items of evidence constitutes sufficient disclosure.

Meyer then explained that, after he learned about the four envelopes in the SIU lab, he contacted Mahoney and explained that the "actual copies of the envelopes" may not have been produced to the defense.[12]  (*Id.* at 123.)  Meyer testified that he believed it was the information on the outside of the envelopes, which, in one case, described the location on the Doan Creek bed where the soil samples were taken, that needed to be produced to the defense.[13]  He stated that he believed

---

[12]     Once he found the envelopes, Meyer testified that he and Mahoney contacted Assistant County Prosecutor, David Zimmerman and Cuyahoga County Prosecutor William Mason for advice on how to proceed.  (ECF No. 237, at 140.)

[13]     This evidence is indisputably important, as is the lab report disclosing the absence of any blood residue in the soil samples themselves, because D'Ambrosio, like the original investigating officers, contends Klann was murdered elsewhere and

-20-

there was a clear distinction between the outside of the envelopes and the contents found therein and that he thought he made this distinction clear to the trial court in chambers on February 24, 2009. He also testified that he attempted to assert this distinction on the record that day but either was not clear or must have been cut-off.  According to Meyer, the distinction is important because, while the material in the envelopes may not have been subjected to forensic testing as of late February 2009, the envelopes themselves needed no such analysis.  Hence, according to Meyer, if the State had adequately disclosed the existence of the *contents* of the envelopes (*i.e.*, the soil samples, boot print, and blood swabs), the only late-disclosed discovery was the envelopes themselves.  Meyer asserted that there was nothing about the disclosure *of the envelopes* that justified the sanction granted by Judge Synenberg, so that the failure to comply with this Court's mandate should be charged to the defense, or to the errant trial court judge, not to the State.  Like Mahoney, Meyer took the position before this Court that the defense had an obligation to ask specifically for the production of the blood and soil samples before the State had an obligation to look for or produce them.

Once again, it is worth noting that, like Mahoney, Meyer was less than precise in responding to certain questions from defense counsel and the Court.  For example, when asked whether he was truthful in his representations to the state court, Meyer responded "[a]s much as I could be under those difficult circumstances."  (Doc. 237 at 143:3-4.)  A longer colloquy between the Court and Meyer, in which the Court questions Meyer regarding his above response, illustrates his tendency to evade when discussing his interactions with the state court:

---

transported thereafter to Doan Creek.  This theory is directly at odds with the testimony of the State's key witness, Espinoza; evidence supporting it would, thus, provide fodder to undercut the credibility of the entirety of Espinoza's testimony.

THE COURT: Now, you said that on the 20th when you discovered this information you immediately contacted your supervisors. And then apparently after discussions with them you then made the conclusion that you had to immediately disclose it to the defendants, right?

THE WITNESS: Yes. I mean that was --

THE COURT: So is it fair for me to assume that you felt that it was important, and that it was important to turn it over?

THE WITNESS: Well, yes. I mean, and again, primarily the facts described on the envelope were what we thought was important.

THE COURT: Okay. And in fact you later said that to Judge Synenberg that it was important to turn it over immediately, right?

THE WITNESS: Yes.

THE COURT: So then three days later on Monday, the 23rd you appear before Judge Synenberg and you actually discuss the envelopes and discuss the issue and your decision that they -- that it should be disclosed immediately, right?

THE WITNESS: That's right.

THE COURT: And at the end of that hearing she says "Tomorrow we're going to discuss counsel's desire to have sanctions relating to this late disclosure." She says that at the end of the hearing on the 23rd, doesn't she?

THE WITNESS: It is in the transcript, yes.

THE COURT: You think the transcript -- the court reporter made it up?

THE WITNESS: I don't recall personally her making that comment. I know that I exited the proceedings fairly quickly. And the proceeding discussion we had in chambers really was --

THE COURT: Wait. Wait. Wait. I'm sorry. But it says -- you actually respond after she says that.

THE WITNESS: Did I?

THE COURT: Yes. I mean so you couldn't have been out of the room. She says, "okay. We'll address this issue with respect to bail and we'll continue tomorrow" . . . And then she says, . . . "Well, counsel requested going on the record tomorrow to

-22-

have a hearing on the motion to continue trial based on this evidence that has not yet been tested and that was recently discovered by Mr. Meyer." And then she turns to you and says, "Mr. Meyer, thank you for your diligence in honoring your ongoing duty to the defense. I'll see everybody tomorrow at 11:00." So you're saying you weren't in the room when she was talking to you?

THE WITNESS: You know, I was fairly distracted when she said that. I don't recall her saying those precise words personally. I can tell you though that I do recall the context of the discussion she had in chambers with me immediately before that took place. And the context of that discussion was the defense counsel wanted DNA testing. They were very concerned that DNA testing would go beyond the date of the Court's mandate. And I mean I honestly don't recall the discussion about sanctions. The record speaks for itself. So if I'm guilty of not paying attention on that particular point, then I am.

THE COURT: So then the next day, the 24th, you get there and you agree that there is no place on the record at all where there is ever a request to file a written response to the defendant's motion.

THE WITNESS: I'm sorry?

THE COURT: That there is no -- you said you asked to file a written response, but it doesn't appear on the record anywhere, does it?

THE WITNESS: No, I didn't state that on the record.

THE COURT: All right. And then on your point of strategy, it may have been a strategy to not ask for any additional time, but in fact Mr. Lewis is correct, not only did you not ask for more time you actually said, "let's not take a break at all. Let's work right through lunch and get to this."

THE WITNESS: I think Mr. Mahoney said that, mainly because he wanted to get to his capital trial. The discussion that Mark and I had mainly was that we thought she was going to dismiss this murder case and we thought it best not to put on the record what we had said outside, because outside the Judge gave us a very negative response. And it's just a matter of not wanting to, I guess.

THE COURT: I mean you have been a lawyer for a long time. You understand the importance of a record, don't you?

THE WITNESS: Yes, I do.

THE COURT: I'm just trying to establish you never said on the record that you wanted any continuance and in fact asked for no break, right?

-23-

THE WITNESS: That is what got said, yes.

THE COURT: All right. And then this concerned me, because when Mr. Lewis asked if you were honest with the state court judge you said "as honest as I could be." What in this record is a falsity? I mean what did you say to the state court judge that was untrue?

THE WITNESS: I was mainly concerned with what I hadn't been able to evaluate in, particularly in, Mr. D'Ambrosio's summary judgment materials. So when I stood up and answered those questions that the Judge and defense counsel were putting to me, it was mainly because I had only had the chance to read the transcript in some detail on the issues that they were raising. I had not had a chance to carefully evaluate the federal habeas corpus material. So I just didn't feel that my knowledge at the point I was answering those questions was complete.

THE COURT: That's fine. But you read this since then, right?

THE WITNESS: Yes.

THE COURT: We have a whole proceeding, we've got all of these exhibits. So what did you say that wasn't true?

THE WITNESS: I can't recall one specific instance of me saying something that was not true. I do point out though --

THE COURT: You said you can't recall, or can not --

THE WITNESS: I don't know of anything I said that wasn't specifically true. If I had had a chance to carefully evaluate and research the material before doing that hearing I probably would have had these police reports and SIU lab cards at my disposal to demonstrate to Judge Synenberg and defense counsel that we were litigating a point that was really already known.

THE COURT: But it wouldn't change the fact that the envelopes weren't already known, right?

THE WITNESS: Right. And I stand by the statements I made there.

THE COURT: Okay. . . .

(ECF No. 237, at 149-54.)

### 3. The Petitioner's Witnesses

Upon conclusion of the State's testimony,[14] the defense called D'Ambrosio's former habeas counsel, John Joseph Bodine, Jr., to testify.  Bodine stated that, during the time he represented D'Ambrosio, he received no notice that any physical evidence from the Klann murder investigation remained in existence at the Cleveland Police Department and that no physical evidence other than certain knives seized after the murder had been produced in response to this Court's discovery order. (ECF No. 237, at 176.)

The defense also called Tobik to testify.  Tobik stated that he did not know that the four envelopes existed, or that their contents had been preserved, until Meyer contacted him on February 20, 2009.  Consequently, he explained, he made no request to view those specific items prior to that date.  He noted that there was no reference to the SIU envelopes in the *Keenan* II CD and there was no place in the *Keenan* II CD where the report indicating that soil samples taken from the Doan Creek area had tested negative for blood could be located.  At the conclusion of Tobik's testimony, the Court adjourned for the day.

### 4. *Keenan* II CD

Although the State heavily relies upon the *Keenan* II CD, it is clear that: (1) there is no reference on that CD to the four SIU envelopes; (2) none of the physical evidence originally stored in those envelopes was introduced at the *Keenan* II trial; (3) there is no testimony indicating that

---

[14]    The State also called Deputy Chief Ed Tomba of the Cleveland Police Department and Curtiss Jones of the Cuyahoga County Coroner's Office.  Both testified about the typical procedures their respective offices follow when they receive defense counsel's request to review evidence, disclosing that when requests to see specific items of evidence are received, they accommodate those requests.  Of course, this testimony presupposes some knowledge on the part of counsel that items of interest were actually maintained in those offices.

either the envelopes or the physical evidence in them remained in existence as of 1993, when Keenan was tried for the second time; (4) there is no reference to the tissue samples taken from Klann that were produced to D'Ambrosio's counsel for the first time on February 2009; and (5) the lab report, again produced for the first time in February 2009 that revealed that the Doan Creek soil samples had tested negative for traces of blood, was not offered into evidence in the *Keenan* II trial.[15]  It is also apparent, however, that certain facts *can* be gleaned from the *Keenan* II CD.  Particularly, there is clear reference in both the police reports and testimony to the fact that both blood and soil samples had been collected during the initial investigation in 1988.  There is, moreover, a testimonial reference to testing the Doan Creek soil samples, though not to the lab report itself.

### 5. Legal Argument

The hearing resumed on April 2, 2009, for argument on all issues raised by the parties' respective filings and the evidentiary submissions.  The parties acknowledged that there are two critical issues posed by the Joint Motion to Extend and opposition thereto:  (1) whether the State has satisfied its burden of convincing the Court that the deadline on this Court's conditional writ should be extended further; and (2) whether, if it has not, the Court should not only deny the extension, but bar reprosecution of D'Ambrosio.[16]

---

[15]     It is undisputed, moreover, that none of these items was produced in response to this Court's December 2, 2002 discovery order directing the production of all test results and all tangible items in the possession of the SIU lab that were collected during the initial investigation.

[16]     Whether one interprets the Joint Motion to Extend as a request for alternative relief – *i.e.*, seeking either an order allowing a further extension of the conditional writ, or an order affirmatively allowing reprosecution after the deadline – or views the opposition to that motion as a cross-motion to bar reprosecution, there is no material effect on the Court's analysis.  In either case, both questions must be answered.

The Warden addressed both points.  First, the Warden argued that the Court may only deny a request to extend a conditional writ where the State wholly fails to act in response to the Court's order.  The Warden argued that, because the State and D'Ambrosio's counsel had been "fighting like tigers" in preparation for D'Ambrosio's retrial, and the trial judge had conducted multiple pre-trials, this Court should acknowledge that activity and give the parties time to finish the process.  On the question of barring reprosecution, the Warden argued both that D'Ambrosio had waived his right to seek such an order because he did not ask for one in his original petition and that this Court had no jurisdiction to enter an order barring reprosecution in these circumstances.

The State focused only on whether it had made a sufficient showing to justify an extension of the Court's mandate – *i.e.*, whether it had established that it had made adequate good faith efforts to comply with that mandate and that its conduct merited additional time within which to do so.  The State left to the Warden the task of arguing the niceties of federal habeas corpus law.  The gist of the State's argument was that it had complied with all of its prosecutorial obligations, and that D'Ambrosio's counsel should have asked to see the physical evidence at SIU, or to review any other tangible items they wanted.  As a result, according to the State, the state court's sanctions order was unwarranted, and it is the defense who should be charged with any failure to satisfy this Court's deadline.[17]

D'Ambrosio's counsel, not surprisingly, disagreed with both the Warden and the State.  He

---

[17]     During oral argument, counsel appearing for the State in these proceedings vigorously argued that the prosecution had complied with all pertinent discovery obligations during the retrial process.  He did not, however, engage in the *ad hominem* attacks on the state trial judge that had characterized the post-February 25 state proceedings, and that colored the testimony before this Court.  Indeed, in closing argument, counsel did not even refer to the allegations of bias contained in the State's "supplemental authority."

argued that this is precisely the kind of case in which it is appropriate for the federal district court not only to deny any request for an extension, but to bar reprosecution.  Citing the Sixth Circuit's opinion in *Satterlee v. Wolfenbarger*, 453 F.3d 362 (6th Cir. 2006), for the applicable standard, and analogizing this case to *Morales v. Portuondo*, 165 F.Supp.2d 601 (S.D.N.Y. 2001), D'Ambrosio's counsel argued that the State's misconduct, coupled with its prejudicial effect, constitute the "extraordinary circumstances" under which the Court may, and should, bar reprosecution.  Counsel argued that the State's steadfast belief that it did nothing wrong vis-a-vis its obligations to D'Ambrosio, to the state court, and to this Court, combined with the State's willingness to re-characterize its action depending on the judicial forum it is in (*i.e.*, for "strategic" reasons) means that "we can have no faith that, unless this Court bars reprosecution, that there will be a constitutional trial." (ECF No. 238, at 83.)  Finally, D'Ambrosio's counsel emphasized that the trial court's decision to sanction the State was distinct from a defense request for a continuance and was chargeable to the State, and only the State.

After taking the matter under advisement, the Court adjourned the hearing.

## II. Analysis

### A. Collateral Estoppel Does Not Apply

Prior to addressing whether to enlarge the time for the State to retry D'Ambrosio, the Court must address the collateral estoppel argument he raises.  D'Ambrosio asserts that this Court may not examine the propriety of the State's conduct when rendering its decision, because the state court already determined that the prosecution's misconduct was responsible for the breach of the 180-day

mandate.  D'Ambrosio argues that the Court is bound by this determination and may not re-litigate it in these proceedings.  To be correct, D'Ambrosio would need to show that:  (1) the question of whether the State's conduct caused the continuance was raised and actually litigated before the state trial court; (2) a determination of that question was necessary to the outcome of a proceeding before the state trial court; (3) the proceeding in state court resulted in a final judgment on the merits; and (4) the State had a full and fair opportunity to litigate the propriety of its conduct.  *Bies v. Bagley*, 535 F.3d 520, 524 (6th Cir. 2008); *Thomas v. Thistledown, Inc.*, No. 1:05-CV-02138, 2009 WL 455305, at *5 (N.D. Ohio Feb. 20, 2009). The Court declines D'Ambrosio's invitation to truncate these proceedings or this Court's findings for two independently sufficient reasons: (1) the state court's sanctions order was not a "final judgment on the merits"; and (2) even if it were, the questions answered by the state court would not alter any conclusions reached in this Order.

In Ohio, for an order to constitute a final judgment on the merits for purposes of collateral estoppel, it must be an immediately appealable order.  *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 118 (Ohio 2006) ("Essentially, collateral estoppel prevents parties from relitigating facts and issues that were fully litigated in a previous case.  The question here is whether the previous facts and issues were 'fully litigated,' given that the case terminated with a dismissal by the plaintiffs.  The issues must have been determined by a final appealable order."); *Anderson v. Eyman*, 2009 Ohio 102, 131 (Ohio Ct. App. 2009) ("[I]n order for [collateral estoppel] to apply the issues must have been determined by a final appealable order.").  The state court order at issue was a discovery sanction ordering a continuance, which is not yet appealable because the state litigation is still pending.  *See State ex rel. Kmart Corp. v. Frantom*, 715 N.E.2d 545, 546 (Ohio 1999) ("A discovery order [can] not be reviewed in mandamus because the writ cannot be used to create an

-29-

appeal from an order that is not final."); *Maxim Fin. v. Dzina*, No. 65206, 1993 Ohio App. LEXIS 5748, at *21 (Ohio Ct. App. Dec. 2, 1993) (contrasting a discovery sanction generally from a sanction that results in dismissal); *accord United States v. Elkins*, No. 96-20152, 2003 U.S. Dist. LEXIS 6441, at *10 (W.D. Tenn. Apr. 17, 2003) ("[A]n order for discovery sanctions is not a final order for purposes of appeal."(quotation omitted)) (federal law); *State v. Cecil*, 533 So. 2d 884, 885 (Fla. Dist. Ct. App. 1988) (finding that a discovery sanction excluding a crime victim's testimony was not a final order) (Florida law); *cf. Banks v. Ohio Physical Med. & Rehab., Inc.*, 2008 Ohio 2165, ¶16 (Ohio Ct. App. 2008) (noting that certain discovery issues are now immediately appealable).[18] Because the state court order is not one that could be immediately appealed, collateral

---

[18]     The Ohio Annotated Code was recently amended to reverse a long line of cases holding that <u>no</u> discovery orders were immediately appealable.  *Compare* ORC Ann. 2505.02 *with, e.g.*, *Walters v. Enrichment Ctr.*, 676 N.E. 2d 890, 892 (Ohio 1997); *Humphry v. Riverside Methodist Hosp.*, 488 N.E. 2d 877 (Ohio 1986).  Although the Ohio courts have not yet had the opportunity to comment extensively on the scope of this change, this Court does not believe that it makes a discovery sanction continuing a criminal trial immediately appealable, so long as that continuance does not trigger some diminution of a party's rights in the Ohio courts.  *See* ORC Ann. 2505.02 (B) (noting that for an order to be immediately appealable under this section of the Ohio Code, it must be "a proceeding ancillary to an action, including, but not limited to, a proceeding for a preliminary injunction, attachment, discovery of privileged matter, suppression of evidence" that prevents a party from receiving a "meaningful or effective remedy by an appeal following final judgment as to all proceedings, issues, claims, and parties in the action").

        A continuance, even as the result of a discovery sanction, does not ordinarily operate to deprive parties of their ultimate rights.  It is, moreover, unlikely that Ohio intended to make such a routine function of a trial court immediately appealable.  Indeed, the early cases interpreting the amendments to the Ohio Code seem to confine the scope of immediately appealable discovery orders narrowly to those ordering disclosure of privileged information, trade secrets, or other confidential information.  *See Legg v. Hallet*, 2007 Ohio 6595, P15 (Ohio Ct. App. 2007) ("Generally, discovery orders are interlocutory and not immediately appealable."); *Delost v. Ohio Edison Co.*, 2007 Ohio 5680, P4 (Ohio Ct. App. 2007); *accord Finley v. First Realty Prop. Managment*, 2007 Ohio 2888, P10 (Ohio Ct. App. 2007) ("The trial court's decision that the issues of liability

-30-

estoppel cannot apply.  *Pac. Emplrs. Ins. Co. v. Sav-A-Lot*, 291 F.3d 392, 399 (6th Cir. 2002) ("Here, there was not final judgment on the merits.  The doctrines of res judicata and collateral estoppel thus have no potential application in this case.").

Even if collateral estoppel did apply, it would not operate in the manner D'Ambrosio urges. Collateral estoppel bars only the reconsideration of issues actually determined by another tribunal. *Thomas*, 2009 WL 455305, at *5.  Although some of the factual issues might be the same and, consequently, barred from reconsideration, the legal issues are quite different: the standard applied by a federal habeas court in determining whether to issue an unconditional writ or to bar reprosecution is not the same as the standard applied by an Ohio trial court in determining whether to issue a discovery sanction.  If collateral estoppel did apply, it would compel this Court to determine that the State, rather than D'Ambrosio, was responsible for the delay, but it would not compel any particular legal conclusion flowing from that determination.  *See id.*  This Court, as explained more fully below, reaches the same conclusion as the state court regarding the delay, but does so independently of the state court determination.  *Id.*[19]

---

and punitive damages should be tried together did not affect any of appellant's substantial rights which determined the action, or prevented a judgment, nor was it an order that affected a substantial right in a special proceeding."); *cf. State v. Upshaw*, 852 N.E.2d 711, 715 (Ohio 2006) (considering ORC Ann. 2505.02 (B) in a criminal case).  It seems unlikely that Ohio courts would deviate from these general rules when a particular continuance does not deprive any litigant of a concrete remedy.

[19]  Although not ultimately determinative of this issue, the State's argument that it was not given a full opportunity to litigate the propriety of its conduct cannot be ignored, particularly given the amount of time devoted to this issue by both parties.  The record of the state court proceedings, as submitted by the parties in connection with this motion, contradicts the State's contention that there was some deficiency in the trial court's proceedings.  Indeed, it seems that the trial court went out of its way to be fair to the State, ultimately choosing not only the mildest form of sanction, but the very form of sanction suggested by the State.

As for the scope of the hearing, the court conducted three on-the-record

## B. Issuance of Unconditional Writ

The purpose of a habeas court's issuance of a conditional writ is to afford the state an opportunity to remedy its error.  As the United States Supreme Court opined, "Conditional writs enable habeas courts to give States time to replace an invalid judgement with a valid one." *Wilkinson v. Dotson*, 544 U.S. 74, 87 (2005); *see also McKitrick v. Jeffreys*, 255 F.3d Appx. 74, 75-6 (6th Cir. 2007) ("District courts rightly favor conditional grants of the writ, which, in addition to providing the state an opportunity to cure its constitutional errors, maintain comity among co-equal sovereigns.").  When a district court issues a conditional writ, an unconditional writ "lies latent unless and until the state fails to perform the established condition, at which time the [unconditional writ] springs to life." *Gentry v. Deuth*, 465 F.3d 687, 692 (6th Cir. 2006) (citations omitted).

---

proceedings to address the issue, notified the parties in advance that the adequacy of the State's compliance with its discovery obligations would be addressed in those proceedings, and gave all parties an opportunity to be heard.  Given the time constraints under which the state court was operating, all parties were provided with more than an adequate opportunity to "litigate" the matter.

That the prosecution was not given additional time to brief the impact of its own discovery violation, moreover, does not cast doubt on the adequacy of the proceedings. *See Rainey Bros. Constr. Co. v. Memphis & Shelby County Bd. of Adjustment*, No. 97-5897, 1999 WL 220128, at *3 (6th Cir. Apr. 5, 1999) ("[S]tate proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause in order to qualify for the full faith and credit guaranteed by federal law."); *Moore v. Rees*, No. 06-CV-22, 2007 WL 2809844, at *11 (E.D. Ky. Sept. 25, 2007) ("[F]ederal courts . . . afford full faith and credit to all state court judgments entered in compliance with the requirements of the Due Process Clause....[A] federal district court [does not] sit as a de facto federal appeals court."); *Zawierucha v. DiMatteo*, No. 00-3198, 2001 WL 1580228, at *1-2 (E.D. Pa. Dec. 10, 2001) (same).  This is particularly true where there is no record that a request for a briefing schedule was ever made by the State and where the State concedes that – for its own "strategic reasons" – it never asked for a continuance of the hearing on D'Ambrosio's request for sanctions.

Ultimately, while this Court concludes that collateral estoppel does not apply, it does so because the state court ruling did not constitute a final appealable order, not because the matter was not fully and fairly litigated; it was.

A habeas court retains jurisdiction to determine whether the state has complied with the conditions set forth in the conditional writ.  *Gentry*, 465 F.3d at 692.  Once the district court has determined that the state has not satisfied the conditions in the writ, it is appropriate for the court to order the immediate release of the petitioner.  *Satterlee v. Wolfenbarger*, 453 F.3d 362, 369 (6th Cir. 2006); *Fisher v. Rose*, 757 F.2d 789, 791 (6th Cir. 1985).

### 1. Extension of the Conditional Writ

Notwithstanding the seemingly absolute language of a conditional writ, a district court retains the equitable power to extend the writ in the face of non-compliance.  *Harvest v. Castro*, 531 F.3d 737, 742 (9th Cir. 2008) ("Despite the absolute language employed by some jurists and commentators, several of our sister circuits have nevertheless held that a district court can modify its conditional order even after the expiration of the time period set in the order, thus allowing the State to retain the petitioner in its custody even when the State failed to act within the prescribed time period."); *see also McKitrick*, 255 Fed. Appx. at 76 ("Despite the seemingly rigid language on which Petitioner relies for his request, *Satterlee* does not require immediate release in all cases where a term of the conditional writ was not performed precisely as ordered."); *but see Wilkinson*, 544 U.S. at 87 (Scalia, J., concurring) ("[T]he consequence [for failure to comply with a conditional writ] is always release.").

The Sixth Circuit, in accord with its sister circuits, has concluded that full compliance with a conditional writ is not *always* required.  In *McKitrick*, the Sixth Circuit held that a district court "must make a finding concerning the sufficiency of the actions the state has taken pursuant to the district court's mandate, and it also must evaluate the prejudice to the petitioner by any non-compliance.  Substantial compliance with the terms of the order may be sufficient."  255 Fed. Appx.

at 76 (citations omitted).

The habeas petitioner in *McKitrick* moved the district court for his immediate release when the state failed to resentence him within the 90 days prescribed in the conditional writ order. *Id.* at 75. Because the state had resentenced the petitioner on the 91st day, however, the district court held that the state's substantial compliance with the conditional writ was sufficient to deny the petitioner's motion. *Id.* at 76. Finding that district courts enjoy broad discretion to determine whether an extension of the conditional writ is justified, the Sixth Circuit concluded that the district court did not abuse its discretion in finding in favor of the state. *Id.* at 77-8.

Other district courts in this Circuit have relied on *McKitrick* to extend conditional writs where the State has substantially complied with its terms. In *Foster v. Money*, No. 05-CV-1009, 2008 WL 4148594 (N.D. Ohio Sept. 4, 2008), for example, another judge on this Court held that the state had substantially complied with the conditional writ that required the state to commence retrial within 120 days or tender a new plea offer to the petitioner. *Id.* at *1. The court held that, because the delay was occasioned by the petitioner's requests for new counsel and two defense requests for a trial continuance, the state had substantially complied with the court's 120-day mandate. *Id.* at *2. Even more recently, in *Brown v. Curtis*, No. 07-CV-14038, 2009 WL 236692 (E.D. Mich. Feb. 2, 2009), a district court held that the state substantially complied with its conditional writ requiring the state to make factual determinations regarding the petitioner's speedy trial claim. In *Brown*, the state court conducted a hearing that involved the taking of testimony and appointment of counsel for petitioner during the hearing, although these actions were not required to satisfy the mandates of the writ. *Id.* at *2. Thus, *McKitrick* and its progeny offer some guidance to the Court, both as to the existence of its authority to extend its own conditional writ and of the types of factors the Court may consider

-34-

in deciding whether to exercise its discretion to invoke that authority.

Other circuits also have addressed the scope of this equitable power.  In *Gilmore v. Bertrand*, 301 F.3d 581 (7th Cir. 2002), the Seventh Circuit took an expansive view of it, holding, "[l]ogically, the equitable power of the district court in deciding a habeas corpus petition includes the ability to grant the state additional time beyond the period prescribed in a conditional writ to cure a constitutional deficiency."  *Id.* at 582-83.  It affirmed the district court's decision to extend the time in the conditional writ despite the state's failure to act, although it did not discuss its reasons for doing so in the opinion.

The Third Circuit's decision in *Gibbs v. Frage*, 500 F.3d 202 (3d Cir. 2007), offers more guidance on the equitable considerations a court should assess when deciding whether to extend the mandates of a conditional writ.  There, the district court issued a conditional writ requiring the state to retry the petitioner within 120 days.  *Id.* at 204.  The district court granted the state's request for an extension of the retrial period when it found that: (1) the petitioner objected to the appointment of the public defender as his counsel; (2) the public defender's father was a police officer who investigated the homicide of which the petitioner was convicted, causing his removal; (3) the petitioner's counsel requested a continuance of the trial; and (4) the 120-day time period in the mandate was based on the Pennsylvania state law speedy trial rule, which excludes delays attributable to the defense.  *Id.* at 209-10.   In reaching this conclusion, *Gibbs* relied in part on *Chambers v. Armontrout*, 16 F.3d 257, 261 (8th Cir. 1994), an Eighth Circuit decision also holding that evidence that the petitioner partially caused the delay in retrial is one equitable factor that can support a state's request to extend the time in an existing mandate.

Finally, in *Harvest v. Castro*, 531 F.3d 737 (9th Cir. 2008), the Ninth Circuit reversed a

-35-

district court's decision to extend the mandate period in a conditional writ when the state failed to act because of the state attorney general's "professionally inexcusable" inadvertence.  *Id.* at 741. There, the attorney general assigned to the case failed to provide the district court's conditional writ order to the county prosecutor's office until after the mandate period had expired.  Reviewing the state's request for an extension of time as a Rule 60(b) motion, the Ninth Circuit held that the state failed to demonstrate that its actions were caused by "circumstances beyond its control."  *Id.* at 749. It therefore concluded that the district court abused its discretion in modifying the conditional writ.

Because circuit courts, including the Sixth Circuit, have yet to establish a definitive test for the exercise of a district court's equitable power in these circumstances, the Court must synthesize existing authority to determine what equitable factors fairly inform the exercise of its discretion when faced with a motion to modify a conditional writ.  First, as both the courts in *Gibbs* and *Chambers* Courts concluded, a district court should consider whether the petitioner's actions either wholly or partially caused the delay.  Second, it is clear that *McKitrick* requires this Court to evaluate the extent to which the State undertook to comply with the writ.  In this regard, because the request to extend a conditional writ is a request for equitable relief directed to the discretion of the district court, the Court must look for more than the mere presence of *some* activity by the State; substantial compliance presupposes that the activity undertaken by the State is *meaningful* activity, activity that represents a good faith effort to comply with the mandate of a conditional writ.  Finally, while not mentioned specifically in the above case law, logic would dictate that this Court examine all aspects of the parties' respective responses to this Court's order and give due weight to *any* relevant equitable considerations.[20]

---

[20]     In its original motion the State described its burden vis-a-vis the requested
extension as an obligation to show both that it had made good faith efforts to

## 2. Equitable Considerations Before This Court

Ultimately, this Court must inquire whether it is equitable to extend its 180-day mandate. *Harvest*, 531 F.3d at 744. The Court concludes it is not.

### a. The State's Discovery Violations

It is now beyond dispute that the State failed to comply with its discovery obligations during D'Ambrosio's first trial.  As the Court found in its March 2006 Memorandum of Opinion, the State withheld significant materials that would have undercut meaningful aspects of its case during D'Ambrosio's original trial.  Some of this potential evidence, moreover, such as the Angelo Crimi tape and certain items of bloody clothing, no longer exist.  In addition, as emphasized during the evidentiary hearing, the State was ordered by this Court in 2002 to produce all reports and materials collected by or in the possession of the SIU lab.  It is against this backdrop that the State's actions upon retrial, its view of its own discovery obligations, and its criticism of the defendant's diligence must be measured.

D'Ambrosio began the retrial process with some basic understandings. First, he and his counsel knew that certain physical evidence collected during the initial 1988 investigation had been destroyed by the time he filed his habeas petition.  Second, they were aware that, in 2002, this Court ordered the production of all tangible items and lab reports collected in 1988, including items in the possession of the SIU.  Third, they knew that few tangible items were produced in response to this

---

comply with the mandate (citing *Gibbs*) and that there was good cause to allow an extension in the circumstances presented.  The "good faith" to which the State refers corresponds to the qualitative evaluation of the pretrial activity *McKitrick* counsels this Court to undertake.  The "good cause" prong, to which all parties referred in the hearing on this matter, seems to correspond to the weighing of all relevant equitable considerations that occurs whenever a motion is addressed to the sound exercise of a court's discretion.

-37-

Court's order and that many items that unquestionably existed at some point or points in time prior to 2002 were not produced at that time.  And, finally, they knew that it was the State's discovery failures during D'Ambrosio's first trial that prompted this Court and the Sixth Circuit to set aside D'Ambrosio's convictions.  With these understandings, it was fair for D'Ambrosio's counsel to proceed on the assumption that the State had complied with this Court's order in 2002 (as it averred it did in affidavit form at the time), that any physical items referenced in the initial reports but not yet produced no longer existed, and that the State would be hyper-vigilant with respect to its discovery obligations upon retrial.

These assumptions were understandably reinforced by the fact that, in response to two written discovery requests for the production of tangible physical evidence in the fall of 2008, and an oral request for an inventory of such evidence in January 2009, no additional physical items of evidence were produced prior to February of 2009.  Indeed, while defense counsel's suspicions were heightened when histological samples from Klann and the Doan Creek soil sample lab report were produced for the first time in mid-February, those productions were made in response to a specific state court order to produce *all* discovery.  Certainly by February 13, 2009, defense counsel had the right to assume that if additional items of physical proof still existed they already would have been produced.[21]

---

[21]     As noted, several items of evidence originally collected in 1988 no longer exist.  Several of these were referenced in this Court's original habeas order. They include: an audio tape of a witness implicating others in Klann's murder, a pile of bloody clothing in Keenan's garage, and Keenan's truck, which the State allowed a repossession company to procure without a thorough search of it beforehand.  The Court now has been informed, moreover, that the blood swabs that should have been stored in one of the four SIU envelopes at issue here are missing.  No one knows whether, how, or why those swabs were taken or destroyed; there has been speculation about what might have caused their disappearance, but no more.

Though all of these assumptions were fair ones given the state of the record, as it turns out, they were neither accurate, nor, from the standpoint of protecting D'Ambrosio's interests, particularly wise.[22]  Instead, as detailed at the hearing before this Court, the State proceeded (and

This Court does not address any implications that may arise from the destruction of these various pieces of evidence (except to the extent it is relevant to the prejudice prong of its *Satterlee* analysis, *infra*).  The state court must address these issues in the first instance and only then, post-exhaustion of state court review and with the appropriate deference to the conclusions reached there, may this Court consider the constitutional implications of the current state of the record evidence.

The Court notes that state courts have broad powers to address spoliation of evidence claims.  Indeed, the state court could:  (1) exercise its discretion to dismiss the case against D'Ambrosio entirely, *see Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv.*, No. 90-256, 139 F.3d 912 (Table), at *3 (10th Cir. Feb. 20, 1998) (*citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); *Plasse v. Tyco Elecs. Corp.*, 448 F. Supp. 2d 302, 311 (D. Mass. 2006); *Gibbons*, 514 N.E.2d at 135; (2) instruct the jury to draw an adverse inference against the state regarding the missing evidence, *see Brokamp v. Mercy Hosp.*, 726 N.E.2d 594, 608 (Ohio Ct. App. 1999) ("Where evidence which would properly be part of the case is within the control of the party whose interest it would naturally be to produce it, and without satisfactory explanation he fails to do so, the jury may draw an inference that it would be unfavorable to him."); *cf. Davison v. Cole Sewell Corp.*, 231 Fed. Appx. 444, 451 (6th Cir. Ohio 2007) ("Ohio courts normally would require a strong showing of malfeasance – or at least gross neglect – before approving such a charge.") (citing *Brokamp*, 726 N.E.2d at 608-09); (3) allow, but not *require*, the jury to draw an adverse inference regarding the missing evidence, *see One Beacon Ins. Co. v. Broad. Dev. Group, Inc.*, 147 Fed. Appx. 535, 541 (6th Cir. 2005) ("[A]n instruction permitting, but not requiring the jury to draw such an inference is a particularly mild sanction for spoliation.") (citation omitted); *cf. Munns v. Csx Transp.*, No. 07-CV-2507, 2009 WL 805133, at *6 (N.D. Ohio Mar. 27, 2009) ("Although I decline to give an adverse inference instruction, [the defendant] may question [the plaintiff] as to the whereabouts of his time books to inform the jury that [the plaintiff] no longer has them. It is up to the jury to decide the effect of the missing time books and how much weight should be assigned to the fact that they are no longer available."); (4) bar any discussion of the missing evidence whatsoever, *see Glover*, 6 F.3d at 1329; *Minton v. Honda of Am. Mfg.*, 684 N.E.2d 648, 667 (Ohio 1997); or (5) fashion any other remedy it deems appropriate.

[22]     In its attempts to shift responsibility for its untimely discovery of the four evidence envelopes to defense counsel, the State cites *Strickland v. Washington*,

-39-

continues to proceed) on the assumption that it had no affirmative obligation to search for and produce any still-existing tangible items of evidence, even in response to written discovery requests from defense counsel seeking the production of such material.  The prosecutors involved steadfastly hold to the belief that it was the defendant's burden to identify the evidence that was gathered during the initial murder investigation – by reference to the *Keenan* II CD and the record of the habeas proceedings in this Court – and orally request the production or review of any items so identified.

The State's discovery posture is not only unrealistic given the state of the record described above, it is inconsistent with the legal obligations imposed upon it by long-established legal precedent.

As the United States Supreme Court has held, the State's obligation in a criminal proceeding "is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).  A prosecutor has as much of a  "duty to refrain from improper methods calculated to produce a wrongful conviction as . . . to use every legitimate means to bring about a just one." *Id.* As it relates to discovery specifically, while a defendant certainly has a duty to be vigilant in seeking exculpatory evidence, or potentially exculpatory evidence, a defendant is not required to "scavenge

---

466 U.S. 668 (1984), its progeny, and the American Bar Association guidelines for capital defense attorneys for the proposition that it is defense counsel's obligation to seek and obtain favorable evidence.  (ECF No. 211, at 10-12.)  This duty to investigate, however, is triggered only when "known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

Here, even if the *Strickland* standard were applicable to this Court's inquiry, defense counsel's actions were simply not unreasonable; counsel had no reason to suspect that additional physical evidence existed and there were multiple bases on which to conclude it did not.  There was no trigger that would have necessitated counsel's further investigation.  As the Court outlines above, counsel's reliance on the State's repeated assurances that it had complied with this Court's and the state court's discovery orders, while subsequently proven to be misguided, was not deficient under *Strickland*.

-40-

for hints of undisclosed *Brady* material." *Banks v. Dretke*, 540 U.S. 668, 695 (2004); *see also State v. Campa*, No. C-010254, 2002 WL 471174 (Ohio Ct. App. Mar. 29, 2002) ("As this court has repeatedly noted, it is the state's continuing obligation under *Brady* and Crim. R. 16(B)(1)(f) to supply the defense with evidence that is favorable to the accused.  Crim. R. 16(B)(1)(f) mandates that, as here, upon motion of the defendant, the state must disclose to counsel for the defendant all evidence, known or which may become known to the prosecuting attorney, favorable to the defendant and material either to guilt or punishment.") (citations omitted); *State v. Roughton*, 724 N.E.2d 1193, 1200 (Ohio Ct. App. 1999) ("[W]e find the repeated failure to make full, timely disclosure of evidence deplorable . . . . [The State] showed a woeful lack of comprehension of the purpose behind the discovery rules in this state; to provide full disclosure of evidence to the accused before trial so that due process is served.").  This is particularly true, moreover, when the prosecution has represented, in this case repeatedly so, that all such material has been disclosed.  *See Banks*, 540 U.S. at 695.

Particularly in light of the State's past, repeated failures to comply with its discovery obligations, the Court is taken aback that the State, at this juncture, continues to view its own discovery obligations so narrowly.  Like the state trial court, this Court finds that the State violated its discovery obligations during the retrial proceedings and that its current effort to deny that fact is unpersuasive.

### b. The State's Delay

It is unquestionably the State's failure to timely comply with its discovery obligations that delayed D'Ambrosio retrial proceedings beyond March 10, 2009.  Despite an order from this Court and two defense requests for discovery, it was not until the state trial court issued an order for the

State to comply with these requests on February 13, 2009, that the State finally took any real action. Perhaps most disturbingly, the State did not contact the SIU lab until after the State filed a notice that it had supplied the defense with all material discovery and until less than two weeks before D'Ambrosio's retrial was scheduled to begin.

This Court finds, as did the state court, that the trial delay was not occasioned by the defense. Instead, it was the State's delay in complying with its Rule 16 discovery obligations, combined with the inexcusable, 20-year delay in producing four highly relevant evidence envelopes,[23] histological samples from the victim, and a lab report that is directly supportive of D'Ambrosio's theory of how the murder occurred that necessitated the continuance. While defense counsel did request sanctions, one of which was a continuance of the trial, the defense was by no means the *cause* of the delay. Thus, though the Warden tried hard to characterize the state pre-trial proceedings as vigorous, the Court finds that no vigorous or even particularly meaningful efforts were undertaken on the part of the State until close to the eve of trial.

### c. The State's Changing Legal Theories

In assessing whether equity demands, or even supports, the State's request for an extension of the mandate, the Court cannot ignore the State's willingness to change its legal posture based on its view of the strategic benefits in doing so. As noted above, avowedly out of fear that its case against D'Ambrosio might be dismissed by the state court, the State pleaded for mercy in the state court proceedings, was expansive and generous in its acknowledgment of its own discovery

---

[23]     While prosecutor Meyer contended, both before the state court and this Court that the blood samples were not relevant, that contention is simply not plausible. As Meyer conceded during the evidentiary hearing, the blood evidence was referenced during the state case-in-chief during one or more of the Klann-related murder trials: clearly, that evidence was considered relevant at the time.

-42-

obligations, and conceded that a continuance of the then-scheduled trial was both reasonable and constitutionally appropriate.

Having gotten what it asked for from the state court, the State then began its reposturing, apparently based on its belief that *this* Court would be less inclined to extend the mandate if it found the State in any way responsible for the failure to satisfy it.[24]  First, the State began a concerted effort in the state court to attack the impartiality of the state court judge and to recast the events leading up to the February 25, 2009 order granting a continuance beyond the then-current mandate deadline. The State then sought to bring that record into this Court in order to convince this Court that it was the defense and the allegedly biased state court judge who made compliance with this Court's order impossible, not the State itself.[25]

During the hearing before this Court, the prosecutors handling D'Ambrosio's case before the state court testified that their production of discovery as not only adequate, but expansive, even when to do so flew in the face of their own on-the-record statements to the trial court.  To get there, the

---

[24]  Ironically, had the State come to this Court on February 25, 2009, or immediately thereafter, and taken the same expansive view of its discovery obligations it initially took in the state court, explained its discovery failures by overwork or inexperience (based on Meyer's need to assist Mahoney) and assured the Court of its commitment to ensure that D'Ambrosio receive the constitutionally appropriate trial to which all defendants are entitled, this Court may have had a different view of how best to exercise its discretion in this matter.  Simply put, the equities would have looked different and perhaps have tipped the balance in favor of a different conclusion.

[25]  As noted, the State filed a pleading in this Court that it cast as "Supplemental Authority" in support of the Joint Motion to Extend.  In it, the State lays out the case in support of the claim that the state trial court judge was biased against it. (ECF No. 225.)  While this Court has no authority to rule on the merits of that pleading, to use the State's words, "even a third year law student" should be aware that statements of palpable disrespect towards a judicial officer, especially snide ones, do not further a litigant's cause.  (ECF No. 225-2, at 3.)

-43-

prosecutors went so far as to characterize their statements to the state court as misstatements, or even less-than-truthful ones, to claim that there were multiple, contradictory off-the-record discussions with the state court which, for "strategic" reasons, they chose not to refer to on the record for purposes of correcting the record they now eschew, to claim they either could not recall portions of certain proceedings or must have left early (despite the absence of any indication to that effect),[26] and to claim that they were not given a full opportunity to express themselves during the lengthy proceedings addressing discovery matters.

As noted above, when this Court attempted to point out some of the obvious inconsistencies in the State's position and to elicit direct responses regarding whether the State knew about the SIU envelopes prior to February 20, 2009, counsel refused to provide a direct answer.   While Mahoney provided great detail regarding his office's standard procedure for supplying the defense with the opportunity to view physical evidence and stated that he always knew where such evidence was housed, he could not answer the Court's straightforward, simple inquiry about when *he actually* became aware of the envelopes or became aware that the physical evidence housed in those envelopes remained (or apparently remained) in existence.  (ECF No. 237, at 51.)  Even after the Court confronted Mahoney with his state trial court testimony, in which he stated unequivocally that the State *first* learned about the envelopes on February 20, 2009, he responded that he must have "misspoke" to the state trial court.  That explanation strains credulity.

### 3. The Motion to Extend the Conditional Writ Must Be Denied

As discussed above, the Joint Motion to Extend is a request for equitable relief that is

---

[26]      While it is clear that Mahoney was excused from the February 24, 2009 proceedings early, Meyer's claim that he was possibly not present on February 23, 2009, when the state court addressed maters to him by name is simply not credible.

addressed to this Court's discretion.  Weighing all the circumstances presented, the Court finds that the State's conduct does not merit an equitable extension of this Court's mandate.  While it is admittedly true that some activity did occur in the state court, it is also true that it was primarily the efforts of the state court judge that prompted that activity.  Unfortunately, the State did not approach its prosecutorial obligations with the same urgency.  The fact that the State did not respond to multiple discovery requests; produced material, relevant items of discovery on the eve of trial; and then sought to interfere with the orderly progress of the trial through gamesmanship all counsel against a finding that the State engaged in a good-faith effort to substantially comply with this Court's mandate.

For these reasons, the Joint Motion to Extend is DENIED and an unconditional writ is issued in conjunction with this Order.

### C. Expungement

D'Ambrosio also requests that the Court expunge his criminal record.  "A federal district court has the authority, in a habeas corpus proceeding, to order the expungement of a habeas petitioner's criminal records against all persons who maintain custody of such records."  *Ward v. Wolfenbarger*, 340 F. Supp. 2d 773, 776 (E.D. Mich. 2004); *accord United States v. Crowell*, 374 F.3d 790, 796 (9th Cir. 2004); *but cf. Newman v. Castellaws*, No. 06-03109, 2007 WL 1839918, at *1 (N.D. Cal. June 19, 2007) ("[R]equests to expunge records are traditionally brought as civil rights claims.").  The Sixth Circuit held in *Satterlee*, that a habeas court's broad discretion to "dispose of [a habeas] matter as law and justice require" authorizes it to expunge a petitioner's criminal record.  453 F.3d at 370; *Newman v. Metrish*, No. 04-CV-74582, 2009 WL 736820, at *1 ( E.D. Mich. Mar.

-45-

16, 2009) ("This Court has the power to order the expungement of petitioner's conviction as part of the issuance of an unconditional writ.") (citing *Satterlee,* 453 F.3d at 370); a*ccord Gentry v. Deuth*, 456 F.3d 687, 696 (6th Cir. 2006)("As a practical, logical, and necessary matter, relief from the collateral consequences of an unconstitutionally obtained state criminal conviction effectively requires expungement of the conviction from the petitioner's record . . . .").

Because the Court issues an unconditional writ vacating D'Ambrosio's prior conviction and sentence based on the State's failure to comply with the mandates in its conditional writ order, it follows that expunging the record of his unconstitutional convictions and sentences is an appropriate remedy.  The Court orders that all criminal records pertaining to D'Ambrosio's conviction and sentence of death for the murder of Estel Anthony Klann be expunged.

## D. Barring Reprosecution

### 1. A Habeas Court May Bar Reprosecution in Extraordinary Circumstances

While the circumstances under which it may do so are not clearly defined, whether a district court is permitted to bar a state's reprosecution of a habeas petitioner does not seem to remain in debate.  In *Satterlee*, the district court granted a conditional writ after finding that defense counsel never communicated the state's plea offer to the defendant.  453 F.3d at 364-65.  The district court gave the state sixty days to reinstate its original plea offer.  When the deadline passed, the petitioner applied for his immediate release, after which the district court granted an unconditional writ.  *Id.* at 365.

On appeal, the Sixth Circuit observed that, pursuant to *Fisher v. Rose*, 757 F.2d 789 (6th Cir.

1985), a state ordinarily is not precluded from re-arresting and re-trying a petitioner once a habeas court issues an unconditional writ. *Satterlee*, 453 F.3d at 370. It reasoned, however, that "in 'extraordinary circumstances,' such as when 'the state inexcusably, repeatedly, or otherwise abusively fails to act within the prescribed time period or if the state's delay is likely to prejudice the petitioner's ability to mount a defense at trial,' a habeas court may 'forbid [] reprosecution'." *Id.* (*citing* 2 RANDY HERTZ AND JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 33.3, at 1685-86). It thereafter remanded the case to the district court to determine whether it had intended to bar reprosecution.

Here, the Warden argued in her brief and during the evidentiary hearing that this Court lacks the jurisdiction to intervene in the on-going state court proceedings and that this recent Sixth Circuit caselaw to the contrary is either in error or of no effect. In particular, the Warden questioned whether the *Satterlee* holding is binding on this Court. The Warden's counsel first argued that *Satterlee* is just wrong, because it is in conflict with *Pitchess v. Davis*, 421 U.S. 482 (1975). *Pitchess*, however, stands only for the proposition that a habeas court may not intervene in a state court proceeding after the terms of the conditional writ *have been satisfied*. Because of the obvious distinction, *Pitchess* is not controlling authority here.

Counsel then contended that *Satterlee* is not controlling authority, because it conflicts with *Fisher v. Rose*, which has never been overruled. In *Fisher*, the Sixth Circuit held that a district court abused its discretion when it barred retrial after the petitioner had already been released from custody. *Fisher* did not consider the precise issue discussed in *Satterlee*, however. In *Fisher*, the district court barred retrial based only on the record that had been presented to it in the habeas proceedings. No new or extraordinary circumstances were cited by that Court in support of its bar

order.  It was in that context that the *Fisher* Court found an abuse of discretion.

The Sixth Circuit in *Satterlee*, on the other hand, after citing *Fisher*, remanded the matter to the district court for the precise purpose of assessing whether extraordinary circumstances beyond the original habeas record warranted an order barring retrial.  The holdings in the two cases are, contrary to the Warden's contention, simply not inconsistent.

Indeed, the development of the law in this Circuit since *Satterlee* suggests it *is* the controlling standard.  First, the Sixth Circuit itself has cited *Satterlee* for the proposition that jurisdiction to bar retrial in extraordinary circumstances does indeed exist.  *House v. Bell*, 287 Fed. Appx. 439, 440 (6th Cir. 2008) (Norris, J.).  District courts in this Circuit, moreover, including the *Satterlee* court on remand and this Court in *Girts v. Yanai*, No. 02-CV-264, slip op., at 4 (N.D. Ohio Nov. 6, 2008), have cited *Satterlee* as the prevailing authority regarding a habeas court's jurisdiction to bar a petitioner's retrial and as setting forth the standard by which to determine if such action is appropriate.  *See also Scott v. Bock*, 576 F.Supp.2d 832 (E.D. Mich. 2008) (following *Satterlee* holding and analyzing whether to bar state retrial pursuant to standard set forth therein).

Other circuits also are in accord with *Satterlee* that a habeas court's authority extends to barring a state's retrial of a petitioner where the circumstances are sufficiently extraordinary to warrant such an order.  *Douglas v. Workman*, 560 F.3d 1156, 1176 (10th Cir. 2009) ("Barring a new trial may be necessary, for instance, when the error forming the basis for the relief cannot be corrected in further proceedings, and it may be a permissible form of relief when other exceptional circumstances exist such that the holding of a new trial would be unjust." (citation and internal quotations omitted)); *DiSimone v. Phillips*, 518 F.3d 124, 127 (2d Cir. 2008) ("[I]n special circumstances federal courts may bar retrial of a successful habeas corpus petitioner without his

-48-

having first sought protection from retrial in the state courts. In all but the most extreme circumstances, this would be appropriate only when the grant of habeas corpus is premised on a theory which inevitably precludes further trial."); *Foster v. Lockhart*, 9 F.3d 722, 727 (8th Cir. 1993) ("A district court has authority to preclude a state from retrying a successful habeas petitioner when the court deems that remedy appropriate.  Nevertheless, this is an extraordinary remedy that is suitable only in certain situations, such as when a retrial itself would violate the petitioner's constitutional rights." (citation omitted)); *Capps v. Sullivan*, 13 F.3d 350, 353 (10th Cir. 1993) ("[A] conditional order may bar retrial if that was the intent of the district court when the order was filed."); *Heiser v. Ryan*, 951 F.2d 559, 564 (3d Cir. 1991) ("Normally, the remedy for a due process violation is not discharge.  Instead, a court faced with a violation should attempt to counteract any resulting prejudice demonstrated by the petitioner.  Nevertheless, discharge is appropriate where attempting an alternate remedy would not vitiate the prejudice of the fundamental unfairness or would itself violate a petitioner's constitutional rights." (citation omitted)).  In the face of *Satterlee*'s unequivocal holding, and the substantial case law consistent with that holding, the Court declines the Warden's suggestion that it ignore that holding.  Instead, the Court concludes, based on *Satterlee*, that an order barring retrial is proper in this Circuit in appropriate circumstances.[27]

### 2. What Circumstances Are Sufficiently Extraordinary In This Context?

---

[27]  The Warden also argued in her brief that *Satterlee* is non-binding because the authoring judge, Judge Karen Nelson Moore, cited only to a treatise, and not to existing case law, in support of her reference to a trial court's authority to bar retrial.  When pressed on this amazing assertion at the hearing, the Warden's counsel conceded that this Court is bound by the Sixth Circuit's legal pronouncements, regardless of the citations provided in support of them.  Indeed, the Warden conceded that Judge Moore could bind this Court with her words even if she cited to nothing at all.

There is little clear authority defining "extraordinary circumstances" beyond *Satterlee*'s general statement that such circumstances might exist when "'the state inexcusably, repeatedly, or otherwise abusively fails to act within the prescribed time period or if the state's delay is likely to prejudice the petitioner's ability to mount a defense at trial,' a habeas court may 'forbid [] reprosecution.'" *Satterlee*, 453 F.3d at 370. Careful consideration of two cases reaching contrary conclusions, – *Scott v. Bock* and *Morales v. Portuondo* – is instructive, however.

In *Scott v. Bock*, 576 F.Supp.2d 832 (E.D. Mich. 2008), the district court, while not specifically defining the extraordinary circumstances standard, reasoned that the court's authority should be used to bar retrial "sparingly, reserving this drastic remedy for the most outrageous cases where the prisoner languishes behind prison bars while the State remains passive in the face of accumulating prejudice to the petitioner." *Id.* at 837.  It cautioned that, unless the "constitutional violation is not redressable at a new trial, or the second trial would be especially unjust, the bar on reprosecution is difficult to justify." *Id.*  The *Scott* court found that, despite the State's inaction in meeting the conditional writ deadline, the petitioner did not demonstrate that he suffered prejudice based on the delay.  In considering whether to exercise its discretion to bar retrial, moreover, the court  found it significant that evidence of the petitioner's guilt was clear cut because he pleaded guilty rather than face retrial.[28]  *Id.* at 838.  It concluded that, based on these factors, barring reprosecution would be "an extreme remedy." *Id.*

Conversely, in *Morales v. Portuondo*, 165 F. Supp. 2d 601 (S.D.N.Y. 2001), the district court held that the circumstances presented in that case *were* sufficiently extraordinary to warrant barring

---

[28]    The state tendered its plea offer outside the 90-day requirement in the mandate. The *Scott* petitioner sought an unconditional writ after the state court accepted his guilty plea.

a state retrial.  There, the Court relied on three factors that it felt compelled the conclusion that reprosecution should be barred.  First, it found that, on the record before it, "no reasonable juror could convict [the petitioners] of murder; indeed, the evidence strongly suggests that they are innocent."  *Id.* at 609.  It based this conclusion on a number of facts: (1) that the trial evidence against the petitioners was "extremely thin," consisting of limited, questionable eyewitness testimony and no forensic evidence; (2) that this testimony was contradicted by compelling alibi witness testimony putting the petitioners elsewhere at the time of the murder; (3) that the key eyewitness was convicted of multiple crimes after the first trial, making her credibility subject to even greater attack upon retrial; and (4) that another individual had confessed to the murder and that confession had substantial indicia of credibility.

Second, the *Morales* court found the prejudice to petitioners arising from the fourteen-year delay between the original trial and retrial compelling, particularly because certain key witnesses for the defense had passed away or were otherwise unavailable for a retrial.

Finally, the court pointed to numerous improprieties by the district attorney's office as factors supporting a bar order in that case.  *Id.* at 612-15.  Among others failings, the court noted that the district attorney had failed to investigate substantial, material evidence pointing to the petitioners' innocence, failed to disclose material impeaching evidence regarding its key prosecution witness, engaged in patent improper questioning of the defendant's witnesses, and coached certain witnesses during initial witness interviews to tell the tale they wanted to hear, ignoring all statements inconsistent with the petitioners' guilt.

The Court concluded that all of these factors combined to compel the conclusion that a retrial in that case "would not serve the interests of justice."  *Id.* at 614.

-51-

### 3. This Court Will Not Bar Retrial of D'Ambrosio

After careful consideration, the Court finds that, while the State's conduct here is more affirmatively egregious than the  mishandling that occurred in *Scott*, the circumstances presented here  fall short of the compelling circumstances found in *Morales*.  Using the framework adopted by the *Morales* court, it is clear that there are material differences between that case and this one.

First, the evidence of D'Ambrosio's innocence is not as compelling as that described in *Morales*.  This Court and the Sixth Circuit did find that the *Brady* evidence not produced at D'Ambrosio's first trial would have materially undercut the prosecution's theory of its case and the credibility of its key witness.  And, both Courts found that, as a result, there was a reasonable probability that D'Ambrosio would not have been convicted of aggravated murder if all of the evidence properly had been presented to the three judge panel.  Both courts also rejected D'Ambrosio's actual innocence claim, however, because this Court found material discrepancies between the alibi testimony at the evidentiary hearing and D'Ambrosio's trial testimony.  There is, moreover, no key compelling piece of evidence – like the confession of another – that points overwhelmingly to  D'Ambrosio's innocence.   Thus, while there is certainly no clear-cut demonstration of D'Ambrosio's guilt, as in *Scott*, the evidence also does not so strongly suggest his innocence that, standing alone, the state of the evidence against him would demand an order barring retrial.

D'Ambrosio cannot demonstrate material prejudice from the additional two-month delay, moreover.[29]  While the State undoubtedly delayed the production of key discovery, the state court

---

[29]    While D'Ambrosio's counsel argued that the Court should examine prejudice from the time of his original conviction, *i.e.*, an expansive view of prejudice, the Court does not find this measure of prejudice appropriate.  Prior to filing his brief in opposition to the Joint Motion, D'Ambrosio never asked the Court to bar the

protected D'Ambrosio from the most material consequences of those discovery failures by granting a continuance to afford him the opportunity to test the blood evidence.  Although counsel argued during the hearing that D'Ambrosio was unable to procure experts in sufficient time to review and evaluate this blood evidence, it appears that such experts may no longer be necessary because the blood evidence was not actually in the envelope that should have housed it.[30]  Additionally, the trial court still can provide D'Ambrosio additional time to procure any experts it deems necessary if that is appropriate.

Going to the last *Morales* factor, the State's actions, the Court is not convinced that the State's conduct here is as egregious as in *Morales*.  While the State's discovery compliance has been woefully inadequate over the course of its dealings with D'Ambrosio (during the original trial, during this habeas proceeding and, now upon retrial), and the State's attempt to contort the reality of what occurred in state court before it returned here is both reckless and, frankly, baffling, there is no evidence of an attempt by the current prosecutors to affirmatively hide evidence or distort witness testimony.  Indeed, it appears that these prosecutors have proceeded with the firmly held belief that a constitutional trial will, in fact, again result in a conviction.

In assessing the conduct of the State, moreover, and its potential impact on D'Ambrosio's

---

State's reprosecution of him.  (ECF Nos. 22, at 36; 39, at 63; 81-10, at 3).  The Court therefore assesses prejudice more narrowly – beginning from the time the State initiated the retrial in September 2008.  While the Court does not agree with the Warden that D'Ambrosio's earlier failure to seek a bar order constitutes a waiver of the right to seek such an order now, the Court does find that the absence of the earlier request narrows the scope of the Court's prejudice analysis at this point in time.

[30]   While it is true that D'Ambrosio is prejudiced to some degree by the destruction of this and other evidence originally collected, as noted in footnote 21, *supra*, the state court has ample tools available to it to cure or at least alleviate the effects of any such prejudice.

ability to receive a fair trial at its hand, the Court cannot ignore the actions of the trial court.  As the state court itself said in its order granting D'Ambrosio's motion for sanctions, the state court is committed to conducting a constitutional trial.  (ECF No. 211-3, at 4.)  The state court's decision to delay the proceedings both benefits D'Ambrosio and ensures that the State has and will continue to honor its discovery obligations.  Because of its confidence in the trial court's ability to provide D'Ambrosio with a fair retrial, and for the reasons otherwise stated above, the Court denies D'Ambrosio's request to bar retrial.

### III. Conclusion

For the foregoing reasons, the Court **DENIES THE REQUEST TO EXTEND THE EXISTING MANDATE** and **ORDERS D'AMBROSIO'S RECORD EXPUNGED**, but will **NOT BAR THE STATE'S REPROSECUTION** of D'Ambrosio.  Accordingly, the Court issues an unconditional writ of habeas corpus and orders the expungement of the existing state criminal records, but does not prohibit the State from proceeding with a reprosecution of D'Ambrosio, to the extent the state courts continue to authorize such action.  The Court delays its issuance of an unconditional writ for fifteen (15) days from the date of this Order, to allow time for the state trial court to resolve any bond issues raised by this ruling.[31]

**IT IS SO ORDERED.**

*s/ Kathleen M. O'Malley*
_____
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**DATE: April 24, 2009**

---

[31] The Court does not stay this order pending a full appeal, however.  On appeal, the Sixth Circuit, if it so chooses, may modify this Court's Opinion and Order *post hoc*.  *Harvest v. Castro*, 531 F.3d 737 (9th Cir. 2008).  The parties can also address issues relating to a stay pending appeal to either the Sixth Circuit itself, or the state court judge, if appropriate.